1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11

HANSEN BEVERAGE COMPANY, a
Delaware corporation,

12

Plaintiff,

13

vs.

14

15

INNOVATION VENTURES, LLC dba
LIVING ESSENTIALS, a Michigan
corporation,

16

17

Defendant.

CASE NO. 08-CV-1166-IEG (POR)

**ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFF'S MOTION TO
DISMISS DEFENDANT'S
AMENDED COUNTERCLAIM**

[Doc. No. 136]

18
19
20
21
22
23

Presently before the Court is Plaintiff Hansen Beverage Company's ("Hansen") motion to dismiss Defendant Innovation Ventures, LLC dba Living Essentials' ("Living Essentials") amended counterclaim. (Doc. No. 136.) Living Essentials filed an opposition, and Hansen filed a reply. The Court heard oral argument on December 14, 2009. For the reasons stated herein, the Court grants in part and denies in part the motion to dismiss.

## BACKGROUND

24
25
26
27
28

This case involves two competing companies that produce energy drinks. Living Essentials produces a two-ounce "energy shot" under the 5-Hour Energy brand name. Hansen produces a number of products under the brand names Hansen, Monster, and Lost.

On July 1, 2008, Hansen filed a complaint against Living Essentials for false advertising in violation of the Lanham Act, as well as unfair competition, false advertising, and trade libel in

- 1 -

1   violation of California law.  (Doc. No. 1.)  On August 18, 2008, Living Essentials filed an answer.

2       On August 11, 2009, the Court granted Hansen's motion for leave to file a first amended

3   complaint asserting the same three causes of action, and docketed the proposed First Amended

4   Complaint attached to the motion.  (Doc. No. 96.)  On August 27, 2009, Living Essentials filed an

5   answer to the First Amended Complaint and asserted a counterclaim against Hansen.  (Doc. No.

6   38.)  The counterclaim set forth two causes of action: (1) false advertising in violation of the

7   Lanham Act, and (2) unfair competition in violation of California Business and Professions Code §

8   17200 and false advertising in violation of § 17500.

9       On September 16, 2009, Hansen filed a motion to dismiss the counterclaim or,

10  alternatively, to sever.  (Doc. No. 111.)  Subsequently, on October 12, 2009, Living Essentials

11  filed an amended counterclaim asserting the same two causes of action.  (Doc. No. 128.)

12      On October 26, 2009, Hansen withdrew the original motion to dismiss the counterclaim or,

13  alternatively, to sever, and filed the instant motion to dismiss.  (Doc. No. 136.)

**DISCUSSION**

15  I.    Legal Standard

16      A complaint must contain "a short and plain statement of the claim showing that the

17  pleader is entitled to relief."  Fed. R. Civ. P. 8(a) (2009).  A motion to dismiss pursuant to Rule

18  12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in

19  the complaint.  Fed. R. Civ. P. 12(b)(6); Navarro v. Block, 250 F.3d 729, 731 (9th Cir. 2001).  The

20  court must accept all factual allegations pled in the complaint as true, and must construe them and

21  draw all reasonable inferences from them in favor of the nonmoving party.  Cahill v. Liberty

22  Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996).

23      To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual

24  allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its

25  face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility

26  when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

27  the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937,

28  1939 (2009) (citing Twombly, 550 U.S. at 556).  "The plausibility standard is not akin to a

08cv1166

1   'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

2   unlawfully." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556).

3       However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

4   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

5   action will not do." Id. at 555 (citation omitted). "Factual allegations must be enough to raise a

6   right to relief above the speculative level, on the assumption that all the allegations in the

7   complaint are true (even if doubtful in fact)." Id. (citation omitted).  In spite of the deference the

8   court is bound to pay to the plaintiff's allegations, it is not proper for the court to assume that "the

9   [plaintiff] can prove facts that [he or she] has not alleged or that defendants have violated the . . .

10  laws in ways that have not been alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State

11  Council of Carpenters, 459 U.S. 519, 526, (1983).  Also, the court need not accept "legal

12  conclusions" as true. Iqbal, 129 S.Ct. at 1949.

13  II.     Request for Judicial Notice

14      Hansen attaches to its reply brief a request for judicial notice of several documents: (1) an

15  excerpt from the deposition transcript of Manoj Bhargava, Living Essentials' Chief Executive,

16  taken November 18, 2009; (2) FDA materials from the FDA website; and (3) the declaration of

17  Leslie T. Krasny, an expert in food law.

18      In ruling on a motion to dismiss for failure to state a claim, "a court may generally consider

19  only allegations contained in the pleadings, exhibits attached to the complaint, and matters

20  properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007).  A

21  court may take judicial notice of facts not subject to reasonable dispute and either "generally

22  known" in the court's territorial jurisdiction, or "capable of accurate and ready determination" by

23  reference to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201 (2009).

24      Information on government agency websites has often been treated as properly subject to

25  judicial notice." Paralyzed Veterans of Am. v. McPherson, 2008 U.S. Dist. LEXIS 69542, at *5

26  (N.D. Cal. Sept. 8, 2008); see also United States ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d

27  968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered

28  'not to be subject to reasonable dispute.'  This includes public records and government documents

1  available from reliable sources on the Internet.") (citing <u>Jackson v. City of Columbus</u>, 194 F.3d

2  737, 745 (6th Cir. 1999)).

3       The Court denies Hansen's request for judicial notice as to the deposition transcript of

4  Manoj Bhargava and the declaration of Leslie T. Krasny, as these are not matters properly subject

5  to judicial notice.  However, the documents Hansen has submitted from the FDA website are

6  properly subject to judicial notice under Federal Rule of Evidence 201, and the Court grants

7  Hansen's request as to these documents only.

8  III.    <u>Analysis</u>

9       Hansen argues Living Essentials' counterclaim should be dismissed for six reasons:  (1)

10  Living Essentials does not have standing to privately enforce the Federal Food, Drug, and

11  Cosmetic Act ("FDCA") and Federal Food and Drug Administration ("FDA") regulations through

12  its Lanham Act claim; (2) the FDCA preempts the state law claims; (3) Living Essentials fails to

13  adequately plead standing under the Lanham Act; (4) Living Essentials fails to adequately plead

14  standing under its state law causes of action; (5) the counterclaim sounds in fraud and does not

15  meet Rule 9(b)'s heightened pleading requirements; and (6) Hansen's representations about its

16  products are non-actionable puffery.     The Court addresses each argument in turn.

17         **A.**    **Standing to Enforce the FDCA**

18       Hansen's first argument is that Living Essentials does not have standing to bring the

19  Lanham Act claim because it is a backdoor attempt to enforce the FDCA or FDA regulations

20  through private action.  The issue is whether Living Essentials' Lanham Act claim constitutes

21  private enforcement of the FDCA.

22         1.    Overview of Living Essentials' Lanham Act Claim

23       Living Essentials alleges in its first cause of action that Hansen's advertising contains false

24  and misleading statements of fact about Hansen's energy products in violation of Section 43(a) of

25  the Lanham Act, 15 U.S.C. § 1125(a) (2009).  Section 43(a) of the Lanham Act provides a private

26  cause of action for "any person who believes he or she is likely to be damaged" by the use in

27  commerce of "any false designation of origin, false or misleading description of fact, or false or

28

1    misleading representation of fact" in connection with any goods or services.[1]  Id.  The Lanham Act

2    is "primarily intended to protect commercial interests" and "provides a private remedy to a

3    commercial plaintiff who meets the burden of proving that its commercial interests have been

4    harmed by a competitor's false advertising."  Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902

5    F.2d 222, 230 (3rd Cir. 1990).

6         Living Essentials' Lanham Act claim is based on Hansen's allegedly false and misleading

7    advertising and labeling of Hansen's products.  Living Essentials alleges Hansen's statements: (1)

8    promote Hansen's energy products as a means to get intoxicated; (2) mislead as to calorie and

9    sugar content; (3) mislead as to energizing effect; and (4) misbrand Hansen's products as dietary

10   supplements.

11        The original counterclaim alleged Hansen violated certain FDCA provisions.  After

12   Hansen's original motion to dismiss raised the argument that Living Essentials was attempting to

13   enforce the FDCA, Living Essentials amended its counterclaim by deleting most references to the

14   FDCA and substituting provisions of the California Food, Drug, and Cosmetic Law ("Sherman

15   Law"), codified at California Health & Safety Code §§ 109875-111915 (2009).  The Sherman Law

16   contains some identical provisions to the FDCA.  See In re Farm Raised Salmon Cases, 72 Cal.

17   Rptr. 3d 112, 118-19 (2008).

18              2.    Overview of the FDCA

19        The FDCA gives the FDA the responsibility to promulgate regulations to ensure that

20   "foods are safe, wholesome, sanitary, and properly labeled."  21 U.S.C. § 393(b)(2)(A).  By

21   contrast to the Lanham Act, the FDCA is "not focused on the truth or falsity of advertising

22   claims."  Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 230 (3rd Cir.1990).

_____

24        [1]The elements of a Lanham Act § 43(a) false advertising claim are: "(1) a false statement of
fact by the defendant in a commercial advertisement about its own or another's product; (2) the
25   statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3)
the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant
26   caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be
injured as a result of the false statement, either by direct diversion of sales from itself to defendant or
by a lessening of the goodwill associated with its products."  Southland Sod Farms v. Stover Seed Co.,
27   108 F.3d 1134, 1139 (9th Cir. 1997).  To demonstrate falsity, a plaintiff must show either: (1) the
challenged advertisement is literally false, either on its face or by necessary implication of a false
28   statement; or (2) while the advertisement is literally true, it is nevertheless likely to mislead or confuse
consumers.  Id.

1   The FDCA does not provide for a private cause of action.  See, e.g., Summit Tech., Inc. v.

2   High-Line Med. Instruments Co., 922 F. Supp. 299, 305 (C.D. Cal. 1996); Braintree Labs., Inc. v.

3   Nephro-Tech, Inc., 1997 WL 94237 at *6 (D. Kan. Feb. 26, 1997) ("[E]very federal court that has

4   addressed the question has held that the FDCA does not create a private right action to enforce or

5   restrain violations of its provisions.").  The standing provision in Section 337(a) states: "Except as

6   provided under subsection (b) of this section, all such proceedings for the enforcement, or to

7   restrain violations, of [the Act] shall be by and in the name of the United States . . . ."  21 U.S.C. §

8   337(a).  The FDA has responsibility for enforcing the FDCA and its regulations.[2]  21 C.F.R. § 7.1

9   (2009).

10                   3.      General Principles of FDCA Preclusion

11   Several cases have addressed the issue of whether Section 337 bars plaintiffs from

12   asserting a claim for violation of the Lanham Act that implicates the FDCA or FDA regulations.

13   The following general principles have emerged from the caselaw.

14   First, a Lanham Act claim requiring interpretation and enforcement of FDA regulations is

15   not properly decided as an original matter by the district court.  Sandoz, 902 F.2d at 232;

16   Braintree, 1997 WL 94237 at *6 ("A plaintiff may not use the Lanham Act as an alternative

17   vehicle by which to seek redress for an FDCA violation.").  "Application of this rule invariably

18   occurs when the FDA has failed to take a position on the particular issue that is the subject of the

19   alleged false representation comprising the Lanham Act claim."  Mutual Pharm. Co. v. Ivax

20   Pharm. Inc., 459 F. Supp. 2d 925, 934 (C.D. Cal. 2006).

21   For example, in Sandoz, the plaintiff sued Vicks for violation of the Lanham Act and for

22   common law unfair competition, alleging Vicks labeled the demulcent in its cough syrup as an

23   "inactive" ingredient.  902 F.2d at 230.  Plaintiff argued that demulcents fell within the FDA's

24   definition of an "active" ingredient.  Id.  But the Third Circuit held that because the FDA had not

25   yet determined whether its definition of the term "active" applied to demulcents, the claim was

26

27   _____

28       [2]Section 337(b) carves out an exception for States to enforce certain sections of the FDCA, provided they give the federal government 30 days notice and the opportunity to commence its own superceding enforcement action.  21 U.S.C. § 337(b)(1).

1   precluded.  Hearing the case would force the court "to usurp an administrative agency's

2   responsibility for interpreting and enforcing potentially ambiguous regulations."  Id. at 231.

3       Similarly, in Summit Technology, Inc. v. High-Line Medical Instruments Co., the district

4   court held that plaintiff's Lanham Act and state unfair competition claims were precluded. 922 F.

5   Supp. 299 (C.D. Cal. 1996) (Summit I).  Plaintiff alleged defendants failed to disclose the fact that

6   the re-imported laser systems defendants were advertising had not been approved by the FDA for

7   use in the United States.  However, the court noted that the FDA had not yet determined whether

8   or not the systems needed further FDA approval at all.  Id. at 306.  Thus, the claim would require

9   the court to "determine preemptively how a federal agency will interpret and enforce its own

10  regulations."  Id.

11      "On the other hand, once the FDA has taken a position on a particular matter, courts have

12  consistently allowed the Lanham Act claim to proceed even if in determining the falsity of the

13  alleged representation the court must make reference to the FDA action."  Mutual Pharm., 459 F.

14  Supp. 2d 925, 934-35.  Courts have held that affirmative misrepresentations are "generally

15  actionable under the Lanham Act, even if the product is regulated by the FDA."  Braintree, 1997

16  WL 94237 at *6 (citing Grove Fresh Distrib., Inc. v. Flavor Fresh Foods, Inc., 720 F. Supp. 714

17  (N.D. Ill. 1989) and Mylan Labs., Inc. v. Matkari et al.,7 F.3d 1130 (4th Cir. 1993)); Summit

18  Tech., Inc. v. High-Line Med. Instruments, Co., 933 F. Supp. 918, 933 (C.D. Cal. 1996) ("Summit

19  II") ("[F]alse statements are actionable under the Lanham Act, even if their truth may be generally

20  within the purview of the FDA.").

21      For example, in Grove Fresh, plaintiff sued a food manufacturer for Lanham Act and state

22  unfair competition violations, for representing its product as 100% orange juice, although the juice

23  contained various additives and adulterants.  720 F. Supp. at 714-15.  The defendant argued that

24  the "sole thrust" of the allegation was that it violated an FDA regulation establishing a specific

25  definition of the term "orange juice from concentrate."  Id. at 715.  The court held that nothing

26  prohibited Grove Fresh from relying on the FDA regulation "merely to establish the standard or

27  duty which defendants allegedly failed to meet."  Id. at 715-16.  Even without the FDA

28

regulation, the court held that Grove Fresh could establish a violation by providing other evidence establishing the proper market definition of "orange juice from concentrate." Id. at 715.

Similarly, in Mylan Laboratories, Inc. v. Matkari et al., the Fourth Circuit held plaintiff's Lanham Act claim was not precluded, where plaintiff alleged that generic drug manufacturers falsely represented the drugs were "bioequivalent" to plaintiff's drugs. 7 F.3d 1130, 1137-38. (4th Cir. 1993). Even though the FDA defined the term "bioequivalence," the court held that Mylan set forth sufficiently particularized allegations of false or misleading representations regarding "bioequivalence" to sustain a claim. Id. at 1138. On the other hand, the court found Mylan's other claim failed, where plaintiff alleged that by the very act of placing the drug on the market, defendants falsely represented that their drugs had been properly approved by the FDA. Id. at 1139. The court held that permitting Mylan to proceed on this theory "would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the [FDCA and its regulations]." Id. Rather, plaintiff was required to point to some affirmative misrepresentation. Id.

From these precedents, the general principle emerges that "[i]f the allegedly false or misleading nature of a statement can be easily verified, then the fact that the determination of the truth of that statement was made by the FDA is immaterial so long as the party can also show the other requirements for establishing a Lanham Act claim, that is, that the false or misleading statement is likely to deceive consumers." Mutual Pharm., 459 F. Supp. 2d at 935 (holding plaintiff's claim was not precluded where plaintiff alleged the defendant's drug labeling gave the false impression the drug was FDA-approved, but FDA had already determined what needed to be on the label and plaintiff simply argued that defendant's label did not conform).

### 4.   Hansen's Allegedly False and Misleading Statements

Hansen argues that Living Essentials' Lanham Act claim would require the Court either to determine preemptively how the FDA would rule on certain issues or contradict established FDCA precedent. Living Essentials argues that the heart of its claims is that Hansen's advertising is false and misleading irrespective of the FDCA or Sherman Law. The Court addresses each allegedly false or misleading statement separately.

//

### a.   Alleged promotion of energy products as a means to get intoxicated

Living Essentials alleges "Hansen misleads consumers through its marketing into believing that it is safe to mix its caffeinated products with alcohol or for young children to consume [excess caffeine]."  (FAC ¶ 18.)

Living Essentials contends Hansen promotes Hansen energy products to youths for use in "partying" and "as a means to achieve intoxication."  (FAC ¶ 20.)   For example, Hansen allegedly posts alcoholic drink recipes on its website, targets youths by sponsoring young athletes at sports events, and promotes at college campuses, bars, and nightclubs.  (FAC ¶¶ 21-25.)  According to Living Essentials, mixing caffeinated products with alcohol is dangerous because it leads people to drink more and engage in dangerous activities, and furthermore, mixing Hansen's products is particularly dangerous because Hansen does not disclose the content of caffeine or guarana in its products. (FAC ¶¶ 26-30.)

Living Essentials alleges violations of the Sherman Law.  First, Hansen's products are allegedly "adulterated" because they "present an unreasonable risk of illness or injury when used as directed or marketed."[3]  (FAC ¶ 17.)  According to Living Essentials, the California Department of Health Services has not approved the use of energy products as "food additives" to alcohol. (FAC ¶ 31.)  Second, Living Essentials contends Hansen's promotion of its energy products for use as intoxicants, while the products are labeled as "dietary supplements," constitutes misbranding.[4]  (FAC ¶ 33.)

_____

[3]Living Essentials specifically alleges violations of Sections 110445 (providing any added poisonous or deleterious substance, or any food additive, pesticide chemical, preservative, or color additive, shall be considered unsafe for use with respect to any food unless there is in effect a regulation adopted that limits the quantity and the use, or intended use, of that substance), 110555 (providing any food is "adulterated" if it is, bears, or contains any food additive that is unsafe within the meaning of Section 110445), and 109940 (defining "food additive" as "any substance, the intended use of which results or may reasonably be expected to result, directly or indirectly, in the substance becoming a component of the food or otherwise affecting characteristics of the food.").

[4]Living Essentials specifically alleges violations of the following Sherman Law provisions dealing with "misbranding": Sections 110505 (adopting the FDCA definitions and standards of identity, quality, and fill of container), 110665 (providing any food is "misbranded" if its nutrition labeling does not conform to FDCA requirements), 110660 (providing that any food is misbranded "if its labeling is false or misleading in any particular"), 110710 (providing any food is misbranded

- 9 -                                           08cv1166

1    This particular claim is not solely governed by an interpretation of the FDCA or FDA

2    regulations, because there is no FDCA provision or regulation regarding the use of caffeinated

3    drinks as mixers with alcohol.  See Sandoz (plaintiff alleged an ingredient was "active" within the

4    meaning of a potentially ambiguous FDA regulation).  It is also not clear whether this is an issue

5    the FDA has undertaken to or has the responsibility to resolve.  See Summit I, 922 F. Supp. 299

6    (holding plaintiff's claims were precluded where plaintiff alleged defendant failed to disclose a

7    "fact," the truth of which was being reviewed and determined by the FDA).  The FDA materials

8    which Hansen has submitted state: "the FDA is focusing on the safety of products in which

9    caffeine has been intentionally added to alcoholic beverages *by the manufacturer*."[5]  Decl. of

10   Edward J. McIntyre in Supp. of Pl.'s Mot. to Dismiss, Exhibit 3 (emphasis added).  This suggests

11   that the FDA is not primarily responsible for deciding whether it is safe for *consumers*, rather than

12   manufacturers, to mix energy drinks with alcohol.  Hansen itself states that the FDA has never

13   regulated what consumers may do with food products once purchased.  (Motion to Dismiss, 11:9-

14   12:5.)

15       To the extent Living Essentials alleges specific false or misleading statements, this claim is

16   not precluded merely because Living Essentials alleges violations the Sherman Law.  Living

17   Essentials alleges Hansen's statements, which suggest mixing caffeinated beverages with alcohol

18   is safe, are false and misleading.  Nothing prohibits Living Essentials from relying on an FDA

19   regulation "merely to establish the standard or duty which defendants allegedly failed to meet."

20   See Grove Fresh, 720 F. Supp. at 715-16.  In addition, Living Essentials can establish the falsity of

21

22   if it is represented to be a food for which a definition and standard of identity has been established by
     Section 110505, but the label fails to bear the name of that food or fails to conform to the statutory
23   definition and standard), 110745 (providing any food is misbranded if it is intended as a component
     of another food and when used in accordance with the directions of the purveyor, will result in the
24   final food being adulterated or misbranded).

25       [5]Hansen submits the FDA's Q&As on Caffeine in Alcoholic Beverages, which states: "Q5:
     Will other caffeine-related products be next?  A5: At this time, the FDA is focusing its attention on
26   products in which caffeine has been intentionally added to alcoholic beverages by the manufacturers.
     Other products containing added caffeine may be subject to agency review if the available scientific
27   data and information indicate that added caffeine may pose a safety concern, or is being unlawfully
     used, under the conditions of its use in other products. The manufacturer's continuing responsibility
28   includes marketing products with ingredients that are safe for their intended use, and are otherwise
     in compliance with the law."   Decl. of Edward J. McIntyre in Supp. of Pl.'s Mot. to Dismiss, Exhibit
     3.

Hansen's statements - i.e., that such use is not safe - by providing other evidence.  For example, Living Essentials alleges such use leads people to drink more and engage in dangerous activities, which Living Essentials can prove without reference to the FDCA.

The Court finds that this claim is not precluded by the FDCA.

<u>b.</u>    <u>Alleged statements as to calorie and sugar content</u>

Living Essentials claims Hansen's advertising and labels mislead consumers as to calorie and sugar content.  Many of Hansen's products are allegedly sold in 16-ounce cans, containing two 8-ounce servings.  (FAC ¶ 34.)  Living Essentials alleges the "Supplemental Facts" on the labels are deceptive because they are based on an 8-ounce serving, although the drinks are promoted, designed to be, and customarily are consumed in one sitting.  (FAC ¶¶ 34, 43.)  According to Living Essentials, the cans are designed to be consumed as a single serving because the can is non-resealable, has no demarcation to indicate a half-way point, and the drink will lose carbonation and the original taste if not consumed in one sitting.  (FAC ¶¶ 38-40.)   Living Essentials alleges Hansen markets the products as single 16-ounce servings, pointing to the following statements:

FAC ¶ 37: "experience a can . . . to achieve the benefits of 100 mg of EGCG"

FAC ¶ 35: "GO BIG"

FAC ¶ 36: "half the caffeine of regular coffee" but "Twice the buzz of a regular energy drink"

FAC ¶ 41: "It's definitely not soda but you can still down the whole 16-oz can"

Living Essentials alleges these statements are misleading because they "promise consumers that they will receive twice the buzz of a regular eight (8) ounce energy drink by consuming its sixteen (16) ounce can, or assuming the opposite, Hansen asserts that a single eight (8) ounce serving of Monster Energy or Lo Carb Monster is twice as effective as regular energy drinks." (FAC ¶ 35.)  Living Essentials further alleges "Hansen's deceptive serving size, calorie, carbohydrate, and sugar listings violate state labeling laws.[6]  (FAC ¶ 33.)

---

[6]Living Essentials specifically alleges violations of Sections 110290 (listing factors to be considered in determining whether labeling or advertising is misleading), 110505 (adopting the FDCA definitions and standards of identity, quality, and fill of container), 110665 (providing any food is misbranded if its nutrition labeling does not conform to FDCA requirements), 110660 (providing that

08cv1166

1    The FDA has promulgated regulations regarding determining the proper serving size.[7]  To

2   the extent that Living Essentials argues that Hansen mislabeled its product as to the serving size -

3   i.e., that the proper serving size is 16-ounces, not 8-ounces - the Court agrees with Hansen that this

4   claim is a matter more properly resolved by the FDA.  If the Court required Hansen to change its

5   labeling, it might force Hansen to violate the FDCA.  See Braintree, 1997 WL 94237 at *7 (noting

6   the possibility of such a dilemma demands that classic misbranding claims be reserved solely for

7   resolution by the FDA).  However, to the extent that Living Essentials argues that Hansen's

8   advertising misleads customers into thinking its products are twice as effective as competing

9   brands, when they are just twice as large, this claim is valid.  The Court does not need to interpret

10  or apply FDCA provisions and regulations regarding serving size to determine the truth or falsity

11  of Hansen's statements.

12   Accordingly, the Court finds that this claim is not precluded by the FDCA, to the extent

13  that Living Essentials argues that Hansen's advertising misleads customers into thinking its

14  products are twice as effective as competing brands, when they are just twice as large.  But to the

15  extent that Living Essentials argues that Hansen mislabeled its product as to the serving size, the

16  Court finds the claim is precluded.

17                   c.       Alleged statements as to energizing effect

18   Living Essentials contends Hansen misleads consumers about the energizing effect of  its

19  energy drinks by making the following false or misleading statements:

20         FAC ¶ 46: "It's a wicked mega hit that delivers twice the buzz of a regular energy
            drink." (Monster Energy)
21
            FAC ¶ 47: "Lo-Carb Monster Energy still delivers twice the buzz of a regular
22          energy drink, but only has a fraction of the calories."  (Lo Carb Monster)

23

24   _____

25  any food is misbranded "if its labeling is false or misleading in any particular"), 110670 (providing
    any food is misbranded if its labeling does not conform with the FDCA requirements for nutrient
    content or health claims); 21 U.S.C. 343(a)) (providing a food is misbranded if its labeling "is false
26  or misleading in any particular").

27    [7]Hansen cites to the following regulations: 12 C.F.R. § 101.9(b) (nutrition labeling of food,
    101.12(b) (table 2) (reference amounts to be used as the basis for determining serving sizes for
28  specific products), 101.9(b)(8)(i) (procedures for determining serving size), and 101.30(b)(1)
    (percentage juice declaration for beverages purportedly containing juice).

FAC ¶ 48: "Java Monster . . . half the caffeine of regular coffee.  Twice the "Buzz." (Java Monster products)

FAC ¶ 49: "works, tastes, and mixes as good as the original, but with only 10 calories" and provides "the energy you need to party all night with just 10 calories." (Lost Perfect Ten)

Living Essentials alleges these statement are "false and/or misleading based on the products' ingredients and generally accepted principles of biochemistry, pharmacology and physiology."  (FAC  ¶¶ 46-49.)  Living Essentials further alleges these statements violate the Sherman Law.[8]

Neither party has cited to an FDCA provision or FDA regulation regarding "energy" or the efficacy of energy products.[9]  Because, to the best of the Court's knowledge, the truth or falsity of Hansen's advertising regarding the energizing effect of its products does not require interpretation and enforcement of the FDCA or its regulations, the Court finds that this claim is not precluded.

> d.      Alleged representation of energy products as dietary supplements

Living Essentials alleges Hansen misbrands its products because Hansen labels them dietary supplements and energy supplements, but promotes them as conventional foods (beverages) and mixers for alcohol (additives) in violation of the FDCA and Sherman Law.[10]  (FAC ¶¶ 52-55.)  According to Living Essentials, under federal law, a dietary supplement cannot be represented to be a conventional food.  (FAC ¶ 57.)  Living Essentials alleges Hansen intends for consumers to ingest its products in lieu of coffee, tea, or alcoholic beverage mixers and by

---

[8]  Living Essentials specifically alleges violations of Sections 110390 (prohibiting dissemination of any false advertisement of any food, drug, device, or cosmetic, false meaning "false or misleading in any particular") and 110290 (listing factors to be considered in determining whether labeling or advertising is misleading).

[9] Hansen argues but does not explain how adjudication of this claim would require interpretation of the FDCA provisions defining adulteration, misbranding, and the term "dietary supplement."

[10] Living Essentials alleges violations of Section 343 of the FDCA (section on misbranding) and violations of the Sherman Law provisions dealing with misbranding: Sections 110100(a) (incorporating all federal food labeling regulations), 110655 (providing any food is "misbranded" if its nutrition labeling does not conform to FDCA requirements), 110710 (providing any food is misbranded if it is represented to be a food for which a definition and standard of identity has been established by Section 110505, but the label fails to bear the name of that food or fails to conform to the statutory definition and standard).

1  implication intends its own drinks to be considered coffee, tea, or alcoholic beverage mixers.

2  (FAC ¶ 57.)

3      The Court agrees with Hansen that this claim is similar to the one in <u>Braintree</u>, where the

4  plaintiff claimed defendant misbranded its product as a "dietary supplement" because defendant

5  should have submitted its product to the FDA for approval as a drug.  1997 WL 94237 at *1.  The

6  court held that plaintiff's Lanham Act claim would require the court to interpret and apply the

7  FDCA definition of "dietary supplement."  <u>Id.</u> at *7.

8      Because this is a straightforward misbranding claim best resolved by the FDA, the Court

9  finds this claim is precluded.

10              5.    <u>Summary</u>

11     The Court finds Living Essentials' claim that Hansen's statements mislead as to calorie and

12 sugar content is precluded to the extent that Living Essentials argues that Hansen mislabeled its

13 product as to the serving size,.  The Court also finds that the claim that Hansen misbrands its

14 products as dietary supplements is precluded.  The remaining claims are not precluded.

15         **B.    Preemption of State Law Causes of Action by the FDCA**

16     Hansen argues that Living Essentials' state law claims are expressly and impliedly

17 preempted by the FDCA.  Living Essentials' state law causes of action are for unfair competition

18 in violation of California Business and Professions Code § 17200 and false advertising in violation

19 of § 17500.  Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."

20 Cal. Bus. & Prof. Code § 17200 (2009).  By proscribing "unlawful" acts or practices, "Section

21 17200 'borrows' violations of other laws and treats them as unlawful practices independently

22 actionable." <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>, 83 Cal. Rptr. 2d 548, 561

23 (Cal. 1999).  Section 17500 makes it unlawful for anyone to use false or deceptive marketing

24 practices.  <u>See</u> <u>Webster v. Omnitrition Intern., Inc.</u>, 79 F.3d 776, 788 (9th Cir. 1996).

25     Living Essentials predicates the Section 17200 unlawful competition claim on alleged

26 violations of the Sherman Law.[11]  (FAC ¶ 68.)

27 _____

28     [11]Living Essentials specifically alleges violations of Section 110100(a) (adopting all federal
food labeling regulations); 110445 (unsafe food additives); 109940 (defining food additive); 110555
(defining adulteration); 110660 (defining misbranding);110655 (defining adulteration of food intended

1          1.       Relevant Legal Principles, Statutory Provisions, and Caselaw

2                  a.       General Principles of Preemption

3          "A fundamental principle of the Constitution is that Congress has the power to preempt

4  state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). United States

5  Supreme Court precedent establishes three situations in which state law is preempted. Congress

6  may preempt state law with an express provision for preemption, or Congress may implicitly

7  preempt state law by field preemption[12] or conflict preemption. Id. at 372-73. As to conflict

8  preemption, "state law is naturally preempted to the extent of any conflict with a federal statute."

9  Thus, state law is preempted "where it is impossible for a private party to comply with both state

10 and federal law . . . and where 'under the circumstances of [a] particular case, [the challenged state

11 law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives

12 of Congress.'" Id. (internal citation omitted).

13         "In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in

14 a field which the States have traditionally occupied,' we 'start with the assumption that the historic

15 police powers of the States were not to be superseded by the Federal Act unless that was the clear

16 and manifest purpose of Congress.'" Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996). Laws

17 regulating the proper marketing of food, including the prevention of deceptive sales practices, are

18 within the states' historic police powers and thus subject to the presumption against preemption.

19 In re Farm Raised Salmon Cases, 72 Cal. Rptr. 3d 112 (2008) (citing Florida Lime & Avocado

20 Growers v. Paul, 373 U.S. 132, 144 (1963) and Bronco Wine Co. v. Jolly, 17 Cal. Rptr. 3d 180

21 (Cal. 2004)).

22                  b.       FDCA's Preemption Provision

23         Congress added an express preemption provision to the FDCA when it enacted the

24 Nutrition Labeling and Education Act of 1990 ("NLEA"). Pub. L. No. 101-535, § 6(a), 104 Stat.

---

25

26 for export); 110710 (stating that food is misbranded if it does not conform with § 110505); 110745
   (defining misbranding of foods used as a component of other foods).

27         Like the FDCA, there is no private cause of action to directly enforce the Sherman Law.
   Jackson v. Balanced Health Prods., Inc., 2009 WL 1625944, at *6 (N.D. Cal. June 10, 2009) (citing

28 Summit I, 922 F. Supp. at 317).

        [12]Hansen does not argue field preemption.

2353 (1990).   Section 343-1(a) of the FDCA preempts state laws which are "not identical to" the FDCA requirements enumerated in the preemption provision.[13]   21 U.S.C. § 343-1(a).  These enumerated requirements are for the most part found in Section 343, the section on misbranded food.

The NLEA also contains an uncodified express savings clause: "The [NLEA] shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under [§ 343-1(a) ]."  Wright v. Gen. Mills, Inc.  2009 WL 3247148, at *2 (S.D. Cal. 2009) (citing Pub. L. No. 101-535, § 6(c)(1)).

c.    In re Farm Raised Salmon Cases

In In re Farm Raised Salmon Cases, the California Supreme Court addressed the precise issue in this case - whether state law claims based on the Sherman Law were impliedly preempted by the FDCA.  72 Cal. Rptr. 3d 112 (2008).  In Farm Raised, the plaintiffs alleged defendants sold artificially colored farmed salmon without disclosing to consumers the use of color additives.  Id. at 115.  Plaintiffs sued under Sections 17200 and 17500, and predicated the 17200 claim on

---

[13]21 U.S.C. §  343-1(a) states in full: Except as provided in subsection (b) of this section, no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce--

(1) any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title, except that this paragraph does not apply to a standard of identity of a State or political subdivision of a State for maple syrup that is of the type required by sections 341 and 343(g) of this title,

(2) any requirement for the labeling of food of the type required by section 343(c), 343(e), 343(i)(2), 343(w), or 343(x) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(c) of this title and that is applicable to maple syrup,

(3) any requirement for the labeling of food of the type required by section 343(b), 343(d), 343(f), 343(h), 343(i)(1), or 343(k) of this title that is not identical to the requirement of such section, except that this paragraph does not apply to a requirement of a State or political subdivision of a State that is of the type required by section 343(h)(1) of this title and that is applicable to maple syrup,

(4) any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title, except a requirement for nutrition labeling of food which is exempt under subclause (i) or (ii) of section 343(q)(5)(A) of this title, or

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title."

violation of the Sherman Law, which contains a provision on artificial coloring identical to the FDA regulation on artificial coloring.   Id. at 116, 118-19.

The court interpreted Section 343-1 to mean that states could adopt state laws "identical to" the FDCA and its regulations, and that nothing in the text of Section 343-1 or the legislative history suggested Congress intended to preempt  private actions predicated on identical state requirements.  Id. at 1121-25.

The court looked to the statutory language and legislative history.  First, the court found that the fact that Congress was silent when passing the NLEA on the issue of who would be allowed to enforce the identical state requirements, suggested that "Congress did not intend to alter the status quo, i.e., states may choose to permit their residents to file unfair competition or other claims based on the violation of state laws."  Id. at 122.  Second, the various specific express preemption provisions in the FDCA, such as the preemption provision for medical devices, clearly demonstrated that "Congress knows how to write a preemption clause when it wants to."  Id. at 123.  Third, the uncodified savings clause was further evidence that Congress intended "that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself."  Id. at 122.

The court also relied on two United States Supreme Court cases, Medtronic, Inc. v. Lohr and Bates v. Dow Agrosciences LLC, in which the Supreme Court construed preemption provisions similar to Section 343-1 and held that private suits to enforce state laws identical to federal laws were not preempted.[14]  Id. at 124-25 (citing Medtronic, 518 U.S. 470, 492 (1996); Bates, 544 U.S. 431, 452 (2005)).  The Supreme Court further held in these two cases that the preemption provisions did not preclude state remedies for violations of identical state rules.  Farm Raised, 72 Cal. Rptr. 3d at 124-25 (citing 518 U.S. at 495; 544 U.S. at 448).  In fact, the court in

---

[14] The preemption provision at issue in Medtronic, the Medical Device Amendments, provided: "[N]o State . . . may establish . . . with respect to a device . . . any [state] requirement . . . which is different from, or in addition to, any [federal] requirement . . . ." 21 U.S.C. § 360k(a) 503.  The preemption provision at issue in Bates, the Federal Insecticide, Fungicide, and Rodenticide Act, provided: "State[s] shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."  7 U.S.C. § 136v(b).

1   <u>Farm Raised</u> noted that no court had ever held that state remedies for violation of identical state

2   laws were precluded.  <u>Farm Raised</u>, 72 Cal. Rptr. 3d at 127.

3        The court further reasoned that the standing provision in Section 337 did not change the

4   outcome: "The statute, by its very terms, only implicates efforts to enforce *federal* law. What

5   section 337 does *not* do is limit, prohibit, or affect private claims predicated on *state* laws."  <u>Id.</u> at

6   128 (emphasis in original).  The court reasoned that the plaintiffs in <u>Farm Raised</u> were not

7   attempting to enforce the FDCA, because the plaintiffs' claims were predicated on the Sherman

8   Law, not on the FDCA.  <u>Id.</u>

9        Finally, the court concluded that the FDCA did not impliedly preempt "identical" state

10   laws such as the Sherman Law:

11        [W]hile allowing private remedies based on violations of state laws identical to
          the FDCA may arguably result in actions that the FDA itself might not have
12        pursued, Congress appears to have made a conscious choice not to preclude such
          actions. Defendants' assertion that Congress intended, without so saying, to limit
13        states long-standing ability to allow private remedies for violations of their own
          laws has no support in either statutory language, legislative history, or case law-
14        and therefore defendants have not overcome the strong presumption against
          preemption applicable here, as is their burden.
15
16   <u>Id.</u> at 128-29.

17             d.      Federal Caselaw

18        Few district court cases have addressed this issue.  Hansen relies on a case prior to <u>Farm</u>

     <u>Raised</u>, <u>Fraker v. KFC Corp.</u>, 2007 WL 1296571 (S.D. Cal. April 30, 2007).[15]  In <u>Fraker</u>, the
19
     district court held plaintiffs' Sections 17200 and 17500 claims based on alleged violations of the
20
     FDCA and Sherman Law were impliedly preempted.  <u>Id.</u> at *2.  The court held that "to the extent
21
     Plaintiff contends that alleged violations of the FDCA and Sherman Law give rise to viable state
22
     law claims, such claims are impliedly preempted by the FDCA."  <u>Id.</u> at *4.
23
          On the other hand, Living Essentials points to another case prior to <u>Farm Raised</u>, <u>Vermont</u>
24
     <u>Pure Holdings, Ltd v. Nestle Waters North America, Inc.</u>, in which the district court came to a
25
     similar conclusion as the California Supreme Court.  2006 WL 839486 (D. Mass. Mar. 28, 2006).
26
     _____
27        [15]Hansen also cites to a footnote in <u>Summit II</u> stating that  "a Plaintiff may not bring a § 17200
     claim that is, in fact, an attempt to state a claim under the federal FDCA."  <u>Summit II</u>, 933 F. Supp.
28   at 943  n.21.  However, Living Essentials' claim does not attempt to state a claim under the FDCA;
     rather, Living Essentials alleges violations of *state* law.

1   In Vermont Pure, plaintiff sued under several state unfair competition statutes, alleging Nestle

2   made false and misleading statements regarding the source, nature, and purity of its bottled water.

3   Id. at *6-7.  Each of these states had enacted laws adopting the FDA definition of "spring water."

4   Id. at *6 n.5.

5          First, the court held that "to the extent the state laws under which Vermont Pure brings suit

6   have adopted, by recitation or reference, the FDA's definition of "spring water," they are not

7   expressly preempted by 343-1."  Id. at *6.  The court's reasoning was similar to the California

8   Supreme Court's in Farm Raised:

9          [Section 337], however, relate[s] only to enforcement of the FDCA. Vermont Pure's
           "spring water" claims arise purely from state law. To be sure, the state laws are
10         based on federal regulations, as the FDCA requires them to be, but Section 337 is
           silent as to these state law suits. This reading makes sense not only in terms of the
11         plain language of § 337, but in light of the legislative history and the agency's
           interpretive history of § 343-1, see infra.
12
     Id. at *6 n.3 (emphasis added).  Second, the court examined the legislative history and FDA's
13
     interpretive history and held that the state law claims were not impliedly preempted: "Congress
14
     and the FDA appear to have made a conscious choice to allow the several states to regulate bottled
15
     water so long as the state standards employed are identical to those adopted by the FDA."  Id. at
16
     *6-7.  The court reasoned: "The requirement of identity promotes uniformity in that courts in
17
     every state look to the same standard.  Permitting states to interpret FDA definitions also allows
18
     for additional resources to be brought to bear in the enforcement of national standards upon
19
     regional and local markets."  Id.
20
            Living Essentials also relies on Jackson v. Balanced Health Products, Inc., 2009 WL
21
     1625944 (N.D. Cal. June 10, 2009), which was decided after Farm Raised.  In Jackson, plaintiffs
22
     sued under Sections 17200 and 17500 and other state law causes of action for defendant's
23
     allegedly false representations that a diet pill was "all natural" although it contained a prescription
24
     strength diuretic.  Id. at *1-2.  The claims were based on violations of the Sherman Law.  Id. at *4.
25
     The court held the defendants' actions gave rise to valid state law claims, and that simply alleging
26
     the diet pill contained a prescription drug did not invoke federal preemption.  Id.
27
            2.      Analysis
28

1    Hansen argues Section 343-1 expressly preempted the Sherman Law provisions that Living

2  Essentials relies on.  Additionally, although the phrase "implied preemption" is not used, it

3  appears Hansen also argues that the FDCA standing provision in Section 337 impliedly preempts

4  state law claims based on Sherman Law provisions "identical to" the FDCA.  Hansen explicitly

5  states it is not arguing field preemption.  Presumably then, Hansen is arguing implied conflict

6  preemption.

7                                a.    Express Preemption

8    First, the Court looks to the "plain wording" of the FDA's express preemption provision to

9  identify the "domain expressly preempted" by the language of the statute.  See Sprietsma v.

10  Mercury Marine, 537 U.S. 51, 62-63 (2002); see also Vermont Pure, 2006 WL 839486 at *6

11  ("[T]he analysis for express preemption turns not on whether a claim requires direct interpretation

12  and application of FDA regulations . . . but on the identity of state and federal regulations.").

13  Section 343-1 provides that "no State or political subdivision of a State may directly or indirectly

14  establish under any authority or continue in effect as to any food in interstate commerce" any

15  requirements which are "not identical to" the federal requirements enumerated in Section 343-1.[16]

16  FDA regulations define the term "not identical to":

> "Not identical to" does not refer to the specific words in the requirement but instead
> means that the State requirement directly or indirectly imposes obligations or
> contains provisions concerning the composition or labeling of food, or concerning
> a food container, that: (i) Are not imposed by or contained in the applicable
> provision [or regulation] . . . ; or (ii) Differ from those specifically imposed by or
> contained in the applicable provision [or regulation] . . . .

21  21 C.F.R. § 100.1(c)(4); see also Pom Wonderful LLC v. Ocean Spray Cranberries, Inc., 642 F.

22  Supp. 2d 1112, 1121 (C.D. Cal. 2009) (citing this regulation and holding that "so long as

23  Plaintiff's state law claims do not impose *different requirements* than the FFDCA or FDA

24  regulations, these claims are not preempted") (emphasis added).

25    The Sherman Law adopts and incorporates by reference the federal requirements relating to

26  (1) food labeling regulations, (2) definitions and standards of identity, quality, and fill of

27

28

_____

[16]See *supra* n.13 (full text of Section 343-1).

1   container, and (3) requirements for nutrient content or health claims.[17]  Thus, the Sherman Law

2   provisions dealing with these subjects do not impose different requirements than the FDA

3   requirements, and are therefore not preempted.[18]  As to the remaining Sherman Law provisions

4   that Living Essentials relies upon which Living Essentials concedes are *not* "identical to" federal

5   requirements,[19] Hansen does not provide any support for its contention that these provisions fall

6   within the preemptive scope of Section 343-1

7        Because Hansen has not met its burden of demonstrating that Section 343-1 expressly

8   preempts these provisions, the Court finds that the Sherman Law provisions relied on by Living

9   Essentials are not expressly preempted.

10                          b.    Implied Preemption

11       Hansen argues that Living Essentials' state law claims are impliedly preempted because

12   allowing private parties to enforce state statutes identical to the FDCA would frustrate Congress'

13   intent that there be no private cause of action to enforce the FDCA.  Hansen contends that the

14   holding in Farm Raised - that state law claims predicated on provisions of the Sherman Law which

15   are identical to the FDCA are not impliedly preempted - is not binding on this Court, and

16   moreover, was wrongly decided.

17       While it is true that this court is not bound by Farm Raised, the California Supreme Court's

18   analysis of the statutory language, legislative history, and federal caselaw is thorough, and the

19   Court finds its reasoning persuasive.  The Farm Raised court relied on Medtronic and Bates, cases

20   in which the United States Supreme Court construed preemption provisions similar to Section 343-

21   1 and held that private suits to enforce state laws identical to federal laws were not preempted.  In

22

23       [17]Cal. Health & Safety Code §§ 110100(a), 110505, 110670.

24       [18]Hansen provides no support for its arguments that "wholesale incorporation by reference"
     does not make the Sherman Law provisions "identical to" the applicable federal requirements and that
     the state law claims would "clearly impose different requirements."

25

26       [19]Living Essentials claims the following sections fall outside the preemption provision: 109940
     (defining food additive); 110290 (misleading nature of food advertisement); 110390 (misleading
27   advertisements of any food); 110398 (advertisement of unadulterated or misbranded food); 110445
     (unsafe food additives); 110555 (defining adulteration); 110655 (defining adulteration of food
28   intended for export); 110660 (defining misbranding); 110710 (stating that food is misbranded if it does
     not conform with § 110505); 110745 (defining misbranding of foods used as a component of other
     foods).

08cv1166

1  addition, the district courts in <u>Vermont Pure</u> and <u>Jackson</u> held that state law claims based on

2  violations of state laws explicitly authorized by section 343-1 were not impliedly preempted.

3       <u>Fraker</u> does not change this result.  First, unlike <u>Fraker</u>, Living Essentials brings claims

4  based solely on the Sherman Law, not the FDCA.  <u>See</u> <u>Jackson v. Balanced Health Prods.</u>, 2009

5  WL 1625944 (N.D. Cal. June 10, 2009) (distinguishing <u>Fraker</u> on the ground that the plaintiff in

6  <u>Fraker</u> brought claims directly based on the FDCA);  <u>Farm Raised</u>, 72 Cal. Rptr. 3d 112 (2008)

7  (same); <u>McKinniss v. Gen. Mills, Inc.</u>, 2007 WL 4762172, at *2 n.3 (C.D. Cal. Sep 18, 2007)

8  (same).  Second, the court in <u>Fraker</u> did not consider Section 343-1, the express preemption

9  provision, in its implied preemption analysis.  <u>See</u> <u>Lockwood v. Conagra Foods, Inc.</u>, 597 F. Supp.

10  2d 1028,1034 (N.D. Cal. Feb. 3, 2009) (declining to follow <u>Fraker</u> for this reason); <u>see</u> <u>also</u> <u>Farm</u>

11  <u>Raised</u>, 72 Cal. Rptr. 3d at 123 (citing <u>Freightliner Corp. v. Myrick</u>, 514 U.S. 280, 288 (1995))

12  ("[A]n express definition of the pre-emptive reach of a statute 'implies' - i.e., supports a

13  reasonable inference - that Congress did not intend to pre-empt other matters . . . .").  Finally,

14  <u>Fraker</u> was decided before <u>Farm Raised</u> and therefore the district court did not have the benefit of

15  considering the California Supreme Court's reasoning in <u>Farm Raised</u>.

16       As the statutory language, legislative history, and federal caselaw suggests, Congress

17  appears to have made a conscious choice not to preempt private actions predicated on violations of

18  state requirements which are "identical to" FDCA requirements.  Accordingly, the Court finds that

19  the Sherman Law provisions that Living Essentials' state law claims rely upon are not expressly or

20  impliedly preempted.

21       **C.     Standing Under the Lanham Act**

22       Hansen argues that Living Essentials fails to adequately plead Lanham Act standing.   In

23  the Ninth Circuit, in order to establish standing under the Lanham Act's "false advertising" prong,

24  a party must allege: "(1) a commercial injury based upon a misrepresentation about a product; and

25  (2) that the injury is "competitive," or harmful to the plaintiff's ability to compete with the

26  defendant." <u>Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.</u>, 407 F.3d 1027,

27  1037 (9th Cir. 2005) (citing <u>Barrus v. Sylvania</u>, 55 F.3d 468, 470 (9th Cir. 1995)).  Hansen

28

1  contends Living Essentials fails to adequately plead the "competitive" injury prong.[20]

2       Courts have held that a plaintiff sufficiently alleges "competitive injury" where the plaintiff

3  alleges the defendant's false or misleading statements tend to divert business from the plaintiff to

4  defendant.  See, e.g., Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,173 F.3d 725, 734 (9th

5  Cir. 1999) (finding that plaintiff's injury was competitive, where the defendant sought by his

6  statements to divert business from plaintiff to his employer); Nat'l Servs. Group, Inc. v. Painting

7  & Decorating Contractors of Am., Inc., 2006 WL 2035465, at *3-4  (C.D. Cal. July 18, 2006)

8  (noting the Ninth Circuit has focused on whether the statements in issue tended to divert business

9  from the plaintiff to the defendant); Kournikova v. Gen. Media Commc'ns Inc., 278 F. Supp. 2d

10  1111, 1117-18 (C.D. Cal. 2003) ("[I]f one participant in the marketplace makes false statements

11  that could theoretically draw consumers away from similar offerings of other participants in the

12  same marketplace, and those false statements implicate the purposes of the Lanham Act . . . then

13  those other participants have standing . . .") (citing Waits v. Frito-Lay, 978 F.2d 1093 (9th Cir.

14  1992)).

15       Here, it is undisputed that Hansen and Living Essentials are direct competitors in the

16  energy product business.  Living Essentials alleges Hansen's energy drinks compete with Living

17  Essentials' two-ounce liquid energy product in the marketplace throughout the United States.

18  (FAC ¶¶ 8-12.)  Living Essentials alleges Hansen's false or misleading statements "are material;

19  they are likely to influence the purchasing decision of a substantial number of reasonable

20  consumers; those misrepresentations actually deceive or, at a minimum, have the tendency to

21  deceive a substantial segment of the reasonable consumer audience; and, Living Essentials has

22  been injured, and in the future is likely to continue to be injured, as a result of the

23  misrepresentations, *both by the direct diversion of sales from Living Essentials to Hansen and by a*

24  *lessening of the goodwill associated with Living Essentials' products*."  (FAC ¶ 63.) (emphasis

25  added).

26  _____

27      [20]Hansen argues in its reply brief that Living Essentials' CEO admitted in a deposition that

28  Living Essentials does not compete in the market for energy drinks sold in conjunction with alcohol; therefore, Living Essentials has not suffered a competitive injury.  Because the deposition is not a matter properly subject to judicial notice, the Court need not address this argument.

1    Living Essentials has sufficiently pleaded that Hansen's allegedly false and misleading

2  statements tends to divert sales from Living Essentials' competing energy product.  Accordingly,

3  the Court denies Hansen's motion to dismiss the first cause of action for lack of standing.

4            **D.      Standing Under the California Business and Professions Code**

5        Hansen argues Living Essentials fails to adequately plead standing under Sections 17200

6  and 17500.   Proposition 64 amended the California Business and Professions Code to provide that

7  an action under these sections may be brought "by a person who has suffered injury in fact and has

8  lost money or property as a result."  Cal. Bus. & Prof. Code §§ 17204, 17535; see also Branick v.

9  Downey Sav. & Loan Ass'n, 138 P.3d 214, 217 (Cal. 2006).

10       A plaintiff suffers "injury in fact" for the purposes of standing under Sections 17200 and

11  17500 when he or she has: (1) expended money due to the defendant's acts of unfair competition,

12  (2) lost money or property, or (3) been denied money to which he or she has a cognizable claim.

13  Hall v. Time Inc., 70 Cal. Rptr.3d 466, 470-71 (Ct. App. 2008).  The phrase "lost money or

14  property as a result" imposes a causation requirement.  Id. at 471.  "A plaintiff alleging unfair

15  business practices under [Section 17200] must state with reasonable particularity the facts

16  supporting the statutory elements of the violation."  Khoury v. Maly's of Cal., Inc., 17 Cal. Rptr.

17  2d 708 (Ct. App. 1993).

18       Living Essentials has sufficiently pleaded it lost money or property and that this loss was

19  caused by Hansen's allegedly false or misleading advertising and labeling.  Living Essentials

20  alleges Hansen's energy drinks compete with Living Essentials' two-ounce energy product in the

21  marketplace throughout the United States.  (FAC ¶¶ 8-12.)  Living Essentials contends "it has

22  suffered injury and harm and will continue to suffer injury and harm both by the direct diversion of

23  sales from Living Essentials to Hansen and by a lessening of the goodwill associated with Living

24  Essentials' products."  (FAC ¶ 70.)  According to Living Essentials, Hansen's false advertising of

25  its energy drinks has caused Living Essentials to suffer "substantial economic damages."  (FAC ¶

26  13.)

27       Accordingly, the Court denies Hansen's motion to dismiss the second cause of action for

28  lack of standing.

1        **E.      Rule 9(b) Particularity Requirement**

2        Hansen argues that Living Essentials' entire counterclaim should be dismissed because it

3    sounds in fraud and fails to meet the requirement of Rule 9(b) of the Federal Rules of Civil

4    Procedure that allegations of fraud be stated with particularity.

5        When a plaintiff alleges "a unified course of fraudulent conduct" and relies entirely on that

6    course of conduct as the basis of a claim, the claim is said to "sound in fraud," and the pleading of

7    that claim as a whole must satisfy the particularity requirement of Rule 9(b).  Vess v. Ciba-Geigy

8    Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  Rule 9(b) requires plaintiff to allege

9    circumstances constituting the alleged fraud that are "specific enough to give defendants notice of

10    the particular misconduct . . . so that they can defend against the charge and not just deny that they

11    have done anything wrong."  Id. at 1106 (quoting Bly-Magee v. California, 236 F.3d 1014, 1019

12    (9th Cir. 2001)).  Plaintiff must allege "the who, what, when, where, and how" of the misconduct

13    charged.  Vess, 317 F.3d at 1106.  "[A] plaintiff must set forth more than the neutral facts

14    necessary to identify the transaction.  The plaintiff must set forth what is false or misleading about

15    a statement, and why it is false."  Id. (quoting Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec.

16    Litig.), 42 F.3d 1541, 1548 (9th Cir. 1994)).

17        On the other hand, under Ninth Circuit precedent, where fraud is not an essential element

18    of a claim, only allegations ("averments") of fraudulent conduct must satisfy the heightened

19    pleading requirements of Rule 9(b).  Vess, 317 F.3d at 1105.  The court should "disregard"

20    particular averments of fraud that are insufficiently pled, and then examine the remaining

21    allegations to determine whether they state a claim.  Id.  Even if the word "fraud" is not used,

22    fraud can be averred by "alleging facts that necessarily constitute fraud."  Id.  Under California

23    law, the "indispensable elements of a fraud claim include a false representation, knowledge of its

24    falsity, intent to defraud, justifiable reliance, and damages."  Id.

25        Here, Living Essentials counterclaim does not "sound in fraud" because Living Essentials

26    does not specifically allege fraud, fraud is not an essential element of the counterclaim, and Living

27    Essentials does not allege "a unified course of fraudulent conduct" and rely entirely on that course

28    of conduct as the basis of the claim.  This case is unlike other cases in which courts have construed

a plaintiff's claims as alleging a "a unified course of conduct."  See <u>Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.</u>, 642 F. Supp. 2d 1112, 1124 (C.D. Cal. 2009) (holding that plaintiff's false advertising claims were grounded in fraud where all plaintiff's allegations dealt with the same underlying issue - the defendant's intent to mislead consumers by mischaracterizing the primary ingredients of their beverage); <u>CollegeNet, Inc. v. Xap Corp.</u>, 2004 WL 2303506, at *4 (D.Or. Oct. 12, 2004) (holding that plaintiff alleged a unified course of fraudulent conduct where "[a] fair reading of these allegations shows that plaintiff accuses defendant of knowingly and intentionally engaging in a pattern or practice of misleading and deceiving colleges and universities about defendant's handling of confidential student data in an attempt to obtain institutional customers"). In those cases, plaintiffs alleged the defendants' statements were misleading as to one underlying factual issue.  Here, Living Essentials' allegations deal with four categories of allegedly false or misleading representations, all relating to different underlying factual issues (*supra*, Section A). Therefore, Living Essentials' counterclaim does not "sound in fraud," and Rule 9(b)'s heightened pleading requirement does not apply to the entire counterclaim.

The only allegations that can be construed as fraud-based are Living Essentials' allegations that Hansen "knew or should have known" its representations as to the energizing effect of its energy drinks were false.  (FAC ¶¶ 46-49.)   These allegations relate only to the claim that Hansen's statements mislead as to energizing effect. The issue is whether these allegations of fraudulent conduct are adequately pleaded.  The Court finds that they are.  Living Essentials alleges Hansen made false or misleading statements, alleges the specific content of the statements, and alleges on what product the statement can be found:

> FAC ¶ 46: "It's a wicked mega hit that delivers twice the buzz of a regular energy drink." (Monster Energy)

> FAC ¶ 47: "Lo-Carb Monster Energy still delivers twice the buzz of a regular energy drink, but only has a fraction of the calories."  (Lo Carb Monster)

> FAC ¶ 48: "Java Monster . . . half the caffeine of regular coffee.  Twice the "Buzz." (Java Monster products)

> FAC ¶ 49: "works, tastes, and mixes as good as the original, but with only 10 calories" and provides "the energy you need to party all night with just 10 calories." (Lost Perfect Ten)

Living Essentials alleges each statement is false and/or misleading based on the products'

1    ingredients and "generally accepted principles of biochemistry, pharmacology and physiology."

2    (FAC ¶¶ 46-48). These allegations are specific enough to give Hansen notice of why Living

3    Essentials believes each statement are false.

4           Accordingly, the Court denies Hansen's motion to dismiss the counterclaim for failure to

5    meet Rule 9(b)'s particularity requirement.

6           **F.      Non-Actionable Puffery**

7           Hansen argues that the allegedly false and misleading statements are "puffery" and not

8    actionable under the Lanham Act, particularly statements that Hansen's drinks provide "twice the

9    buzz" and allow a user to "party all night." Hansen argues that each phrase depends on

10   consumers' subjective opinions and cannot be scientifically quantified either to prove or disprove

11   the statement. Because Hansen raises this issue for the first time in its reply brief, Living

12   Essentials has not had an opportunity to respond, but in any event, the Court rejects Hansen's

13   argument.

14          Puffery is defined as "involving outrageous generalized statements, not making specific

15   claims, that are so exaggerated as to preclude reliance by consumers." Cook, Perkiss and Liehe,

16   Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246 (9th Cir. 1990). "[A]dvertising which

17   merely states in general terms that one product is superior is not actionable." Id. (quoting Smith-

18   Victor Corp. v. Sylvania Elec. Prods, Inc., 242 F. Supp. 302, 308 (N.D. Ill. 1965). On the other

19   hand, specific and measurable advertisement claims of product superiority based on testing are

20   actionable. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134 (9th Cir. 1997).

21   Additionally, "misdescriptions of specific or absolute characteristics of a product are actionable."

22   Cook, 911 F.2d at 246.

23          At this point in the proceedings, the Court declines to determine whether the statements

24   constitute puffery, because it is a question of fact whether the level of "buzz" or energy can be

25   scientifically quantified or whether it is a subjective feeling. Accordingly, the Court denies the

26   motion to dismiss.

27                                  **CONCLUSION**

28          The Court GRANTS the motion to dismiss as to the Lanham Act cause of action to the

extent that Living Essentials counterclaim is based on the arguments that (1) Hansen mislabels its products as to the serving size and (2) misbrands its products as dietary supplements.  The Court DENIES the motion to dismiss as to the remaining claims.

**IT IS SO ORDERED.**

**DATED:  December 22, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

08cv1166