1           UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4  HANSEN BEVERAGE COMPANY,      )  Case No. 08CV1166-IEG-(WVG)
                                 )
5          Plaintiff,            )  San Diego, California
                                 )
6  vs.                           )  Wednesday,
                                 )  March 3, 2010
7  INNOVATION VENTURES, LLC.,    )  8:30 a.m.
                                 )
8          Defendant.            )
                                 )
9  _____)

10            TRANSCRIPT OF DISCOVERY HEARING
             BEFORE THE HONORABLE WILLIAM V. GALLO
11              UNITED STATES MAGISTRATE JUDGE

12 APPEARANCES:

13 For the Plaintiff:           EDWARD J. MCINTYRE, ESQ.
                                WILLIAM N. KAMMER, ESQ.
14                              Solomon, Ward, Seidenwurm &
                                   Smith, LLP
15                              401 B Street, Suite 1200
                                San Diego, California 92101
16                              (619) 231-0303

17 For Living Essentials:       MARK B. MIZRAHI, ESQ.
                                Brooks, Kushman, PC
18                              6701 Center Drive West
                                Suite 610
19                              Los Angeles, California 90045
                                (310) 348-8200
20
                                THOMAS W. CUNNINGHAM, ESQ.
21                              Brooks, Kushman, PC
                                1000 Town Center
22                              Suite 2200
                                Southfield, Michigan 48075
23                              (248) 358-4400

24

25 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

Transcript Ordered by:        MARK B. MIZRAHI, ESQ.

Transcriber:                   Jordan Keilty
                               Echo Reporting, Inc.
                               6336 Greenwich Drive, Suite B
                               San Diego, California 92122
                               (858) 453-7590

1

1   <u>SAN DIEGO, CALIFORNIA  WEDNESDAY, MARCH 3, 2010 8:30 A.M.</u>

2                           --oOo--

3       (Call to order of the Court.)

4           THE COURT:  Good morning, gentlemen.  Bill Gallo

5   here.

6           ALL:  Good morning, your Honor.

7           THE COURT:  I think I know who we got, but why

8   don't you just state your -- your appearances at this time.

9           MR. MCINTYRE (telephonic):  Good morning, your

10  Honor.  This is Ed McIntyre, and with me is my partner, Bill

11  Kammer, on behalf of Hansen.

12          THE COURT:  Okay.

13          MR. CUNNINGHAM (telephonic):  And, your Honor,

14  this is Tom Cunningham.  With me is Mark Mizrahi on behalf

15  of Living Essentials.

16          THE COURT:  All right.  Gentlemen, this is the

17  time and date set for resolution of the discovery disputes

18  which have been -- been filed.  We are on the record.  So if

19  you desire a transcript, as you have in the past, of these

20  proceedings, one will be available.

21          All right.  Let's start with Hansen's dispute, and

22  off the bat, what's the deal with Lynn Petersmark

23  (phonetic)?

24          MR. CUNNINGHAM:  If I could, your Honor, I think

25  Ed and I have come to an agreement on that, that we will

2

1 produce her as a 30(b)(6) witness on the topics related to

2 media buys and the topics relating to the two public

3 relations firms, Crosby Baumer and Lambert Edwards.  And

4 then the other topics you could ask her in her individual

5 capacity.

6             Is that your understanding, Ed?

7             MR. MCINTYRE:  Okay.  When?

8             MR. CUNNINGHAM:  You told me you wanted to wait

9 for the documents, and I --

10             MR. MCINTYRE:  I got the documents last --

11 yesterday or the day before.

12             MR. CUNNINGHAM:  No, no.  As I explained in an E-

13 mail --

14             MR. MCINTYRE:  Okay.  I'm sorry.  I was out of the

15 office yesterday.

16             MR. CUNNINGHAM:  Okay.  That's okay.  You only

17 have the media buys back to 2008.  They went computerized at

18 that point.  Prior to that point, we're trying to figure out

19 the best way to evidence them, to provide you with the

20 evidence of what's going on.  I actually had a voice mail

21 this morning, which I haven't had a chance to call my client

22 back on that very issue, asking me some questions.  So I

23 should know something later today on the rest of the

24 documents.

25             Once you have the rest of the documents,

3

1  scheduling when I think will be easy.  I don't think that

2  will be an issue.

3         THE COURT:  Okay.  Well, let me take this point by

4  point.  Have the parties then reached an agreement as to the

5  acceptable scope and anticipated areas of inquiry of Ms.

6  Petersmark?

7         MR. CUNNINGHAM:  I believe we have, your Honor.

8         THE COURT:  Let me hear -- Mr. McIntyre?

9         MR. MCINTYRE:  I am -- I believe so, your Honor,

10  if it will include all media buys and the Crosby -- Crosby

11  Baumer and Lambert Edwards has never been an issue.  Okay.

12  Yes, your Honor.

13         THE COURT:  Okay.  So agreement has been reached

14  with respect to the scope of the inquiry then relative to

15  the deposition?

16         MR. CUNNINGHAM:  Yes, your Honor.

17         MR. MCINTYRE:  Yes, your Honor.

18         THE COURT:  Because I really don't want you coming

19  back saying, "Well, I thought it was -- I was going to be

20  allowed to ask this and now they're objecting to that."  So

21  that's why I'm asking now, and I want a -- you know, I want

22  a definitive answer for both of you that that's not going to

23  be an issue ever again.

24         MR. CUNNINGHAM:  I think we -- we've settled it,

25  your Honor.

4

1          THE COURT:  Okay.  Now the next question is when

2     can Living Essentials get those necessary documents over to

3     Hansen so -- you know, in advance of the deposition date so

4     the deposition can then be scheduled?  So give me an idea,

5     Mr. Cunningham.  These documents and other -- other evidence

6     that Hansen needs in order to conduct a meaningful

7     deposition will be ready and produced.

8          MR. CUNNINGHAM:  Well, your Honor, I'm kind of at

9     a bit of a disadvantage because, as I said, I haven't talked

10    to my client other than we've been discussing how to put

11    together the evidence prior to the computer system of what

12    media they bought.

13         My client in this -- in his voice mail to me

14    seemed to think he has a solution.  I hate to put a date on

15    it because I really haven't -- until I talk to him again,

16    it's hard for me to say.

17         I would think that, you know, hopefully within the

18    next week we could get them out the door.

19         THE COURT:  Okay.  I'm going to give you 10 days.

20         MR. CUNNINGHAM:  Thank you, your Honor.

21         THE COURT:  So today is the 3rd of March, a

22    Wednesday.  You have until the 12th of March, so really nine

23    days, the 12th of March, which is the following Friday.

24         MR. CUNNINGHAM:  That's fine.  And if I get them

25    sooner, you'll get them.

5

1          MR. MCINTYRE:  Okay.  That's fine.

2          THE COURT:  Okay.

3          MR. MCINTYRE:  All right.

4          THE COURT:  Now --

5          MR. MCINTYRE:  I'm sorry, your Honor.  Can I just

6  address a point?  Because we are -- and perhaps this becomes

7  mooted given the denial of the motion for certification, but

8  can we at least get a commitment so long as we stay on the

9  schedule, the interim schedule that your Honor set, that we

10 will very promptly then get Ms. Peter -- I mean, if I get

11 the documents on the 12th, I mean, somebody has to look at

12 them over a weekend, but we will very promptly then get Ms.

13 Petersmark because, your Honor, we have also subpoenaed an

14 outside media buyer by the name of Mercedes Media in

15 Chicago, and that entity and the individual are subject to

16 subpoena out of the Northern District of Illinois, that

17 obviously we want to coordinate the deposition in Chicago

18 and Ms. Petersmark in Detroit.

19          So if we can at least get the commitments that as

20 soon as the documents are produced, we will get a commitment

21 on Ms. Petersmark so we then can inform Mercedes Media when

22 it will have to respond to the deposition subpoena.  As I

23 say, this may all be mooted, your Honor, by whatever happens

24 as a result of Judge Gonzalez denying the motion for

25 interrogatory appeal, but -- certification for interrogatory

6

1  appeal, but right now we are on a -- with your Honor's

2  schedule, we're on a relatively tight time frame.

3         THE COURT:  Yes, and I'm not sure that time line

4  is going to slip at all, but if you get these documents and

5  other electronic discovery on or before the 12th of March,

6  how soon thereafter would you want to or think you'll be

7  prepared to depose Ms. Petersmark?

8         MR. MCINTYRE:  I would think, your Honor, that

9  sometime in the following week.

10        THE COURT:  Okay.  Why don't --

11        MR. MCINTYRE:  Under the current schedule, I

12 believe we all turn into pumpkins by either the 23rd or the

13 26th.

14        THE COURT:  I think you're right, but I don't have

15 the dates right here in front of me.

16        MR. CUNNINGHAM:  Your Honor, it's the 23rd, but I

17 think the parties have pretty much agreed and Ms. -- or --

18        MR. MCINTYRE:  Judge Gonzalez.

19        MR. CUNNINGHAM:  -- Judge Gonzalez agreed that we

20 need a new schedule given that the counterclaims are in, but

21 with that said, I'm willing to produce Ms. Petersmark as

22 quickly as her schedule will permit.  In the past, she's

23 been very good at finding open dates.

24        THE COURT:  All right.

25        MR. CUNNINGHAM:  But I don't know if that

7

1  following week she's going to be on vacation, and I'd hate

2  to disturb that, but that said, we will produce her quickly.

3          THE COURT:  So why don't we do this, Mr.

4  Cunningham?  After we conclude today's hearing, get on the

5  phone with Ms. Petersmark, find out what her availability is

6  that following week, and even if it's Monday, the 15th, and

7  that seems to be the only day that she may be available --

8  and hopefully it isn't.  I would prefer to give Hansen, you

9  know, more than just the weekend to review whatever it is

10  that they receive and then prepare and then be able to fly

11  out to Detroit.  That's a little bit of a tall order, but

12  hopefully she's available more towards the middle of the

13  week like Tuesday or Wednesday or Thursday.  See if she is,

14  and then communicate that just as quickly as you can to Mr.

15  McIntyre and then schedule it with her.  Assuming that the

16  documents and everything else regarding the media buys, et

17  cetera, are going to be turned over as you have indicated

18  and as the Court has ordered by the 12th of March, I don't

19  think it's too early now to begin that process of scheduling

20  her.  And so you have her locked in.  It's much easier to

21  cancel than it is to schedule if you wait any further.

22          MR. CUNNINGHAM:  Sure.

23          THE COURT:  Okay.  Now, with respect to Mercedes

24  Media, it's your druthers, Mr. McIntyre, to in one fell

25  swoop up in the frozen Midwest to take her deposition either

8

1 before or after Petersmark -- or the deposition of Mercedes

2 Media?

3        MR. MCINTYRE:  It is, your Honor, for the obvious

4 reason of just cost to the client.  You know, flying here to

5 Chicago and back and then here to Detroit and back is just

6 wasteful, and we would do it -- it makes no difference who

7 goes first.  We will do both on the same trip.  We just in

8 fairness to a third party witness who has no dog in this

9 fight, I want to give that company as much advance notice of

10 when the subpoena -- when they will have to produce a

11 witness for the subpoena.

12        THE COURT:  All right.  Then I would make the same

13 recommendation to you as well.  As soon as you get off the

14 phone, start making calls to Mercedes Media.  See what their

15 availability is that week of March the 15th, and -- and even

16 if they are available on that Monday, I would assume -- do

17 these documents that you're about to receive -- you would

18 need those before you depose Mercedes Media?

19        MR. MCINTYRE:  Obviously they're going to be

20 helpful, your Honor, because the more one can prepare, the

21 shorter the time necessary to take a deposition.

22        THE COURT:  Okay.

23        MR. MCINTYRE:  I think we all recognize that.

24        THE COURT:  Right.

25        MR. MCINTYRE:  So yes.

9

1          THE COURT:  Well, do the best you can.  It's kind

2   of a three or four-way conversation now, coordinating with

3   Petersmark and Mercedes Media as well as your -- and what

4   their schedules are.  So stay in touch with one another.

5   Try to make those calls as soon as you can today and get

6   something arranged for the -- the week of the 15th of March.

7          MR. MCINTYRE:  We will, your Honor.

8          THE COURT:  Okay.

9          MR. CUNNINGHAM:  Your Honor, I'm going to be

10  representing Mercedes Media.  So I will give them a call and

11  find out their availability.

12         MR. MCINTYRE:  That will be fine.

13         THE COURT:  Okay.  All right.  Okay.  Now, and

14  while we're on the subject of Ms. Petersmark, there are a

15  couple of requests for production of documents that -- that

16  are in Hansen's -- part of Hansen's dispute today,

17  specifically 125 and 126.

18         And I'm going to get to the production of

19  documents in a moment, but while we're on the Petersmark

20  deposition topic, I thought it might be appropriate to

21  address 125 and 126 at this time.

22         With respect to those two, my -- I assume that,

23  Mr. Cunningham, you're going to turn over documents that are

24  responsive to those -- those requests?

25         MR. CUNNINGHAM:  Yes, your Honor.  Well, a little

10

1  background, your Honor.  These document requests we have not

2  even met and conferred on.  These document requests were

3  served to me by E-mail.  And, as I explained to Mr.

4  McIntyre, I missed them when they -- when they were served

5  by E-mail, and I had explained to him numerous times that I

6  was unwilling to accept service by E-mail.  And, as you

7  know, the Federal Rules state that you cannot serve by E-

8  mail unless you have written permission, and they didn't get

9  to my document clerk, and we missed them.  So I -- I called

10 Ed, and we discussed and he gave us an extension until the

11 26th to file our response, and we filed a response on the

12 26th with our objections, and -- and we produced some of the

13 documents right on that time, even though it was only three

14 weeks from the time we -- we really took a look at the

15 document requests.

16         A lot of these requests are simply repetitive of

17 previous requests, and we have produced and they have a

18 number of Crosby Baumer and Lambert Edwards documents

19 already in their possession.  But I -- we haven't even

20 discussed my objections to those, to their document requests

21 because those were just served last week I believe.

22         MR. MCINTYRE:  Two days ago.  Yeah, the 26th I got

23 your objections.

24         THE COURT:  So I'm not exactly sure what the

25 answer is then with respect to 125 and 126 as it relates to

11

1 Ms. Petersmark.

2        MR. CUNNINGHAM:  Well, subject -- I think they

3 have a lot of these documents already, your Honor, and I'll

4 go back with my client and ask, but I think the reason

5 they're -- they know about Crosby Baumer and Lambert Edwards

6 is mostly because of the documents which my client has

7 already produced.

8        MR. MCINTYRE:  Actually, we served a subpoena, a

9 document subpoena on Crosby Baumer.  That's how we got its

10 documents.  I learned of Lambert Edwards when I took

11 Sperber's deposition.  I had some but not all -- well, I

12 don't know that I have the total universe of Lambert

13 Edwards' documents.

14        MR. CUNNINGHAM:  I can certainly -- I mean, since

15 they're -- let's hope we can work out -- there's nothing

16 high level about this stuff.  It's communication with a

17 public relations firm, and I'm willing I guess, your Honor,

18 to take my chances on past good faith that we can have a

19 conversation later today and resolve this and get the

20 documents.  There's no objection to her testifying about

21 their dealings with Crosby Baumer and Lambert Edwards, and I

22 think we all recognize that for that to be a meaningful

23 inquiry, we need to see the documents back and forth between

24 them.

25        THE COURT:  Well, I do too, Mr. Cunningham, and to

12

1   the -- since we're on this subject now -- we'll get to your

2   objections relative to the other RFPs, 111 through 124, but

3   with respect to 125 and 126 as it does relate to Ms.

4   Petersmark, you should turn these documents over that are

5   responsive to these requests.

6           But I do have one question, and I'll direct this

7   to Mr. McIntyre, because I haven't seen exactly what the

8   definition is in my review of these many documents of what

9   an energy shot product is precisely, and so I want to make

10  sure that we're all operating on the -- the same sheet of

11  music here.

12          What is your definition of an energy shot product?

13          MR. MCINTYRE:  The definition, your Honor, is the

14  working definition, and it would include regular 5-hour

15  Energy or its two other versions, the decaf -- 5-hour

16  Energy, the shot product, the decaf version and the extra

17  strength version.

18          THE COURT:  Okay.

19          MR. MCINTYRE:  I mean, it's --

20          THE COURT:  Just those --

21          MR. MCINTYRE:  Unfortunately, on the Living

22  Essentials side, there are only three products for product

23  iteration.

24          THE COURT:  Okay.  And I saw all three of those

25  mentioned at various places but not necessarily included in

13

1  the definition of energy shot product.  So now I know for

2  sure that when you say energy shot product, we're talking

3  about the 5-hour, the decaf, and the extra strength.

4          MR. MCINTYRE:  That's correct, your Honor.

5          THE COURT:  All right.  So with respect to those

6  three products, my -- my conclusion is is that Living

7  Essentials should turn over those documents responsive to

8  125 and 126.

9          My -- my one concern is there's no time frame

10 indicated as to how far back they have to go, not only with

11 respect to these two RFPs, and my inclination is to go back

12 to 2004.  Is there any reason why Living Essentials should

13 have to go further than that?

14          MR. MCINTYRE:  No, your Honor.  As your Honor may

15 recall, the Living Essentials, the product at issue is the

16 shot.  It won't come to market until September of 2004 with

17 test marketing at GNC, and -- Tom, correct me if I'm wrong

18 -- with respect to using a PR firm or radio or TV

19 commercials, I would -- I would expect that that probably

20 didn't kick in until very early 2005, but going back to mid

21 2004 is more than ample, your Honor.  There's no reason to

22 go beyond it because there was no product at issue back

23 then.

24          THE COURT:  And that's the reason why I said 2004.

25 Now, I could be even a little more specific and say

14

1    September of 2004 if that -- Mr. Cunningham?

2              MR. CUNNINGHAM:  Yeah.  I mean, there's not going

3    to be anything before that, your Honor.

4              THE COURT:  Right.

5              MR. CUNNINGHAM:  I mean --

6              MR. MCINTYRE:  That's fine with me, your Honor.

7              THE COURT:  All right.

8              MR. CUNNINGHAM:  That said, your Honor, should

9    they be allowed the communications up until today even

10   though the commercials at issue haven't been run since 2009,

11   early 2009?

12             THE COURT:  The -- my ruling would apply up to the

13   present.

14             MR. MCINTYRE:  You're still running commercials.

15             MR. CUNNINGHAM:  The commercials we're running now

16   are not at issue in this case.

17             THE COURT:  My ruling is up to the present.

18             MR. CUNNINGHAM:  All right.

19             THE COURT:  So September of '04 to today, for both

20   125 and 126.  Okay.  So that addresses those two RFPs.

21   We'll come back to the remainder in a moment.

22             All right.  Now, Doctor Gail Mahadi (phonetic).

23   Let me run through what I think, and when I'm concluded with

24   that, that will be more or less the tentative ruling with

25   respect to Mahadi, and then I'll give each of you an

15

1   opportunity to -- to weigh in, and then I'll -- I'll make a

2   decision that will be etched in granite.

3          To begin with, I've read every case that each of

4   you have cited and, frankly, with the exception of maybe

5   one, I didn't find any of them particularly persuasive.  I

6   didn't find any of them to really be on point.  I found most

7   of them to be distinguishable in some respect or another,

8   with the present issue before the Court at this time.  And

9   in some respects, I felt that the case cited by one party

10  should have been cited by the other party, despite the fact

11  that there was distinguishing facts in every case and they

12  weren't really on point, but I found bits and pieces of

13  every opinion to support the other side's position.

14         That being said, I think one of the reasons why

15  it's so difficult to find anything of controlling authority

16  or even persuasive authority is that the opinions are all

17  over the place, and that's really reflected in most of the

18  cases that were cited by both sides.  There doesn't appear

19  to be a really hard and fast rule that -- that applies in

20  this situation.

21         So let me go through my analysis, and I will cite

22  these cases and, you know, let you know why I find them to

23  be not on point or why bits and pieces of them ultimately

24  support my -- my tentative ruling at this time.

25         First of all, I disagree with Hansen's -- Hansen's

16

1 assertion that Judge Gonzalez relied heavily on the Mahadi

2 declaration in denying Hansen's motion for a preliminary

3 injunction.  I think she relied on it in part, but there are

4 also other reasons in my view in reading her order to deny

5 the motion for a preliminary injunction.  Most notably,

6 perhaps equitable principles that Hansen simply just waited

7 too long to file this lawsuit, and that she was unwilling to

8 find that there was a presumption of irreparable harm if --

9 if the injunction was not ordered.  And while no doubt

10 Mahadi's declaration played some role in that, I don't

11 believe it was the controlling factor in Judge Gonzalez's

12 opinion.

13        But, regardless of whether it was or it wasn't, I

14 think there are other reasons why the bottom line is that

15 Mahadi may not be deposed at this time, and I'm going to

16 touch on that at the very end, but at the outset, my

17 tentative is Mahadi should not be deposed.

18        The cases cited by Hansen, starting with the

19 Soffuba (phonetic) case, was a deposition of an expert that

20 occurred prior to the motion for preliminary injunction, and

21 so while the expert was, in fact, deposed, it occurred

22 before the -- the hearing on the injunction, but the real

23 issue in that case was that it was as motion to compel

24 production of documents after the deposition and not whether

25 the -- the expert should be deposed again.  And so it was

17

1  distinguishing in that factor.  And so while, yes, the

2  expert that the one side used was, in fact, deposed did

3  actually happen before the motion for preliminary injunction

4  at a time when the deposition, if one had been asked or if

5  time had been provided of Mahadi, should have been done in

6  this case, but it wasn't.

7          With respect to the <u>Hooker Occidental</u> case, the

8  Court ordered the deposition of that expert who filed a

9  declaration much like Mahadi did to oppose the Plaintiff's

10  motion for summary judgment, and I find no distinction

11  really between a motion for preliminary injunction or a

12  motion for summary judgment as it pertains to the -- the

13  issue here as to whether a declaration -- or, excuse me, a

14  deposition should be ordered or not.

15          But isn the <u>Hooker Occidental</u> case, the deposition

16  that was ordered occurred before the hearing on the motion

17  for summary judgment, and furthermore, the Court in that

18  case imposed time limitations and topic limitations on the

19  questioning of that expert, focusing the deposition in on

20  the declaration that was, in fact, filed.

21          In the <u>Atari v. Sega</u> case, the Court again

22  permitted the deposition of the Defendant's expert who was a

23  former employee of the Plaintiff and who was only a

24  consultant, not designated as a trial witness, kind of like

25  what we have here.  However, the Court's ordering of the

18

1  deposition was severely limited only to those matters,

2  facts, and opinions that the expert required while the

3  expert was then employed by the Plaintiff and not to any

4  opinions, facts, and other matters that the expert was

5  opposed to after the expert was retained by the Defendant as

6  the Defendant's expert consultant.

7         And so those are all very distinguishing factors

8  and really provide the Court with no help in trying to

9  resolve the issue before it at this time.

10        In the reply brief filed by Hansen, Hansen

11 mentioned the Dayton Phoenix case.  There the Court did

12 allow the Plaintiff to depose the Defendant's expert who was

13 first designated as a trial witness under 26(b)(4)(A) but

14 then redesignated as a non-testifying consultant under

15 (b)(4)(B).  But, again, the Court limited the deposition

16 only as to facts and opinions the expert acquired before the

17 expert -- and I stress the word before -- before the expert

18 was retained by the Defendant, as the Defendant's expert.

19 And then, again, only after the Defendant demonstrated the

20 exceptional circumstances that are required under

21 24(b)(4)(A) by first providing the Court with a explanation

22 of the purpose of that deposition, the inability of the

23 Defendant -- excuse me -- the Plaintiff to obtain the

24 information from other sources, and then the Court, even

25 after all that, was going to conduct a Rule 403 analysis and

19

1 then make the decision.

2        Again, the facts in that case are completely
3 distinguishable from the facts of this case.  The cases
4 cited by Living Essentials, one, were either inappropriate
5 for citation in this brief, for example, the <u>Federal</u>
6 <u>Insurance</u> case clearly indicates it's a case not for
7 citation purposes.  In my view, that case has no persuasive
8 value at all and should not even have been cited.  But,
9 nevertheless, while the case was cited, I have read it.  I
10 have considered it but find it to be of very little
11 persuasive value, if any, at all.  Nonetheless, that case
12 seems to support Hansen's position more than it does Living
13 Essentials' because, even though the Court in <u>Federal</u>
14 <u>Insurance</u> denied the Plaintiff's request to depose the
15 Defendant's expert who was designated initially as a trial
16 witness but then sort of downgraded to a non-testifier and
17 that redesignation occurred after the Court had ruled on a
18 motion for partial summary judgment, and when the Court did
19 that, it eliminated many of the issues in the case upon
20 which the expert in <u>Federal Insurance</u> was initially retained
21 to testify about, and so that expert became really just
22 excess baggage for -- for the Defendant at that point in
23 time.

24        And so the Court reasoned that while the expert
25 was not relied upon by the Defendant -- and, furthermore,

20

1  the Court reasoned that the expert was not relied upon by

2  the Defendant in that motion for partial summary judgment,

3  unlike here where Mahadi was relied upon in part by the

4  Defendant in the motion for the preliminary injunction.

5          So the Court was implying at least that if the

6  Defendant had used the expert declaration, for example, in

7  the motion for partial summary judgment, then perhaps the

8  outcome may have been different.  Perhaps the Court may have

9  ordered the deposition, but in this particular case, unlike

10 Federal Insurance, the facts that are in Mahadi's

11 declaration still very much remain in issue, and so that's a

12 fact that perhaps weighs against Living Essentials' desire

13 to insulate Mahadi from a deposition, unlike the expert in

14 Federal Insurance because, as I said, in that case, the

15 expert's opinion and purpose for being retained were no

16 longer necessary given the outcome of the motion for partial

17 summary judgment.

18         However, as I stated at the outset, Federal

19 Insurance, as far as I'm concerned, has very little, if any,

20 persuasive value because it's a case not meant for citation.

21         The Calloway case cited by Living Essentials, it's

22 another case that I'm not sure why Living Essentials even

23 cited it, because the Court allowed the deposition of a

24 redesignated expert who was once designated as a trial

25 witness but then was downgraded or redesignated as simply a

21

1  consulting expert.  The Court allowed the deposition but,

2  again, allowed it on a limited as to time and scope and

3  using a 403 analysis.

4         The Court did, however, acknowledge that in that

5  case, as in many of the others, that there is no consistent

6  position on this issue but that generally, redesignated

7  experts are insulated from discovery absent exceptional

8  circumstances.

9         The Durfinger case cited by Living Essentials also

10 is clearly distinguishable, and that is a case where it's

11 not -- the issue in the case didn't even surround whether a

12 deposition should or should not be taken.  But in that case,

13 the Plaintiffs redesignated an expert as a non-testifier,

14 and the Defendant, ignoring the discovery process and the

15 spirit and intent of the discovery process, circumventing

16 that discovery process went VFR direct, went directly to the

17 expert to obtain that expert's reports, and that, of course,

18 angered the Court and there were various sanctions issued as

19 a result, but it had nothing to do with the deposition.

20        The -- the Intervet case, also cited by Living

21 Essentials, is the case that I found to be the closest on

22 point and the one that -- that helped me the most.  And in

23 that case, the Court rejected the argument that a party

24 weighs Rule 26(b)(4)(B) protection by using a non-testifying

25 expert declaration in the motion for a preliminary

22

1 injunction, meaning, in other words, that the person -- a

2 party who uses an expert's declaration in a motion for

3 preliminary injunction or any motion for summary judgment,

4 for example, but has indicated that that person is not going

5 to be a testifier at trial, not be presented at trial, that

6 person is protected from -- from -- from the discovery

7 process, and the -- the party that retained that expert can

8 insulate and protect that expert's opinion and thought

9 processes.

10         So that case I found to be the most helpful to me

11 and the most on point.  There are other cases out there or

12 the cases that you cite argue alternatively, for example,

13 the -- the Hooker case, that once an expert is sort of put

14 into the judicial arena, either by way of a declaration or a

15 previous deposition and despite a later redesignation of

16 that expert as a non-testifier, they're kind of out there,

17 and they're subject to being deposed.  But there are cases

18 on the other side, for example, that Intervet case, that

19 says, "Hey, you have the right to protect -- a party has the

20 right to protect a witness or an expert who's only a

21 consultant, not designated as a trial expert, and they

22 haven't actually put themselves into the judicial arena."

23 So, as I said at the outset, there are cases that go both

24 ways.  That's my guess as to why the parties had a difficult

25 time finding many, if any, cases that were directly on point

23

1  with the exception of perhaps this <u>Intervet</u> case.  Now, with

2  that sort of as the backdrop -- and maybe I should have

3  started out with this -- my question is because it's one

4  that's raised by Living Essentials at the outset, claiming

5  that I have no jurisdiction to even rule on this, my

6  question is, has Living Essentials sought protection in the

7  Northern District of Illinois to prevent the deposition of

8  Doctor Mahadi.  Hansen has, in fact, gone out with the

9  deposition.  I presume it's been served by now.  A

10 deposition issued out of that district.

11        And so, like the <u>Intervet</u> case cited by Living

12 Essentials, the motion to quash a subpoena to depose the

13 expert in that case was filed in Nebraska, presumably where

14 the expert resided or was found and not in Washington, D.C.

15 where the action was pending.

16        So my question right now to Living Essentials is

17 have you sought that protection that you claim -- you claim

18 in the converse that I lack the jurisdiction.  Have you

19 sought the protection in the Northern District of Illinois?

20        MR. CUNNINGHAM:  I -- Living Essentials has not,

21 your Honor, but I don't know if Doctor Mahadi herself has

22 made a decision on that yet.

23        MR. MCINTYRE:  No, your Honor.  No one has sought

24 a protective order from the -- District Court for the

25 Northern District.

24

1          THE COURT:  Okay.  Well, that -- that being the

2  case, my -- my tentative ruling is this, is that Hansen may

3  not depose Mahadi, regardless of the fact that protection

4  has or has not been sought in the Northern District of

5  Illinois unless -- unless Hansen can show that there are

6  exceptional circumstances, which I believe is what the rule

7  requires with a non-testifying expert.  I have not seen such

8  a showing to date, but I will give Hansen one week from

9  today's date, March the 10th, to provide to the Court

10 similar to some of the procedures that were outlined in

11 other cases that I've already gone through, provide to the

12 Court your purpose in reasoning for wanting to depose

13 Mahadi, why you can't obtain the same information from

14 another source or expert, and why Hansen would be prejudiced

15 by not being able to take the deposition of Doctor Mahadi.

16          Hansen, in my view, has a declaration.  You can

17 use it.  You can show it to your own experts who can use it

18 in their own preparation for cross examining of the experts

19 provided by Living Essentials.  However, having said that,

20 I'm going to give Hansen a week to sort of pony up as to why

21 they think they have to provide or why they have to depose

22 Mahadi, provide me with your purpose, provide me with

23 information from another source or why you can't and why

24 you'd be prejudiced, and then I will engage in a 403

25 analysis.

25

1          That's my tentative ruling, but I'm going to give

2  you each an opportunity, if you care to, to give me some --

3  some thoughts and rationale as to why I either ought to

4  allow it outright or deny it outright.

5          MR. MCINTYRE:  Very good, your Honor.  Your Honor,

6  this is Ed McIntyre.  We accept the Court's proposal, and we

7  will submit the papers on or -- the additional material on

8  or before the 10th rather than to take the Court's time

9  today.  We'll simply get it before the Court.

10          THE COURT:  Okay.  Mr. Cunningham?

11          MR. CUNNINGHAM:  My only comment, your Honor, is

12  -- it's a jurisdictional one, and I'm not sure any of us,

13  including you, your Honor, can compel Ms. Mahadi -- Ms.

14  Mahadi or Doctor Mahadi to be deposed.  I think she -- and I

15  don't know -- and, frankly, I don't know if she -- what

16  she's going to do in regards to that or not, but she I think

17  would have the ability to file a motion to quash her own

18  testimony on her own --

19          MR. MCINTYRE:  Let me address that, your Honor.

20          MR. CUNNINGHAM:  -- on her own behalf.

21          MR. MCINTYRE:  When we served a document subpoena

22  -- and I have support of this from our papers -- when we

23  served a document subpoena much earlier on Doctor Mahadi,

24  she not only didn't object, didn't seek protection, but she

25  produced her documents, and, oh, by the way, Living

26

1  Essentials never even objected.  We're perfectly happy to

2  brief it with the Court.  We're also I guess perfectly happy

3  to go into the District Court for the Northern District of

4  Illinois and say we have subpoenaed this witness and we

5  would like an order directing her to appear.  But I guess if

6  I were a judge sitting in the Northern District of Illinois,

7  my first question would be, "Well, but I don't know anything

8  about this case.  What does the court that has the case

9  think," jurisdictional niceties notwithstanding.

10              So we're willing to either rebrief this or

11  supplemental briefing for this for the 403 analysis by the

12  10th, your Honor, or if the Court believes it has no

13  jurisdiction, then we'll simply go and enforce the subpoena

14  in the Northern District.

15              THE COURT:  I think the jurisdictional issue is

16  one that's ambivalent and unequivocal or equivocal I should

17  say, not unequivocal, equivocal and ambivalent in this

18  situation.  The subpoena indicates that it -- well, let me

19  -- do you have the date there, Mr. McIntyre, when the

20  subpoena was served?

21              MR. MCINTYRE:  I know it was served, your Honor.

22  I don't have the date in front of me of the date of service.

23              THE COURT:  Okay.

24              MR. MCINTYRE:  Sorry.

25              THE COURT:  And I have not seen -- I know that

27

1  Living Essentials is aware of the fact that the subpoena has

2  been served.  I've not seen any effort by Living Essentials

3  or Doctor Mahadi to quash the subpoena, and I just find

4  that, you know, if you -- if you live by the sword, you die

5  by the sword.  If you say I have no jurisdiction and that

6  jurisdiction really lies in the Northern District of

7  Illinois to compel, then jurisdiction lies in the Northern

8  District of Illinois to quash, and if there's been no effort

9  made to quash, then I personally am not just going to sit

10 idly by and wait for one side to do or not do something

11 while this case continues to take a very, you know, slow

12 approach to resolution here one way or the other or trial,

13 and so my -- my tentative ruling is that jurisdiction either

14 here or in Illinois is -- is questionable with respect to

15 who actually has the authority.

16        To the extent I do not, to the extent I don't have

17 that authority, Mr. Cunningham, what I have just said I

18 think would be very persuasive because I'm guessing that Mr.

19 McIntyre will have this transcript -- or this hearing

20 produced in black and white in a transcript.  That judge in

21 Illinois who's got a million things on his or her plate is

22 going to want to know what a judge here in San Diego has to

23 think, and all they have to do is produce this transcript,

24 and I'm guessing that that judge there will ultimately allow

25 the deposition to be taken, providing this 403 analysis has

28

1 been taken.  And I ultimately say that Hansen has

2 established the exceptional circumstances which I believe it

3 must before it can take Mahadi's deposition.

4          So bottom line, Mr. Cunningham, do what you think

5 you need to do to prevent it or to prevent it absolutely,

6 that that is the deposition of Mahadi.  Right now my ruling

7 is -- and it's ripened into a final ruling on this -- is

8 that Hansen may not, N-O-T, not depose Mahadi unless it can

9 show those exceptional circumstances, which I will give them

10 a week to do.

11          MR. CUNNINGHAM:  Thank you, your Honor, and we

12 will do it.

13          MR. MCINTYRE:  Thank you, your Honor.  Will I get

14 a chance to respond to them or will you just be ruling on

15 their papers?

16          THE COURT:  No, I'm going to let you have it.  You

17 should get it.  They should provide you a copy of it.  I'm

18 not so sure I'm going to seek your input, but you can get a

19 copy of it.  You know, unless there's privileged material in

20 there that goes to the rationale and the purpose why Hansen

21 needs to -- needs to take this deposition and why they might

22 be prejudiced, in that regard, you know, Hansen, you can

23 redact out portions that go to the other side or file it as

24 a confidential attorneys' eyes only document.

25          MR. MCINTYRE:  That would be fine.  Thank you,

29

1   your Honor.

2            MR. CUNNINGHAM:  Yeah, it --

3            THE COURT:  Okay.

4            MR. CUNNINGHAM:  It will be a little bit like

5   opening up our books, but we'll try to get the Court as much

6   information as possible.

7            THE COURT:  Okay.  All right.  Now, moving to

8   Hansen's request for production of documents from 111 down

9   to 124, having already dealt with 125 through 126, my

10  tentative ruling, Mr. Cunningham and Mr. McIntyre, is to --

11  is to grant these requests.  They seem to me to be

12  reasonable requests relevant to the claims, counterclaims

13  before the Court, but to limit them back to 2004.

14           So, with that, I'm guessing, Mr. McIntyre, you may

15  not want to say too much because you're already ahead at

16  this point.

17           And, Mr. Cunningham, I'll give you the floor as to

18  why these RFPs 111 through 124 should not be produced.

19           MR. CUNNINGHAM:  Well, your Honor, we have in a

20  sense agreed, as I -- as I told you, we didn't address this

21  request until just a couple of days ago, and we in a sense

22  agree with you to a certain extent, and I don't have them in

23  front of me, but I did issue a number of objections.  We are

24  going to produce our formulations and the changes in

25  formulations, and to the extent -- and respond to these to

30

1    the extent we have them.

2          Some of these requests were just -- are just

3    identical to previous requests and we've responded to a

4    number of them already.

5          THE COURT:  Unfortunately, Mr. Cunningham, I don't

6    believe I have your -- your response, your -- to these

7    requests.

8          MR. CUNNINGHAM:  That's my point, your Honor.

9    They filed on these requests for production of documents

10   before the response date.  The response date was February

11   26th.  That's when I responded.  We haven't even met and

12   conferred on these.

13         THE COURT:  All right.

14         MR. CUNNINGHAM:  I just submitted an objection

15   just a few days ago.

16         THE COURT:  I think part of the problem here is

17   that there have been conversations back and forth between

18   the two of you, Mr. McIntyre and Mr. Cunningham, with

19   respect to these, and representations made that the

20   documents would be provided and the documents didn't come,

21   and so Hansen files this -- this dispute and after maybe

22   given an extension or two to provide the documents, and so

23   time was running out.  I could be wrong in that -- that

24   assessment.

25         MR. MCINTYRE:  I can address that, your Honor.

31

1  Tom is correct on the issue of service.  We spoke on the

2  phone, and I gave him -- I thought, but I will stand

3  corrected, I thought I gave him until the 23rd to respond.

4  He tells me and the Court it was the 26th.  That's perfectly

5  fine.  Three days is a mox nix, and we got those responses

6  in on the 26th.  I can have them pdf -- well, that would be

7  unfair because the Court would have to look -- I -- I was

8  going to say I can have them pdf'd to the Court right now.

9  The -- when I hear Tom say we will give you, for example,

10  formulations, what I have in front of me is a series of

11  objections and then a sentence that I -- truly defies any

12  understanding.  It will provide non-privileged, non-immune

13  relevant responsive documents relating to the energy shot to

14  the extent not already produced, and I can understand that.

15  I have no idea when you're talking about a formulation what

16  a non-privileged, non-immune relevant responsive document

17  is.

18        MR. CUNNINGHAM:  Well, for instance --

19        MR. MCINTYRE:  What we're dealing with, your

20  Honor, is -- and maybe for the Court's convenience you

21  should direct Tom and me to try to nail this down today and,

22  if need be, come back.  I'm also mindful of the Court's

23  admonition "Get all the discovery issues in front of me now

24  once and for all."  So that's really what we've been trying

25  to juggle.

32

1      THE COURT:  Well, I'm going to give -- no, we're

2  going to resolve it right now.  I'm going to give Mr.

3  Cunningham an opportunity as we go through each run of these

4  requests -- as I tentatively have indicated, I -- they seem

5  to me on their face to be reasonable, relevant, not over-

6  broad, not vague in the -- in requesting the various

7  documents requested in each specific item -- number here,

8  but, Mr. Cunningham, you have filed objections.  Let's go

9  through them.  Tell me what they are right now, and let's

10  move forward.

11      So Number 111.

12      MR. CUNNINGHAM:  Your Honor, I don't have them in

13  front of me.  If you'll give me a minute, I'll try and find

14  them.

15      MR. MCINTYRE:  Tom, I just E-mailed them to you.

16      MR. CUNNINGHAM:  Okay.

17    (Pause.)

18      MR. MCINTYRE:  Your Honor, this is Ed McIntyre,

19  while Tom is looking at this, while he's listening, this --

20  this whole formulation issue raises -- I can appreciate we

21  -- we fully understand -- a serious issue for Living

22  Essentials.  It raises equal issues for anybody all the way

23  back to the original Coca Cola case.

24      The only fight in this case is over energy and

25  crash.  Caffeine and sugar are probably the only ingredients

when we get down -- boil it down that anybody will ever care about in the trial of this case, and I'm wondering, your Honor and Tom, if rather than getting into what obviously us usually proprietary to Living Essentials, if we can't simply reach some agreement that the ingredient that people will really care about are caffeine and sugar mixes or no sugar, as Living Essentials holds itself out, such that there is no need to get into all of the other super secret sauce, if you will, of anybody's formulations and, in fact, a thought that comes out of another case is to see if we could not even stipulate to that fact or those facts and produce subject to attorneys eyes only whatever caffeine content or changes have occurred, sugar content or changes have occurred or to the extent that one side or the other is relying on a particular element, glucuronolactone or taurine or whatever, to limit it only to those elements in anybody's formulation that either side is going to say this is the secret sauce that makes ours work and not have to deal with issues that both of us I think know from our own clients and from our experts simply will never be at issue in this case, and probably they're not worth taking up the Court's time in walking through why they should or should not be produced.

THE COURT: Well --

MR. MCINTYRE: A suggestion to the Court -- it is one that Tom and I have not talked about. It is one that

34

1   came to me as I sorted through some of these issues.

2             THE COURT:  Mr. McIntyre --

3             MR. CUNNINGHAM:  I'm not sure I agree with that.

4   First of all, we've already produced our formula for 5-hour

5   Energy with the complete formula.  So what you're seeking

6   here is the changes and things that we've made, and that's

7   fine.  I -- for some reason, I'm not getting anything from

8   Mr. Mizrahi, but that said, let's -- let's go through these.

9   I think we're going to -- to the extent we have documents

10  that evidence changes in our formulation, we're going to --

11  we're going to provide those.  My -- and I don't have in

12  front of me what Ed read about what we weren't willing to

13  produce.  It says any document that evidences, and like, for

14  instance, if my expert prepared a report that has the

15  formula listed in it, under this request, I'd have to

16  produce that expert report now, and we all make objections

17  to protect ourselves from things like that because it's

18  difficult to craft objections to get what you want and not

19  be over-broad, but as far as us producing our formulation

20  and the documents that evidence the changes, we're willing

21  to do that and just as Hansen was ordered to do last week.

22  I mean, I'm not going to sit here and argue that I'm

23  entitled to Hansen's formulas but we can't provide ours.

24  But to the extent we had objections on those, they were just

25  to protect ourselves from the breadth of the requests

35

1 themselves.

2       THE COURT:  Well, I appreciate what you just said,

3 Mr. Cunningham, with respect to expert reports, opinions,

4 things of that nature, because you're right, the expert

5 disclosure date has not yet arrived, and so I think we ought

6 to stick with that.  And so to the extent that any of these

7 requests -- and that's something I hadn't thought about, and

8 I appreciate you mentioning it now.  So to the extent that

9 any of these requests require or would require for a full

10 and complete response, the disclosure of an expert report,

11 that would not have to come until the date for expert

12 disclosures.

13       However, when responding to 111, to be clear -- or

14 any of these, if there are reports -- expert reports out

15 there that may be responsive and you aren't going to provide

16 them until the expert disclosure date, you ought to let that

17 fact be known in your response.  With respect to RFP 111,

18 Living Essentials provides the following Bate stamped

19 documents, whatever they are.  They are, in generic terms,

20 expert reports which are responsive but are not being

21 provided at this time subject to the Court's order today

22 that they don't need to be disclosed until the expert

23 disclosure date.

24       Were many of your objections to disclosures on

25 that basis, that there may be expert reports that are due at

36

1   some later time or is that --

2           MR. CUNNINGHAM:  Yeah.  I mean, the requests had

3   some breadth to them which conceivably could be used to

4   cover certain documents that shouldn't be produced at least

5   at this time, and that's basically what we were trying to

6   protect ourselves from, but as far as the formulations, the

7   changes and the dates on which they were done, to the extent

8   we have those documents, we're going to provide them.

9           THE COURT:  Okay.  So let's go down through them.

10  Is there -- 111, what's your position?

11          MR. CUNNINGHAM:  We will provide our formulation,

12  the changes to them and the dates on which they were done to

13  the extent we have them.

14          MR. MIZRAHI:  This is Mark.  On -- 111 and 112 are

15  relatively similar regarding the date issue.  I mean one is

16  asking, part 111, the date on which each change in

17  formulation occurred, and 112 was when the change

18  formulation, the new formulation was first available for

19  sale, distribution.

20          I mean, to the extent that we have the documents,

21  you know, or the documents themselves show that a change in

22  formulation occurred on a particular date, we're not going

23  to redact that date, but I haven't seen the documents, but

24  one of the objections to 111 was what does it really matter.

25  Isn't it, you know, over-broad and irrelevant on the date in

37

1  which the formulation occurred because, in contrast, 112

2  asks when it was first available for the consuming public,

3  and that's the relevant issue is when was the new formula

4  out in the marketplace.

5          So we did make an objection to the breadth of 111

6  asking them the date on which the change in formulation

7  occurred because that's not relevant.  The relevant issue is

8  112 regarding dates as to when it was first available

9  because that's really the issue, the marketplace issue.  So

10 we did make objection to 111 along those lines.

11         To the extent it's in the document, the revised

12 formulations, you know, whatever the date is, we're not

13 going to redact it, but we don't want to go search for

14 documents that I did not myself have documents in hand when

15 we produced these responses.

16         MR. MCINTYRE:  If I could address that issue, your

17 Honor, why the date of the change is relevant.

18         THE COURT:  Go ahead.

19         MR. MCINTYRE:  A lawyer for Living Essentials --

20 and I'll put my characterization on it -- caused an expert

21 whose report was submitted to the Court to make changes in

22 that report, deletions, before the report was submitted.

23 The lawyer's name is Mr. Imorg (phonetic).  Mr. Imorg

24 testified that the reason he did it was, "Oh, that

25 ingredient was already out."  I am entitled to documents to

38

1  show that, as I think will be the case, the ingredient was

2  not out and the changes were ordered to the report because

3  those -- that particular part of the report was unfavorable

4  to Living Essentials.

5        Fortunately, the party that made the changes

6  produced both the redacted and unredacted report, and that's

7  the only way we would have known it, because Mr. Imorg, the

8  Washington lawyer, never produced the redacted version --

9  the unredacted version.  So the relevance of when it

10 occurred as opposed to when it was available to the public

11 -- and I agree with Mr. Mizrahi that when it was available

12 to the public is also relevant -- is, frankly, for purposes

13 of assuming I can, unhinging Mr. Imorg's testimony, and I

14 don't -- Tom was at his deposition or Mr. Cunningham was at

15 his deposition.  I don't think there's any mystery about

16 where we're headed here.  So that's the relevance, your

17 Honor.

18        THE COURT:  Okay.

19        MR. MCINTYRE:  Cross examination.

20        THE COURT:  Anything else, Mr. Mizrahi or Mr.

21 Cunningham?

22        MR. CUNNINGHAM:  No, your Honor.

23        THE COURT:  All right.  My tentative ruling stands

24 with respect to 111, subject to the caveat that expert

25 reports certainly are not to be included in that production

39

1   until required by the expert disclosure date which I believe

2   is March the 23rd at the earliest.  Okay.

3          Going on to 112, I think there seems to be no

4   disagreement about that.  Am I correct?

5          MR. CUNNINGHAM:  Yeah.

6          THE COURT:  Okay.  So --

7          MR. CUNNINGHAM:  One thirteen is subsumed within

8   111, because one of the ingredients are enzymes.

9          THE COURT:  I'm sorry.  Say that again.

10         MR. CUNNINGHAM:  Request 113 is subsumed within

11  request 111.

12         THE COURT:  So no objection?

13         MR. CUNNINGHAM:  No.

14         THE COURT:  Okay.  One fourteen?

15         MR. CUNNINGHAM:  I guess we're a little vague on

16  what they mean here, that any document that supports the

17  choice.  I mean, what does that mean?

18         THE COURT:  I think they're looking for

19  information as to why he chose one over the other.

20         MR. MIZRAHI:  I -- yeah.  That's funny because I

21  didn't read it that way.  So what you're -- you're saying

22  something different from the way I read it.

23         MR. CUNNINGHAM:  Yeah, that's different from the

24  way I read it too.  If that's the case --

25         THE COURT:  Well, how are you reading it, Mr.

40

1  Cunningham, Mr. Mizrahi?

2         MR. CUNNINGHAM:  I didn't even understand what

3  supports the choice means.

4         MR. MCINTYRE:  All right.  Let me try to

5  explicate.  Your client came to market choosing a name and a

6  slogan 5-hour Energy as opposed to two or three or seven or

7  six.  We have testimony from Mr. Bargavez.  All we're asking

8  for is is there any documents that exist that supports the

9  choice of the name 5-hour Energy as opposed to any other

10 durational period or no durational period.  And since you

11 came -- your clients came to market first using the chaser

12 modification of the 5-hour Energy for marketing purposes and

13 to be complete since the product was first called Chaser 5-

14 hour Energy and then segued into 5-hour Energy, that's why

15 Chaser is in there, but the thrust of the question is why 5-

16 hour Energy as opposed to Lots of Energy or 2-hour Energy or

17 any other name that conceivably could have been chosen, if

18 there -- if there are any documents that would support that

19 particular choice.  We have Bargavez' testimony why he said

20 he chose it.

21        MR. CUNNINGHAM:  Okay.

22        MR. MCINTYRE:  He was not a 30(b)(6) witness, as

23 you may recall.

24        MR. CUNNINGHAM:  I have no problem with that.

25        THE COURT:  Okay.  One fifteen?

41

1        MR. CUNNINGHAM:  Here it says any document that

2   came into existence that supports the statement "Hours of

3   energy now."  Say, for instance, that there's medical

4   studies all over the place about caffeine lasting for five

5   hours.  Do I have to find every medical study and produce it

6   that would, you know -- a study which says that the half

7   life of caffeine is seven hours?

8        THE COURT:  Okay.  Valid point.  Obviously --

9   well, maybe not so obvious, but, yeah, literal reading of

10  115, 116, and 117 would seem to indicate that you have to go

11  to the -- to the Library of Congress and get all those

12  documents.  Obviously that is not what's required, at least

13  in my view.

14        So to the extent that these requests ask for

15  documents, I interpret this and you interpret it as

16  requiring -- asking Living Essentials to produce documents

17  that -- that were considered by Living Essentials in those

18  -- those years that supports the statement.

19        MR. MCINTYRE:  That's correct, your Honor.  I

20  think if we had the complete set, you would see that the

21  requests -- all of these requests were preceded by the

22  generic -- obviously only to the extent that these documents

23  are in the custody, possession or control of Living

24  Essentials.  This is not some requirement because I don't

25  think the rules ever require it of a party to go out and now

42

1  find stuff that it did not then have or to go to the Library

2  of Congress or Pub Med or anybody else.

3          MR. CUNNINGHAM:  Just so we're clear, what if my

4  experts have found medical articles.  Would they be subject

5  to this?

6          MR. MCINTYRE:  Then I suspect your expert will

7  have as part of your expert file when we take your expert's

8  deposition whatever your expert found that as consistent

9  with what his Honor just said, none of these requests are to

10 require a party to produce expert material before expert

11 disclosure.

12         MR. CUNNINGHAM:  That's what I'm wondering.  Is

13 that how you interpret expert material would be a

14 publication that's out there, it's just one that we -- that

15 our expert has found that supports the case.

16         MR. MCINTYRE:  Okay.  Let me -- I'm sorry, your

17 Honor.

18         THE COURT:  Yeah, what I was going to say, in that

19 regard, that document would not be required for disclosure

20 until later --

21         MR. MCINTYRE:  Okay.

22         THE COURT:  -- when expert disclosure occurs.  But

23 there's a however.  There's a comma, a but, or a however

24 that follows that if those same or similar documents were

25 reviewed, examined, considered by officers and directors,

43

1  non-experts, at board meetings, marketing meetings or

2  whatever in arriving at, you know -- or having a discussion

3  about these terms that are at issue in 115, 116, and 117,

4  then I believe they ought to be disclosed pursuant to these

5  requests for productions.  I mean, they may have a dual

6  purpose.  They may be used by your experts.  They also may

7  be used by the company itself in making business decisions.

8          To the extent that your expert has medical reports

9  and other scientific data that it used that the company did

10  not use itself, then those reports obviously wouldn't need

11  to be provided at this time.

12          MR. CUNNINGHAM:  All right, your Honor.

13          THE COURT:  Okay.  So with respect to -- I mean,

14  the issues in 115, 116, and 117 to me all seem to be

15  related.  I'm assuming that the objections are the same, but

16  if they're not, then please speak up now, and my -- my

17  clarification then in terms of my tentative rulings would be

18  as to those three requests that the documents must be in the

19  possession, custody, or control of Living Essentials, have

20  been considered by them in those years 2004 up through July

21  of '08, and any documents that were considered by experts

22  and exclusively by experts and not reviewed, discussed, you

23  know, bandied about the water cooler by officers and

24  directors of the -- of the company, then should be

25  disclosed.

44

1          MR. CUNNINGHAM:  Yes, your Honor.

2          THE COURT:  Is that sufficiently muddy?

3          MR. CUNNINGHAM:  Yeah.

4          THE COURT:  Okay.  All right.  So with respect to

5   115, 116, and 117 then, with the explanation I just gave,

6   Living Essentials should produce those documents.

7          Okay.  Now, moving on to 118.

8          MR. CUNNINGHAM:  We already provided these

9   documents, your Honor.

10          THE COURT:  Already provided?

11          MR. CUNNINGHAM:  Yeah.

12          MR. MCINTYRE:  Yes.  They -- they were -- they

13   appear to be in a set in the package that I got on the night

14   of the 26th.

15          THE COURT:  Okay.  Are you withdrawing this

16   request then?

17          MR. MCINTYRE:  I believe so, your Honor.  yes.

18          Tom, if that completes that -- I haven't had a

19   chance to go through them.

20          MR. CUNNINGHAM:  I believe so, yes.

21          MR. MCINTYRE:  Okay.  Fine.  Then obviously, your

22   Honor, it's withdrawn.  It's been produced.

23          THE COURT:  Okay.  How about 119?

24          MR. MCINTYRE:  Tom?  I don't think so.

25          MR. CUNNINGHAM:  Well, you want the -- let me look

45

1  first.  I'll tell you what I -- I'm not sure we have

2  produced our most recent television commercials which are

3  public, but I'm -- you know, I guess I'm willing to provide

4  those.

5          The date first used for a lot of these should be

6  in those documents that were produced.

7          MR. MCINTYRE:  The media buys?

8          MR. CUNNINGHAM:  Yes.

9          MR. MCINTYRE:  Yeah, okay.  It's about three

10 inches.  I have not gone through them.  And maybe we can

11 just get through this, your Honor, right now of why I'm

12 asking for this.  It is -- and I --

13         THE COURT:  Mr. McIntyre --

14         MR. MCINTYRE:  There won't be any issue at trial.

15         THE COURT:  Mr. McIntyre, I don't mean to cut you

16 off, but I think you're entitled to it.  So I'd much just

17 rather hear from the other side.

18         MR. MCINTYRE:  Fine.  I'll stop.

19         THE COURT:  Yeah.

20         MR. CUNNINGHAM:  Your Honor, and I didn't have a

21 problem with this.

22         THE COURT:  Okay.

23         MR. MCINTYRE:  Sorry.

24         THE COURT:  Okay.  Good.  One twenty?

25         MR. CUNNINGHAM:  To the extent we have them, your

46

1  Honor, sure.

2            THE COURT:  Okay.  One twenty-one?

3            MR. CUNNINGHAM:  I -- what I didn't understand

4  here was how video and audio portion is different from

5  producing the commercial itself.  I mean, they've asked me

6  to produce all the television advertisements.  I just don't

7  understand what --

8            MR. MCINTYRE:  It may be redundant.

9            THE COURT:  Well, I can see a big difference

10  between having a transcript of the commercial as opposed to

11  actually, you know, the visual and audio effect of the -- of

12  the commercial itself on the viewer.

13            MR. CUNNINGHAM:  What I'm talking about, your

14  Honor, is Number 119 which asks for each television

15  advertisement --

16            THE COURT:  Okay.

17            MR. CUNNINGHAM:  -- which is a copy of the

18  commercial and then 121 --

19            THE COURT:  I've already moved on from that.

20            MR. CUNNINGHAM:  -- which says the video and audio

21  portion.  I didn't understand the difference.

22            THE COURT:  All right.  Mr. McIntyre, you want to

23  explain the difference between I guess an exemplar and a

24  transcript and an audio, video audio portion?

25            MR. MCINTYRE:  Well, the exemplar all I want is

47

1  obviously one version of each commercial as opposed to every

2  time they ran it.  If what I'm going to get in response to

3  119 is both the transcript as well as some -- the video

4  itself, then that's perfectly fine, and to that extent they

5  overlap.

6           Is that what you're producing, Tom?

7           MR. CUNNINGHAM:  Yeah, I'll produce the actual --

8           MR. MCINTYRE:  Transcript plus video?

9           MR. CUNNINGHAM:  Just like all the other ones we

10 produced.

11          MR. MCINTYRE:  Transcript plus video?

12          MR. CUNNINGHAM:  If we have a written transcript,

13 then I can produce that, but the video itself is -- I mean,

14 it's -- it has audio and video.  You'll have everything

15 that's in it.

16          THE COURT:  Okay.

17          MR. MCINTYRE:  Okay.  But if you have a written

18 transcript that was used or maybe not used by the producer

19 of it -- and we both know from deposition testimony it was

20 as third party -- you will get me the transcript?

21          MR. CUNNINGHAM:  If it was used?

22          MR. MCINTYRE:  Yeah.

23          MR. CUNNINGHAM:  If it was used, yes.

24          MR. MCINTYRE:  Okay.  Thank you.  That's fine.

25          MR. MIZRAHI:  If the commercial was run.

48

1          THE COURT:  Okay.  One twenty-two?

2          MR. CUNNINGHAM:  That's what's been produced.  We

3   haven't went all the way back to 2004 yet, and, as I said,

4   that's what my client is trying to figure out.

5          MR. MIZRAHI:  And that's what we'll now have by

6   say the 13th.

7          THE COURT:  This is part of that discovery that's

8   coming in 10 days?

9          MR. CUNNINGHAM:  Yeah.

10         THE COURT:  All right.  So my -- my druthers then

11  is to grant the request and then have Living Essentials

12  provide the documentation.

13         MR. CUNNINGHAM:  That's fine, your Honor.

14         THE COURT:  Okay.  One twenty-three?

15         MR. CUNNINGHAM:  This, your Honor, is just way too

16  over-broad.  Every Internet advertisement is just -- I mean,

17  think about it.  Think about that.  We buy banners that, you

18  know, that go on Google, that will show up on Google, you

19  know, show up on all sorts of different websites, things of

20  that nature.  I mean, to ask for every single Internet,

21  we've had a website since, whatever, 2004.  To be able to

22  marshal every single Internet advertisement and for what --

23  to what end?  I mean, I don't understand what it would be

24  necessary for.

25         MR. MCINTYRE:  Well, as you know, Tom, there are

49

1  things that are on your client's website that are directly

2  at issue in this case.  To pick an obvious example is the

3  crash effect explained and also the energy drink comparison.

4          MR. CUNNINGHAM:  And you have that.

5          MR. MCINTYRE:  Well, I have it because I

6  downloaded it.  I showed it to Sperber, and he said, "Well,

7  I'm looking at it.  Yeah, it's probably what was on the

8  website," and I don't want to end up, you know, frankly with

9  my thumb in my ear in front of Judge Gonzalez without

10 appropriate foundation.  You know, if this is something that

11 we can stipulate to that, yes, this appeared on the website,

12 fine.  But --

13         MR. CUNNINGHAM:  But this request goes to banner

14 ads that we have on Google, Yahoo.

15         MR. MCINTYRE:  I'm not looking for banner ads on

16 Google and Yahoo.

17         MR. CUNNINGHAM:  I mean, this is every single

18 Internet advertisement we've ever done.

19         MR. MCINTYRE:  Okay.

20         THE COURT:  Yeah, Mr. McIntyre, the -- the request

21 as written, I mean, the literal interpretation of it would

22 certainly include, you know, advertising on Yahoo, Google

23 and any other countless search engines that are out there,

24 not just Living Essentials' website.

25         Now, are you, Mr. McIntyre, simply asking for --

50

1  to substitute out Internet advertisement Defendant's

2  website, is that what you're asking for?

3          MR. MCINTYRE:  That's fine, your Honor.

4          THE COURT:  Okay.  Now, with respect to that

5  limitation, Mr. Cunningham, is there any objection?

6          MR. CUNNINGHAM:  Would that be just -- just they

7  want us to copy our current website and provide it to them?

8          MR. MCINTYRE:  No.  Your website -- as -- as we

9  know from screen shots we've taken, your client's website on

10 some very critical issues, Tom, has changed over time.

11 Crash effect explained, which is probably one of the

12 cornerstones of the case, has gone through, what, three or

13 four morphings as your client keeps changing the definition

14 of crash, and I believe we are entitled to be able to show

15 that this is what they were saying, "Oh, yes, we sued them

16 and they shifted.  Then we took Blum's deposition.  They

17 shifted again.  They're shifting again."

18          So I -- I think on those it's what has appeared on

19 your client's website, obviously only to the extent your

20 client has captured it or -- or the host has captured it.  I

21 don't know how you deal with your website.

22          MR. CUNNINGHAM:  Are you looking for one in -- is

23 crash effect explained, is that what you're looking for?

24          MR. MCINTYRE:  Well, I used that one as because it

25 is -- I mean, its relevance just screams at us, at both of

51

1   us as one of the cornerstone issues in the case.  Your

2   website has also hosted your TV commercials.  That may be

3   redundant.

4           MR. CUNNINGHAM:  I'm just not sure we archive our

5   website.

6           MR. MCINTYRE:  I don't know that, and, again, I

7   think, as his Honor has made clear to both of us, if the

8   client doesn't have it, then the client can't produce it,

9   and I think that's a fair reading of the Federal Rules.  I

10  don't know whether you do or don't either.

11          MR. CUNNINGHAM:  Okay.

12          THE COURT:  Yeah, Mr. Cunningham, I -- the thought

13  that was running through my head as the two of you were

14  discussing this is, you know, every business' website

15  changes over time.  It's -- I would take judicial notice of

16  that fact.  And the -- the technical ability to preserve and

17  archive those changes over time I simply don't have the

18  technical expertise to say, oh, yeah, that's what businesses

19  do, and maybe you don't either, but what Mr. McIntyre said

20  is absolutely true.  To the extent that Living Essentials

21  has in their archives and can readily retrieve the various

22  iterations of the website over time from 2004, September, to

23  the present, it should produce those.  If it -- it knows

24  that it's made changes but there's just no way to recall

25  those changes in any format that you have available to you,

52

1  then so state that as well so there's just no confusion by

2  Hansen that, "Oh, yeah, there are changes and we haven't got

3  them.  So where are they?"  Let them know exactly what

4  you're able to produce, what you're not able to produce, but

5  only as to your website.  You don't -- none of this other

6  Internet stuff.

7            MR. CUNNINGHAM:  Okay, your Honor.

8            THE COURT:  Okay.  Now, 124?

9            MR. CUNNINGHAM:  That's fine, your Honor.

10            THE COURT:  Okay.  And then we've already done 125

11  and 126.  So let me review here so we're all on the same

12  page.

13            Request for production 111 through 124 are all

14  granted with the exception of 118, which is withdrawn by --

15  by the Plaintiff, also with the caveats that 123 only

16  applies to Defendant's website that is -- and that they have

17  the ability to recall any changes made over time and also

18  with the further caveat that if any of these responses

19  requires the disclosure of an expert report to be completely

20  accurate and -- and thorough, then Living Essentials should

21  so designate that there is more that would be responsive but

22  its experts and its -- will be -- it will be disclosed at

23  the appropriate time.

24            Now, I think that -- that covers all of those.

25  Now let's talk about when these disclosures might be made.

53

1 Let's talk about a time frame.  And I'm -- I'm figuratively

2 looking at you, Mr. Cunningham, for some guidance on this.

3          MR. CUNNINGHAM:  A lot of it, your Honor, is in

4 the works.  How about two weeks, your Honor?

5          THE COURT:  Two weeks.  All right.  Mr. McIntyre,

6 no objection with that I hope.

7          MR. MCINTYRE:  No, your Honor.  Would this be an

8 appropriate time, though, to -- and maybe not -- to bring up

9 an issue that Tom has already raised and that I agree with

10 him on, and that is when Judge Gonzalez denied Living

11 Essentials' motion to push out dates, it was without

12 prejudice to refiling the motion after the Court's decided

13 the certification question because the certification issue

14 may or may not have mooted some of this.  The Court has now

15 obviously decided adverse to us the certification question.

16          I'm in agreement with Mr. Cunningham that that

17 being the case, we're going to have to designate experts on

18 that counterclaim, conduct a whole rash of expert discovery,

19 and at some point we may want to be with the Court to talk

20 about sensible scheduling.  I would suggest that Tom and I

21 first, however, get together and see if we can come up with

22 a proposal for the Court that's going to allow all that

23 additional discovery to be accomplished to cover the

24 counterclaim.

25          MR. CUNNINGHAM:  I agree, and I think Judge

54

1   Gonzalez agreed with you a couple of times, both in her

2   original motion to deny the stay that we -- that we're going

3   to need a new schedule if these counterclaims are going

4   forward.  She made that pretty clear.

5           MR. MCINTYRE:  I think that that's a fair reading

6   of those orders.

7           MR. CUNNINGHAM:  The March 23rd date really isn't

8   going to stand.  The only issue is what the new schedule is

9   going to be.

10          THE COURT:  Here's what I would propose,

11  gentlemen, is submit a joint request, a joint statement

12  requesting, you know, new scheduling dates, make it very

13  reasonable in the extensions that you're asking for.  I

14  will, once I get that, speak with Judge Gonzalez and see --

15  and get her input obviously as to whether your requests are

16  reasonable, whether she's entitled -- or inclined to grant

17  the request but not nearly as long as you're asking for.

18  You know -- you know the --

19          MR. CUNNINGHAM:  Sure.

20          THE COURT:  You know the scenario, but until we

21  get something that's filed, I really have nothing to work

22  with, but my advisory opinion at this time is some -- some

23  extensions seem to be appropriate and are in order, and --

24  as long as they're reasonable.

25          MR. MCINTYRE:  That's fine, your Honor.

55

1        THE COURT:  And if they're not reasonable, you may

2   still get the extension but just not nearly as long as you

3   request, bearing in mind that there have been a -- a

4   plethora of requests for extensions in the past and this is

5   an '08 case.  We now are in 2010, and I know Judge Gonzalez

6   is anxious to get this thing resolved.  So keep that in the

7   back of your mind when you're making these requests.  You're

8   more likely to get your way if your request is reasonable in

9   terms of the extension date you're asking for.  You're less

10  likely to get your way or -- or at all if the request you're

11  asking for is unreasonable.  Then you may -- may get cut way

12  back.  So make your request reasonable.

13        MR. MCINTYRE:  We understand, your Honor.

14        THE COURT:  Okay.

15        MR. MCINTYRE:  Word to the wise is more than

16  enough.

17        THE COURT:  Yeah.  All right.

18        Okay.  So I think that resolves all of Hansen's

19  disputes.  Am I -- am I correct?

20        MR. MCINTYRE:  I believe so, your Honor.

21        THE COURT:  Okay.  So now let's move to Living

22  Essentials' disputes.

23        All right.  The first one that I have on my plate

24  is the depositions of Cheryl Rizick (phonetic) and David

25  Schmidt.  Now, I didn't see that Hansen responded at all in

56

1  its reply brief with respect to these.

2          Did you provide a response and I just didn't see

3  what your -- Mr. McIntyre, did you provide a response or did

4  I miss it?

5          MR. MCINTYRE:  We did, your Honor.  I can direct

6  the Court's attention to --

7          MR. CUNNINGHAM:  Page 12.

8          MR. MCINTYRE:  Thank you, Tom -- dealing

9  specifically with --

10          THE COURT:  I got it.

11          MR. MCINTYRE:  -- Cheryl Rizick and David Schmidt,

12  it's at page 12 under the heading VI.

13          THE COURT:  No, I -- I got it now.  I got it.

14  Yeah.  Okay.  I don't know why I missed that the first time.

15  Give me a second.  For some reason I just overlooked this

16  page.

17          MR. MCINTYRE:  No problem, your Honor.

18      (Pause.)

19          THE COURT:  Okay.  Let me ask you some questions,

20  Mr. Cunningham.

21          How -- were these individuals, Rizick and Schmidt,

22  were they subpoenaed?

23          MR. CUNNINGHAM:  No.  They are employees of

24  Hansen.  So I just did a notice of deposition.

25          THE COURT:  And that --

57

1          MR. CUNNINGHAM:  They -- these are employees in
2   two key positions.  Two weeks ago your Honor ruled that the
3   collegiate marketing was relevant to this lawsuit, and one
4   of these women was the marketing manager for the collegiate
5   marketing program at one time.  So she's clearly relevant.

6          The -- from their response, they don't disagree
7   that the collegiate marketing is relevant, and I don't think
8   they can based on your Honor's previous ruling.  What
9   they're trying to do is pick the witness that they want to
10  testify on it, and this person was directly the marketing
11  manager for that particular program.  No one's going to be
12  as knowledgeable as that person.

13         The second person was the marketing manager for
14  Junior Sports.  And, as you know, your Honor, and one of the
15  issues in this case is Hansen Marketing and sponsoring
16  athletes that are eight, nine, 10, 11, 12 years old.  That
17  person is going to be the person who dealt directly with
18  these sponsorships.  These people are highly relevant.

19         Hansen can't choose its witnesses.  They're
20  treating my brief where I identified what issues I thought
21  they'd be relevant on as a 30(b)(6) topic and then trying to
22  designate their own witness.  These people are employees of
23  Hansen in positions which were highly relevant to issues in
24  this lawsuit.  These people should be expected to testify.

25         THE COURT:  Mr. McIntyre?

58

1          MR. MCINTYRE:  Yes.  Two points, your Honor, and

2  let me take the big one first and then a clarification.

3  These are employees, neither of whom can bind Hansen.

4  Whatever they know they know, but clearly whatever -- these

5  are very low level employees, with all due respect to Tom's

6  attempt to elevate them to some status of importance.  The

7  fact they're given the title manager versus -- almost is a

8  little bit like taking the deposition of somebody at a bank.

9  They're all vice presidents the day they walk through the

10  door.

11          With further clarification, your Honor, Ms. Rizick

12  no longer even holds that position.  It is held now -- that

13  role -- by a different person.  Her name is Kim Castelli.

14  That is -- that really makes no difference whether it's Ms.

15  Castelli or not.  Our belief is, your Honor, that the most

16  coherent testimony would be given by Mr. Pontrelli

17  (phonetic), who really knows what's going on in the area.

18  He's the vice president of marketing, and we're perfectly

19  willing, obviously, to produce Mr. Pontrelli, not as a

20  30(b)(6) witness but as somebody who really knows what's

21  going on.

22          THE COURT:  Now, Mr. Cunningham, did you name

23  these two employees or identify these two employees by name

24  in your --

25          MR. CUNNINGHAM:  I did, your Honor.  They were

59

1 produced -- Hansen produced organizational charts, and these

2 people were identified as managers of these particular areas

3 which are highly relevant.

4         Ed makes the point that -- that these -- the

5 testimony wouldn't bind the corporation.  That's -- whether

6 that's true or not --

7         THE COURT:  You can argue that later.

8         MR. CUNNINGHAM:  -- discovery is about, you know,

9 likely to find admissible evidence.  These people are going

10 to have a wealth of information.  And, frankly, if they're

11 the people doing the actual work in this area, they're going

12 to have a lot more information than Mr. Pontrelli, who's a

13 senior vice president in the company.  And if they can lead

14 me to other evidence, you know, in regards to this and point

15 me in directions that Mr. Pontrelli might not, then their

16 testimony is relevant.

17         THE COURT:  Mr. McIntyre, I tend to agree with Mr.

18 Cunningham on this point with respect to these two

19 witnesses.  Whether they can and do bind the company if

20 deposed I think is going to be an issue that will most

21 likely be resolved at a later time, maybe by me or maybe by

22 Judge Gonzalez, but because of their position -- whether

23 they presently hold that position now or not, I think is

24 neither here nor there.  It certainly may go to the weight

25 of their testimony that they're no longer in the position

60

1    and maybe, you know, the -- and the why -- you know, why

2    aren't they in that position anymore, you know, that may go

3    to the weight of their testimony and maybe even undermine

4    their credibility if, for example, let's say they were

5    demoted or removed from the position for one reason or

6    another, unfavorable reasons.

7              MR. MCINTYRE:  Okay.  So that the Court -- perhaps

8    I wasn't clear, your Honor, to you and to Mr. Cunningham.

9    Ms. Rizick is no longer an employee of Hansen.  That's why I

10   said she's no longer in that position, excuse me.  She's not

11   even there.  We could not produce her subject to a notice,

12   but if the Court says that we have to produce the individual

13   at that level, I've identified for Mr. Cunningham and the

14   Court the individual -- her name happens to be Kim Castelli

15   -- who now holds that position.  The charts that were given

16   to Mr. Cunningham obviously were -- spoke historically.  As

17   with any company, employees come and employees go.  Ms.

18   Rizick is no longer employed.

19             THE COURT:  Well --

20             MR. MCINTYRE:  Mr. Schmidt is still an employee to

21   my knowledge of Hansen.

22             MR. CUNNINGHAM:  That clearly wasn't -- wasn't

23   clear from the papers.

24             MR. MCINTYRE:  I'm sorry.

25             THE COURT:  No.  In reading the response, it

61

1  sounds as if Ms. Rizick is still with Hansen but no longer

2  in that position, but you've clarified that now.  She's no

3  longer with the company.

4          MR. MCINTYRE:  She is not only no longer in the

5  position.  She's no longer even an employee.

6          THE COURT:  Okay.  That --

7          MR. MCINTYRE:  Sorry.

8          THE COURT:  That latter part was not mentioned.

9  But now knowing that, Mr. Cunningham, I don't think that

10 Hansen can produce a witness that it no longer employs.

11         MR. CUNNINGHAM:  I agree, your Honor.  I mean, I

12 will -- obviously I'll have to send her a subpoena, and then

13 the issue --

14         THE COURT:  Right.

15         MR. CUNNINGHAM:  -- will be her appearance.

16         THE COURT:  Right.  Now, the -- the individual

17 that now holds that position, Kim Castelli?

18         MR. MCINTYRE:  Castelli, yes, your Honor.

19         THE COURT:  If -- if the subpoena or notice, I

20 should say, the Rule 30 notice was sent out and provided to

21 Hansen to produce Ms. Castelli, my ruling would be Ms.

22 Castelli should be produced.

23         MR. MCINTYRE:  Then spare the notice, your Honor.

24 That's perfectly fine.  I mean, if the Court's going to rule

25 that we have to produce the individual now in that position,

62

1  then I would assume that as soon as he gets off the phone

2  call, Tom would send me a Rule 30 notice to produce Kim

3  Castelli.

4         THE COURT:  I'm guessing he's doing it right now.

5         MR. MCINTYRE:  We'll spare the formality on that

6  one, your Honor.

7         THE COURT:  Yeah.  So the -- Mr. Schmidt and Ms.

8  Castelli or the person who holds the collegiate marketing

9  position at this time should be produced.

10         Now, I personally think that it goes to the --

11  they're relevant.  I think they may lead to other

12  discoverable information, and the position that they hold,

13  whether it be manager and sort of in title only but they're

14  really just sort of, you know, everyday employees, you know,

15  that can be used to discredit them if they make any

16  statements that are -- are contrary to the interests of

17  Hansen I suppose.  Whether they can bind the company or not

18  will be an issue left for another day, and if the -- if

19  Living Essentials wants to, you know, send over a 30(b)(6)

20  notice with respect to these issues and perhaps Mr.

21  Pontrelli will be produced in that vein, but that's not

22  before me right now.  So Schmidt and Ms. Castelli or the

23  person holding the collegiate marketing position should be

24  -- should be made available for deposition.

25         MR. CUNNINGHAM:  Very good, your Honor.

63

1          THE COURT:  Okay.

2          MR. MCINTYRE:  Thank you, your Honor.

3          THE COURT:  Let's talk about a date.

4          MR. MCINTYRE:  Your Honor, that's probably going

5    to depend on when they can get me the documents which --

6    from the last deposition, which we haven't discussed.  They

7    were going to -- maybe we should deal with that now.

8          They were going to tell you at the last hearing

9    when it was originally scheduled when they were going to

10   produce documents pursuant to your previous order.

11         THE COURT:  Okay.  Let me get that out.  I don't

12   recall what date I gave them.

13         MR. CUNNINGHAM:  You didn't, your Honor.  You said

14   when we next convene, and we thought we were going to be

15   doing it last week, that you were giving us to then and you

16   had a series of questions that you wanted us to respond to

17   dealing with the 11 -- the regional vice presidents, the --

18         THE COURT:  Right.  Okay.

19         MR. MCINTYRE:  My suggestion, your Honor, is I

20   agree with Tom.  He's going to need documents before he can

21   seasonably take these depositions.  And, with all due

22   respect, your Honor, maybe we would want to just put those

23   issues at the end of this conversation and deal with them,

24   because I've had my partner -- I've been just horribly tied

25   up.  I've had my partner, Bill Kammer, who's on the phone

64

1   with us, working with the client on those issues and,

2   frankly, he's going to have to address them.  I could not.

3   But they should be addressed, I agree.

4           THE COURT:  All right.  Now, there was -- I

5   probably should have addressed this first just to make sure

6   that we are -- we don't need to address it, and that is the

7   deposition of Custom Nutrition Laboratories and Alan James.

8           I don't need to address that now?  That's off the

9   table?  It's premature?

10          MR. CUNNINGHAM:  No, your Honor.  They submitted a

11  second subpoena which narrowed the topic considerably, and

12  we don't have a problem with that.

13          THE COURT:  Okay.  All right.

14          MR. MCINTYRE:  So that's simply a scheduling

15  issue, Tom, just get it scheduled and get it done?

16          MR. CUNNINGHAM:  I think it's already been noticed

17  and scheduled for the -- I've already made reservations and

18  everything.

19          MR. MCINTYRE:  Perfect.

20          MR. KAMMER:  Did you pay for your ticket?

21          MR. CUNNINGHAM:  Pardon?

22          MR. KAMMER:  I'm just kidding you.

23          MR. MCINTYRE:  I'm sorry.  Bill's trying to be

24  funny.

25          MR. CUNNINGHAM:  Is that going forward on the 9th?

65

1        MR. KAMMER:  Yes.  So far as I'm concerned, it's

2   going forward.  I had told all the deponents that we were

3   having this hearing today and that the schedule might be

4   affected, but I'm ready to meet you in Dallas on Tuesday.

5        MR. CUNNINGHAM:  Okay.  Great.

6        THE COURT:  All right.  Now, let's go through the

7   30(b)(6) issues relating to the follow-on deposition or

8   depositions of either Sacks or Davis or perhaps other

9   individuals in Hansen that are most knowledgeable of these

10  various topic areas.  Okay.

11        Let me run down through the chronology of events

12  as I have been able to discern them from your papers to make

13  sure we're all on the same sheet of music because some of

14  this -- some of the chronology is relevant and influences my

15  thinking.

16        On or about the 8th of September, Living

17  Essentials served a 30(b)(6) notice on Hansen noticing all

18  these -- these topics that we're going to discuss today and

19  others.  The deposition was scheduled for the 29th of

20  September until completed.

21        On the 23rd of September, Hansen filed objections

22  to Living Essentials' 30(b)(6) notice.  Living Essentials

23  represents that they did not receive these objections

24  initially.

25        On the 29th of September, the date set for the

66

1  deposition of the CEO, Rodney Sacks, Hansen produced at that

2  time the objections which were filed on the 23rd of

3  September, but those objections were not accompanied by a

4  certificate of service indicating they had been properly

5  filed and served.

6          Some of this I'm extrapolating from Living

7  Essentials' documents, some of it from Hansen's, and some of

8  this is my characterization.  So in the interest of full

9  disclosure, you know that on that 29th of September,

10 according to Living Essentials, CEO Sacks was unable to

11 answer "numerous" questions about the topics, and the

12 deposition was continued.  Now, the papers say September

13 31st, but as I have learned, there are only 30 days in

14 September, and so I'm assuming that meant October 1st.

15         MR. CUNNINGHAM:  Yes, your Honor.

16         THE COURT:  On September 29th, the -- in the

17 evening, at 10:48 p.m., the evening of Sacks' deposition,

18 presumably after it had concluded for the day, Mr. McIntyre

19 sent an E-mail to Mr. Cunningham.  In that E-mail, Mr.

20 McIntyre indicates that Mr. -- or, excuse me, Doctor --

21 Doctor Davis will answer questions regarding efficacy and

22 other technical issues and will do so the following day,

23 September 30th.  And from what I could gather from the

24 pleadings and several of the exhibits that attach

25 transcripts, portions of those depositions, that was -- that

67

1  was discussed, that meaning Doctor Davis' appearance the

2  following day to answer questions on efficacy and technical

3  questions that Mr. Sacks was unable to respond to.  That was

4  discussed during the deposition of Mr. Sacks.

5         On September 30th, in the morning apparently and

6  according to Mr. Cunningham -- excuse me -- yes, Mr.

7  Cunningham, just minutes before he was to begin the Davis

8  deposition -- or maybe that was Mr. Kammer that was there.

9  I don't recall exactly.

10        MR. MCINTYRE:  It was Mr. Kammer, your Honor.

11        THE COURT:  Mr. Kammer.  That is when counsel for

12 Living Essentials received the E-mail or actually read the

13 E-mail that came in or was sent the night before at 10:48

14 p.m. by Mr. McIntyre, indicating that Davis would be the

15 guy.

16        On the 30th of September, Doctor Davis' deposition

17 was taken by Living Essentials, and I believe that was Mr.

18 Kammer, as you just stated, that took that deposition.  Mr.

19 Cunningham, I don't -- I don't think you were present.  Or,

20 excuse me, I don't think --

21        MR. CUNNINGHAM:  Mr. McIntyre wasn't.

22        THE COURT:  -- Mr. McIntyre was present.

23        MR. MCINTYRE:  I was not, your Honor.

24        MR. CUNNINGHAM:  Mr. Kammer attended on behalf of

25 Hansen, and obviously Mr. Cunningham took the deposition on

68

1  behalf of Living Essentials.

2       THE COURT:  Right.  Okay.  So Mr. Kammer was

3  present.  Mr. Kammer asserts that Doctor Davis was

4  designated as the 30(b)(6) witness on various topics, 14

5  through 17, 36 and 37.  And here's where I think it gets a

6  little murky for me is that there's some reference in the

7  pleadings that indicates that Doctor Davis was also

8  testifying in his personal capacity and not necessarily as a

9  binding witness.

10      MR. CUNNINGHAM:  Your Honor, if I could add to

11 your history a little bit.

12      THE COURT:  Yes.

13      MR. CUNNINGHAM:  Originally, when we scheduled

14 these depositions, we were going to take a two-day 30(b)(6)

15 of Hansen, and they identified Mr. Sacks as the witness.  I

16 wanted to take Doctor Davis' personal deposition on the same

17 trip.  He lives in Arizona, and the only date he could make

18 it was one of the dates we had scheduled for the 30(b)(6).

19 So that's why he was sandwiched in between.  We moved the

20 second date of the 30(b)(6) to October 1st, and Doctor

21 Davis' personal deposition was scheduled for the 30th.  He

22 was not there as a 30(b)(6) witness.  He was there as a

23 personal -- we served a notice of personal deposition.  Mr.

24 Sacks was -- was the 30(b)(6) designee on every topic.

25      THE COURT:  Thank you for that, but let me -- let

69

1 me ask you this question in return.  However, during the

2 Sacks deposition, it became -- my words here -- obvious that

3 he was unable to respond to a number of topics, and then

4 Davis was then designated.

5          MR. MCINTYRE:  I think that's fair, your Honor.  I

6 believe Mr. Sacks on some of Mr. Cunningham's questions said

7 "Here's what I know, but the fellow who really knows is

8 Doctor Davis."

9          THE COURT:  All right.  So --

10          MR. MCINTYRE:  Which is what then prompted, if you

11 will, the late -- and I apologize for the lateness, but it's

12 -- we've all been working hard -- the late E-mail to Mr.

13 Cunningham saying, okay, this is where Doctor Davis -- this

14 is what Doctor Davis will testify to.

15          THE COURT:  Okay.  And in that regard he sort of

16 transformed himself or Hansen transformed him into this

17 30(b)(6) witness as to certain topics.

18          MR. MCINTYRE:  That's fair, your Honor, yes.

19          THE COURT:  And so he was not only a personal

20 witness or a witness testifying in a personal capacity but

21 also a witness testifying in a binding way upon Hansen?

22          MR. MCINTYRE:  Yes, that's correct, your Honor.

23          THE COURT:  Okay.  The deposition -- continuing

24 on, the deposition of Doctor Davis on the 30th lasted about

25 five and a half hours, and according to statements made by

70

1 Hansen, it was terminated by Living Essentials.

2          Now, the implication when I see that is that it

3 was terminated prematurely or abruptly or before it had to.

4 Again, that's my interpretation of the -- of the language or

5 the implication, and that's what I inferred.  Whether that's

6 true or not I don't know.

7          According to Hansen, Living Essentials should have

8 been prepared to propose Davis on that date, on the 30th of

9 September, on all the remaining 30(b)(6) topics, presumably

10 those that were not answered the day before by CEO, Mr.

11 Sacks.

12          Then on October the 1st, not September 31st, Sacks

13 came back for a continuation or a resumption of his

14 deposition which began on the 29th and that -- and that Mr.

15 McIntyre was now in attendance and represented that the

16 witness, Davis, Doctor Davis, the day before was a 30(b)(6)

17 witness as to topics 11 through 28, 35 and 36, which

18 according to Living Essentials, was inconsistent with and

19 contrary to the representation made the day before by Mr.

20 Kammer as to what Davis would be testifying about in his

21 30(b)(6) capacity.

22          And at that deposition, the follow on deposition

23 of Sacks on the 1st of October, Mr. McIntyre acknowledged --

24 and the transcript mostly supports this -- acknowledged that

25 Doctor Davis would have to return to testify about

71

1  additional topics that were not addressed on the 30th of

2  September.

3          So the issues as I see them right now are with

4  respect to these remaining topics that are in issue or in

5  dispute by Living Essentials, one, does Davis have to

6  return, two, does Sacks have to return, three, does some

7  other person most knowledgeable about these topics have to

8  return, four, on what topics -- if any witness has to

9  return, on what topics will they have to be conversant in

10 and testify about, and I'm not stating at this point that I

11 have -- because I haven't at least verbalized what I think

12 about the various topics that are up for discussion here,

13 but assuming that any of these topics remain on the board

14 for a follow on deposition, what topics would any witness

15 have to come back and testify about.

16         Two observations.  One is, Mr. McIntyre -- well,

17 let me ask this question first.

18         Mr. Cunningham, after you submitted your 30(b)(6)

19 notice on September 8th with all of these topics included in

20 it, did you -- and if you did, when -- did you receive

21 notice back or a response back from Hansen identifying the

22 person who would be the 30(b)(6) witness designated to

23 testify on these topics?

24         MR. CUNNINGHAM:  Your Honor, I can't tell you

25 when.  It was certainly before -- I knew it was going to be

72

1 Rodney Sacks a fair amount of time before the deposition.

2          THE COURT:  And if -- in that responsive notice or

3 responsive letter, did Hansen indicate that Sacks would be

4 prepared to respond to the various topics or were there

5 objections to any of these topics?  Did Hansen identify

6 anyone else as a potential 30(b)(6) witness?

7          MR. CUNNINGHAM:  No.  Rodney Sacks was the only

8 one that was identified.

9          THE COURT:  All right.

10          MR. CUNNINGHAM:  As far as objections, as I said,

11 your Honor, I didn't -- they were handed to me when I walked

12 in --

13          THE COURT:  Okay.

14          MR. CUNNINGHAM:  -- the deposition.

15          THE COURT:  All right.

16          MR. CUNNINGHAM:  Objections to the topics.

17          THE COURT:  Okay.  Now, as a -- this is a question

18 to both of you.  Is a company, a corporation, a partnership,

19 any 30(b)(6) kind of organization, required to identify

20 ahead of time the person who that company or corporation

21 will designate as their -- as their witness prior to the

22 deposition actually being taken?

23          MR. MCINTYRE:  There's nothing in Rule 30(b)(6)

24 that would require it, your Honor.  All you have to do is

25 have a witness who is willing or prepared -- and prepared to

73

1  testify.

2         THE COURT:  All right.  And would you agree with

3  that, Mr. Cunningham?

4         MR. CUNNINGHAM:  I would, your Honor, but I would

5  point out a fact, that the 30(b)(6) was scheduled for the

6  29th and the 31st, not on the 30th.

7         THE COURT:  Okay.  Well, we've already established

8  that September doesn't have 31 days.

9         MR. CUNNINGHAM:  I'm sorry.  I'm sorry.  Yeah, the

10 30(b)(6) was scheduled for two days, on the 29th and October

11 1st, and I had originally and did cover some of the topics

12 on the 29th and reserved others for the 1st.

13         THE COURT:  Okay.

14         MR. MCINTYRE:  Right.

15         THE COURT:  Now, while there may not be a -- a

16 requirement that a company designate ahead of time or

17 sufficiently in advance of the deposition date who their

18 30(b)(6) witness is or will be, I think based on my limited

19 experience that just practice, procedure, you know, common

20 courtesy to the other side, that often the opposing party or

21 the party taking the deposition, out of fairness or sense of

22 fair play, is given the name of the individual, if for no

23 other reason than it gives the party taking the deposition

24 the opportunity, one, to prepare, two, to organize their

25 exhibits and, three, to make the deposition progress in a

74

much more orderly and efficient fashion.  And, yes, it does
give the party taking the deposition, you know, time to
prepare some zingers, if you will, or questions or topic
areas that may be designed to kind of set that witness up.
I appreciate that.

But -- and so rather than have, you know, a
deposition by ambush, if you will, from the corporation or
company's part by not designating someone and then
submitting that person at the time of the deposition, says,
well, here he or she is, have at it.  It just seems to me
that the better procedure and the one followed here is to
give that notice ahead of time as to who the witness will
be.

And so, Mr. McIntyre, having provided the notice
and identified Mr. Sacks as the 30(b)(6) witness, as Mr.
Cunningham just said, you know, a fair amount of time before
the deposition, you know, giving his sufficient notice -- I
don't think he's arguing about that --

MR. MCINTYRE:  Right.

THE COURT:  -- I think it's -- and then the -- the
objections coming as they did or not coming as Living
Essentials indicates, until really the day of the
deposition, them not having the -- the press time to respond
to those objections in any meaningful fashion, I do think
it's disingenuous for Hansen now to say, "Hey, they should

75

1 have been ready to depose Davis on all these remaining

2 topics.  You know, they didn't, and, therefore, you know,

3 too bad, so sad."

4        MR. MCINTYRE:  Okay.

5        THE COURT:  "They had their shot.  They blew it.

6 They should have been prepared," because Davis was the guy

7 that was going to talk about the efficacy and technical

8 questions.  And so that's my initial observation with

9 respect to that as being a reason not to take any follow on

10 deposition of Davis.

11        My other observation with respect to the topic

12 areas, putting aside any objections that Hansen has -- and

13 we will address them one by one -- is that I think for the

14 most part -- I say for the most part, the topic areas

15 identified by Living Essentials meets the reasonable

16 particularity test as required under 30(b)(6), and I think

17 it gave Hansen, you know, fair notice of the topics that

18 were to be covered.  I think the -- the topics to be covered

19 are fairly relevant, related to the complaint,

20 counterclaims, the answers, related to the issues in

21 question that are still in question here in this litigation,

22 and that is my second observation.

23        And so with that, I will give each party, you

24 know, a brief opportunity to respond to clarify some of my

25 -- my observations or characterizations or the chronology if

76

1  necessary.  Then we will go down one by one and deal with

2  the topics in question.

3          MR. MCINTYRE:  Very good, your Honor.  Two -- two

4  points.  One, I cannot explain, but that's not excuse.  I am

5  responsible to make sure that if I have filed an objection

6  or any pleading, that it has been timely served on Mr.

7  Cunningham and that it wasn't served or that we had no proof

8  of service, and I -- obviously, I accept Tom saying that he

9  never got it.  That's never been a question.  I'm

10 responsible for that, and so that I apologize that he got it

11 so late.

12          On showing up when they -- and, yes, we did

13 identify Mr. Sacks.  As Mr. Cunningham recognizes I believe

14 because it happened -- this happened to both of us.  We show

15 up with a witness who we fairly believe is fully equipped to

16 testify about a topic because it falls obviously within what

17 we think the witness knows, perhaps even what the witness

18 even said he or she knew.  And, as it happened with Mr.

19 Sperber, he was designated to testify on some topics.  He

20 candidly admitted that he could not, and that's why we

21 renoticed again Ms. Petersmark.  As it turned out, there

22 were topics on which Mr. Sacks could not testify -- well, on

23 which Mr. Sacks testified to the limit of his ability and

24 said that if you really want to get technical, you have to

25 talk to Doctor Davis, who was here and, hence, the

77

1  production, if you will, or the producing of Doctor Davis

2  then as a 30(b)(6) witness.  I mean, with -- with that

3  explanation, your Honor, I think it has happened to all of

4  us.  There's some of these topics that either Doctor Davis

5  or somebody else who is fully prepared ought to be able to

6  testify to.  Mr. Sacks has testified that it is -- some of

7  the most technical stuff is beyond the scope of what he

8  really would know.  I mean, there are the -- there are the

9  observations.

10          THE COURT:  All right.  I'm not sure what the

11  bottom line is then.

12          MR. MCINTYRE:  The bottom line, your Honor, is I

13  think that Living Essentials is entitled to get the 30(b)(6)

14  testimony of Hansen, without regard to who the witness may

15  be, on topics that it did not cover or did not have the

16  opportunity to cover in the circumstances of those three

17  days, and, you know, the Court indicated you would like to

18  go through some of the objections one by one, but to the

19  extent -- I guess really what I'm withdrawing, your Honor,

20  is the position of, heck no, you can't have more than

21  whatever.  I think in fairness, Living Essentials ought to

22  be able seasonably to take 30(b)(6) testimony of relevant

23  witnesses.

24          THE COURT:  Okay.

25          MR. MCINTYRE:  Or relevant 30(b)(6) testimony

78

1  without regard to which individual we produce, and I also

2  agree with the Court -- and we have been doing it here --

3  that we identify in advance who is going to be the 30(b)(6)

4  witness.  Mr. Cunningham has done it for us.  We did it for

5  him.

6            THE COURT:  All right.

7            MR. MCINTYRE:  Okay.

8            THE COURT:  Now, I am -- and I appreciate that,

9  Mr. McIntyre.  I, of course, am not in a position nor would

10  I, even if I could, say that Hansen or Living Essentials for

11  that matter has to produce a specific witness as the

12  30(b)(6) witness, one, because it would be stupid for me to

13  do that because I don't know who is the witness that has the

14  relevant information and is most knowledgeable on any

15  specific topic item.

16            So I'm going to leave that up to you whether it's

17  Doctor Davis, whether it's Sacks or whether it's somebody

18  else with respect to many of these topics.  So let's go down

19  through them.

20            The first issue that -- that Living Essentials has

21  is they say Doctor Davis should be compelled to testify on

22  topics 11 through 28.  Now, Mr. Cunningham, I just got done

23  saying I'm not going to tell Hansen who they have to

24  designate as the 30(b)(6) witness.  So I'm not terribly

25  inclined, unless I hear a really good argument, as to why it

79

1   has to be Davis, because maybe Davis isn't the guy, despite

2   any representations made by the attorneys, Mr. Kammer or Mr.

3   McIntyre, you know, back in September or October, that, you

4   know, Doctor Davis is your guy with respect to some of these

5   efficacy and technical questions.

6            Maybe he is, but -- but with respect to --

7            MR. CUNNINGHAM:  I can respond, your Honor.

8            THE COURT:  With respect to that -- that dispute

9   that it ought to be Davis, I don't -- I'm not in agreement

10  that it has to be Davis.  So --

11           MR. CUNNINGHAM:  Well, your Honor, my argument to

12  that would be that they already have indicated that he's the

13  most knowledgeable person for these topics.  I think they

14  pretty much conceded that.

15           THE COURT:  Well, I don't know if they have or

16  they haven't.  I mean, I -- the transcripts that have been

17  provided to me -- and I don't have all of them.  I have what

18  you have given me and I have what I've asked for, but I

19  don't have everything.  I am not as clear that, you know,

20  Doctor Davis is the guy with respect to any individual

21  topics.  Yes, they have said he's the guy on efficacy and

22  technical questions, but as I read some of these deposition

23  topics -- let's start with number 11 for example.  You know,

24  I don't know if I can say that that's an efficacy or

25  technical question per se.  it may have aspects of being a

80

1  technical or an efficacy question, but it also has other

2  aspects too.  So I think as far as you're concerned with

3  respect to a 30(b)(6) witness, you get almost who Hansen

4  gives you, and Hansen is in the same boat with respect to

5  any 30(b)(6) witnesses and depositions they want to take,

6  and then Hansen is stuck with, so to speak, the witness that

7  they put up as their person most knowledgeable.  If they

8  don't put up that person as their 30(b)(6) witness and they

9  give you -- and they put up someone less than and that

10  person gives, you know, not false but inaccurate, incomplete

11  responses, then that comes back to haunt Hansen.  It's in

12  their best interest to put up the person most knowledgeable.

13  If that's Davis, then it's Davis.  If it's someone else,

14  then it's someone else.

15          MR. CUNNINGHAM:  That's my only concern, your

16  Honor, that the person be able to answer the questions.

17          THE COURT:  Yes.

18          MR. CUNNINGHAM:  And from what I've learned about

19  Hansen, it appears that Doctor Davis is the guy they go to

20  for technical questions.

21          THE COURT:  Okay.

22          MR. CUNNINGHAM:  And if they can't -- if they put

23  someone up there and they're able to answer all the

24  technical questions, that's fine, but I don't want to have

25  to come back and do the deposition basically a third time.

81

1          THE COURT:  No, and that's what we're going to do
2     here today is resolve this.  But I may not be able to
3     resolve for you today that it's Davis, but whatever topic
4     survives this discussion today, Hansen will have to put up
5     the person most knowledgeable at a time and date certain and
6     get it done.  And if there are any issues that, you know,
7     evolve out of that, we'll have to deal with them at that
8     time, and it may or may not be pretty for Hansen or you,
9     depending on what the transcripts really do say, and we'll
10    talk about that later on too.
11          So let's start with Number 11.  To me that seems
12    like a reasonable topic, Mr. McIntyre.
13          MR. MCINTYRE:  I'm not disagreeing, your Honor,
14    that it is -- we have claimed that certain statements are
15    false to the -- obviously, we have facts for that, and to
16    the extent that it -- I'm sorry.
17          The identification of the statements, I think
18    that's already been covered.  I think we all know the
19    statements, but that's a fair question.
20          THE COURT:  Okay.
21          MR. MCINTYRE:  I thought, but maybe I'm wrong,
22    that it's already been addressed, but that is a fair
23    question.
24          THE COURT:  All right.  Number 12?  Again, that
25    seems reasonable to me, reasonable topic to cover.

82

1        MR. MCINTYRE:  Again, I'm not disagreeing, your

2   Honor.  It will also involve expert testimony, but that's

3   beside the point.

4        THE COURT:  Well, let's discuss that.  I mean, if

5   any response here requires an expert opinion so to speak,

6   the caveat that we talked about an hour or so ago would

7   apply here equally.

8        MR. MCINTYRE:  I believe so, your Honor.

9        THE COURT:  Mr. Cunningham, we all on the same

10  page with that?

11       MR. CUNNINGHAM:  I don't disagree with that, your

12  Honor.  But that said, Hansen made a bunch of

13  representations without experts other than Mr. Davis, when

14  they filed their complaint and on the preliminary injunction

15  regarding the falsity of these statements and the facts and

16  basis for those which aren't expert testimony.

17       MR. MCINTYRE:  That's true.

18       THE COURT:  That's true.  If -- if a response does

19  not require expert testimony, then a response to a

20  particular topic ought to be provided, but to the extent

21  that a topic in its entirety calls for an expert opinion,

22  relying on an expert report or so forth, then the caveat and

23  the disclaimer given an hour or so ago that that stuff is

24  not disclosable until expert disclosures are required, then

25  they're not.  They don't have to provide it.

83

1          MR. CUNNINGHAM:  Understood, your Honor.

2          THE COURT:  Okay.  Okay.  Number 13?  And I'm --

3     I'm looking at you, Mr. McIntyre for --

4          MR. MCINTYRE:  No, I understand that, your Honor.

5     Except to the extent it asks for a legal basis, clearly we

6     can produce an expert to testify about the factual -- not an

7     expert -- a witness to testify about the factual basis for

8     our contention.  The legal basis for the contentions other

9     than those that are already in the pleadings is work

10    product.

11         THE COURT:  Okay.  Now, going back to then Number

12    11, there is no objection about the request or the topic

13    including a legal --

14         MR. MCINTYRE:  I beg your pardon.  Then I read it

15    too fast, your Honor, and my comments with respect to 13 are

16    the same as with respect to 11.  I'm sorry.  I was focusing

17    on a witness talking about the facts.

18         THE COURT:  Okay.

19         MR. MCINTYRE:  Yeah.  And I guess 12 to the extent

20    they're asking for a legal there as well.

21         THE COURT:  That's right.

22         MR. MCINTYRE:  Yeah.

23         THE COURT:  Mr. Cunningham?

24         MR. CUNNINGHAM:  That's fair, your Honor.

25         THE COURT:  All right.  So I guess maybe perhaps

84

1  another caveat needs to be addressed in that to the extent

2  that any response would call for attorney work product, the

3  disclosure of attorney-client communications or privilege,

4  then the responses in that -- in that vein obviously would

5  not have to be made if it called for attorney work product

6  or the disclosure of a privilege.  Okay.

7          MR. MCINTYRE:  Thank you, your Honor.

8          THE COURT:  Number 14?

9          MR. MCINTYRE:  I believe 14 only asks for factual

10  support, and they're entitled to that testimony to the

11  extent it hasn't already been done.

12          THE COURT:  Fifteen?

13          MR. MCINTYRE:  I think I came out the same place

14  for 15 as well, your Honor, that -- and factual support that

15  it doesn't -- same with 16.  I'm just jumping ahead to

16  the --

17          THE COURT:  You know, the other ones, I'm going

18  through very quickly to Number 28.  They all ask for factual

19  support of an allegation up to Number 28, which is the --

20  the disputed topics with respect to Doctor Davis.

21          Now, Number 27 also asks for a legal basis, and --

22          MR. MCINTYRE:  Yes, it does.  Yes, it does.  But a

23  factual basis for the trade liable claim would be

24  appropriate.

25          THE COURT:  Okay.  So if we can expedite this

85

1   then, is it fair to say -- or is it accurate to say, Mr.

2   McIntyre, that the topics 11 through 28 are appropriate

3   topics for Living Essentials to inquire into with the

4   exception of 11, 12, 13, and 27 that call for some legal

5   work product?

6           MR. MCINTYRE:  I think that's accurate, your

7   Honor, and I think that is fair.

8           THE COURT:  Okay.  And, Tom, correct me if I'm

9   wrong.  Did you not cover already some of these with Rodney

10  Sacks?

11          MR. CUNNINGHAM:  To the extent of identifying what

12  in the commercial was false but not so much the factual

13  support.

14          MR. MCINTYRE:  Okay.  I'm working from memory on

15  Rodney Sacks' deposition.  I thought you had been through

16  this with him, but why false didn't get covered -- if you

17  tell me it didn't, that's fine.

18          MR. CUNNINGHAM:  I'm thinking back too.  I mean,

19  he may have mentioned one thing like why false, well, 5-hour

20  Energy doesn't last five hours.  I obviously would like to

21  go deeper than that, which he couldn't do.

22          MR. MCINTYRE:  Understand.  Rather than take up

23  the Court's time, we both have transcripts, and we can both

24  look at the.  I will vouch for the Court if, in fact, Mr.

25  Cunningham only got the witness to say these following

86

1  statements are false and didn't get into the why of it, you

2  know, tell me the facts that support the conclusion is

3  false, that's fair 30(b)(6) testimony.

4         MR. CUNNINGHAM:  And, as Ed knows, I'm not going

5  to take lengthy depositions and reask every single question

6  that I've asked before.  I'm just not going to do that.

7  It's a waste of my time as much as anybody else's.  So I'm

8  not there to -- I'm not going to go back there and reask

9  questions that I asked before.

10        THE COURT:  Okay.  I appreciate that.  I would

11 hope that would be the case.

12        Now, moving on.  So we're beyond those initial

13 topics with respect to Davis, and so it's perfectly clear,

14 Hansen must produce the person that's the most knowledgeable

15 to answer those topics, whether it's Davis or someone else,

16 okay.  I'm looking for some sort of a --

17        MR. MCINTYRE:  I'm sorry.  Yes.  I thought it was

18 a rhetorical okay, your Honor.  Yes, your Honor, I

19 understand.

20        THE COURT:  Okay.  And Mr. Cunningham as well?

21        MR. CUNNINGHAM:  Yes, your Honor.

22        THE COURT:  Okay.  Now, moving on to Topic Number

23 29.  Living Essentials claims that Mr. Sacks only read a

24 portion of the Blum report, wasn't, you know, intimately

25 familiar with the report.  Hansen in response claims that

87

1   the Blum report is a matter of expert discovery and, of

2   course, that's not yet due.  I think that's true with

3   respect to the actual disclosure of the Blum report.  I

4   don't know if it's been disclosed in some fashion or form,

5   but Hansen also indicates that Doctor Davis has already

6   provided an opinion in his individual capacity as a witness

7   as to the Blum report.

8           On this particular topic, I think that it -- I

9   agree with Hansen in other words.  I think this is a subject

10  that almost begs for an expert report or an expert

11  assessment of and the date has not yet arrived for that, and

12  so whatever Sacks has testified about in terms of his

13  impressions of the Blum report, fine, but the actual factual

14  assertions by Hansen regarding that study of Blum, I think

15  that's best left to an expert to provide at the appropriate

16  time.

17          Now, either side want to comment on that before we

18  move on?

19          MR. MCINTYRE:  This is Ed McIntyre.  No, your

20  Honor, no need.

21          MR. CUNNINGHAM:  Your Honor, that's fine.

22          THE COURT:  All right.  Now, Number 37 and 61,

23  they're very much related one to the other.  Living

24  Essentials claims that no witness testified about these

25  areas that are identified -- the products that are

88

1  identified, and Hansen, of course, claims that Doctor Davis

2  testified and using the words "extensively."  I asked Hansen

3  to provide to me a copy of the portion of the transcript

4  where Doctor Davis supposedly testified extensively so I

5  could make my own determination.

6          I've read the transcript that was provided to me

7  by Hansen yesterday evening relating to Doctor Davis'

8  testimony.  It's at pages 26 -- this is of Doctor Davis'

9  deposition testimony -- page 26, 137 through 153.  I've read

10  those pages, and in reading those pages, I admit that Doctor

11  Davis has testified extensively about a couple of these

12  products but not all of them.  Now, I don't have the entire

13  transcript, and I don't know if another question was asked

14  of Doctor Davis, because your testimony with respect to the

15  Primal Energy Tea which he testified extensively about

16  beginning on page 137 of his transcript applies with, you

17  know, equal force and effect to these other energy drinks.

18          I just don't know.  But I would disagree with the

19  characterization that he testified extensively about each

20  and every one of these products, with the exception of the

21  Primal Energy Tea, which I believe he has.  So to the extent

22  that Doctor Davis has not testified extensively or at all or

23  anyone, for that matter, Hansen, in my view should provide a

24  witness to testify as to each and every one of these

25  products.

89

Now, having said that -- and you have the transcript -- all the transcripts.  I don't -- if Mr. Cunningham asks the question that I just posited may have been asked with respect to every other energy product and so Doctor Davis, what we just discussed in detail with respect to Primal Energy Tea, does it also apply to Monster Lo Carb Energy, Diet Red Energy, and so on, and the answer is yes, yes, yes, yes, yes, yes, then there has been a response and there would be not a need for further deposition on these areas.

I don't have all that.  You do.  I'm going to have to rely upon you.  So the bottom line is for me if there has not been a response to each one of these products, Hansen should provide a witness who can.  That's as to 37 and 61.

MR. MCINTYRE:  Thank you, your Honor.

THE COURT:  Okay.

MR. CUNNINGHAM:  Thank you, your Honor.

THE COURT:  All right.  Now, Number 58.  The question is any attempt by a government agency, regulatory or other entity to restrict or ban the sale of any Hansen Beverage Company energy drink.  I believe Hansen should designate someone who can respond to that question. However, I would note that the Court has already compelled Hansen to respond to a request for production of documents by Living Essentials.  It's document number 91 or document

90

 1 request 91 of the third set.

 2          So Living Essentials may already have this

 3 information in some form or fashion.  But, nevertheless,

 4 even if it does, I don't believe it's an inappropriate area

 5 of inquiry of someone in the Hansen organization who's most

 6 knowledgeable.  But, Mr. McIntyre, I'll give you an

 7 opportunity to respond.

 8          MR. MCINTYRE:  Given the Court's ruling on

 9 document production, I believe the answer is going to end up

10 being no and that may settle it, but given the Court's

11 ruling on document production, I'm not going to argue with

12 the Court on this one.

13          THE COURT:  Okay.  Number 6 is communications

14 between Hansen and lobbyists.

15          MR. MCINTYRE:  It's six or --

16          THE COURT:  I meant to say 63.

17          MR. CUNNINGHAM:  Sixty-three, your Honor, yes.

18          THE COURT:  I'm sorry if I --

19          MR. MCINTYRE:  No, that's fine.

20          THE COURT:  Yeah, Number 63, which is the next

21 topic in dispute.

22          MR. MCINTYRE:  Right.

23          THE COURT:  Mr. Cunningham, I'm going to ask you

24 to help me here as to why this may be relevant or lead to

25 discoverable information.  I'm on the fence on this one.

91

1          MR. CUNNINGHAM:  Okay.  Well, your Honor, there's

2 a lot of -- there's been a lot of state legislation around

3 the country in regards to restricting or banning the sale of

4 energy drinks to minors which, as you know, is one of the

5 issues that we've been talking about in our case, and the

6 sales to young children of these energy drinks and as well

7 as initiatives related to mixing them with alcohol, and we

8 want to know what Hansen has been discussing with it

9 lobbyists about the safety of these particular issues and

10 whether it's been lobbying people to stop these legislatives

11 initiatives that would prevent the sale to minors.

12          THE COURT:  Mr. McIntyre?

13          MR. MCINTYRE:  Well, last time I looked at the

14 First Amendment, your Honor, it included a right to

15 petition, and to the -- I don't know that we even use

16 lobbyists.  But putting that to the side, we have the right

17 to go to any governmental entity and say do this or do not

18 do it.  What we -- what those lobbyists say may be one

19 thing.  What we communicate to the lobbyists is something

20 entirely different.  And, as I think the Court knows, many

21 lobbyists are also lawyers which obviously then attaches

22 arguably some element of privilege to it.

23          THE COURT:  I would disagree on the privilege

24 contention, and obviously these lobbyists aren't being

25 consulted or employed in their capacity as an attorney to

92

1   provide legal advice as they are so much as to promote a

2   project policy, you know, outcome in the legislature.  So

3   I'm not persuaded by the privilege aspect of it, but go on.

4            MR. MCINTYRE:  Again, how is it conceivably

5   relevant what we say to a lobbyist on any of these issues?

6   I mean, that's where I -- what I struggle with, your Honor,

7   even assuming we say anything to lobbyists.  I mean, this is

8   sweeping.  It's any lobbyist presumably before any state,

9   county, municipal government and/or any of the federal

10  agencies, the FDA, FTC.  And it is without regard to any --

11  any limitation, lobbyists on behalf of energy -- or

12  regarding energy drinks in its -- in its totality.  I mean,

13  what we just heard was okay, some -- some governmental

14  entity may want to restrict the sale of energy drink to a

15  particular age group, but that has nothing to do with what's

16  here.

17           THE COURT:  Yeah.

18           MR. MCINTYRE:  Now, I mean, we may have lobbied --

19  I don't know.  We may have lobbied the FDA with respect to

20  what has to be put on the supplemental facts title, not at

21  all in issue in this case.

22           THE COURT:  I'm inclined to go with Mr. McIntyre

23  on this particular topic, Mr. Cunningham.  And so this topic

24  is off limits with respect to any further deposition of a

25  30(b)(6) witness of Hansen.

93

1          MR. CUNNINGHAM:  You know, now that Mr. McIntyre
2    brings that point up, I guess I -- I agree with him to the
3    extent that he's right.  It is -- it is over-broad.  If I
4    were to limit it to restrictions of the sale of energy
5    drinks, minors or in combination with alcohol, would that
6    alleviate his problem?
7          MR. MCINTYRE:  My problem is the same.  What
8    conceivable relevance does it have to what we -- what we
9    communicate with the lobbyists since --
10          MR. CUNNINGHAM:  Your Honor, we'll deal with the
11   privilege issue only if we ever have to get to it, but I can
12   see someone consulting a law firm that is both a law firm on
13   FDA issues and it then on behalf of Hansen dealing with the
14   FDA.  To the extent it deals with the FDA, it may, in fact,
15   constitute "lobbying" as only the law firms in Washington
16   would know, but obviously we consult with FDA counsel on FDA
17   related issues which I -- with all due respect, I would say
18   is, in fact, privileged.  But we don't even have to address
19   that issue at the moment.
20          THE COURT:  I'm still not -- not with you, Mr.
21   Cunningham.  Sorry.
22          MR. CUNNINGHAM:  Your Honor, what they -- what
23   they're telling these people is highly relevant to our case.
24   Internally at Hansen, they've recognized, at least their
25   technical director and their CEO, that mixing energy drinks

94

1   and alcohol is dangerous.  That's their words.  It's

2   dangerous.  And at the same time, are they going out and

3   trying to lobby to stop laws that would prevent the mixture

4   of those -- of alcohol and energy drinks, and to me that is

5   very relevant.

6            THE COURT:  Relevant to what precisely?

7            MR. CUNNINGHAM:  To the good or bad faith and

8   their belief that what they're doing is -- is not deceiving

9   consumers.

10           MR. MCINTYRE:  Huh?  I'm sorry.  That was rude.

11           THE COURT:  Okay.  I can see that, and I wasn't

12  trying to be obtuse here, but I can see where Mr. Cunningham

13  is going with this, but I think the more important question

14  in terms of the jury is exactly what Hansen itself believes,

15  and if you have evidence that they know it's dangerous,

16  then, you know, that's going to win the day for you.

17           But all right.  I'm going to backtrack a little

18  bit here on this one.  As modified and limited, Mr.

19  McIntyre, by -- by Mr. Cunningham as to any lobbying efforts

20  with respect to these energy drinks as defined, towards

21  minors and mixing them with alcohol, admittedly, if there

22  are any lobbyists -- and you're not even sure that there

23  are, and if there aren't lobbyists employed by Hansen,

24  then --

25           MR. CUNNINGHAM:  Ends the question, sure.

95

1          THE COURT:  -- that's the end of the question.

2          MR. CUNNINGHAM:  I understand.

3          THE COURT:  Okay.  All right.  Now, as I

4    understand, topics 89 through 94, Mr. McIntyre, you have no

5    dispute with.

6          MR. MCINTYRE:  I think at this time, given all the

7    rulings, that is correct, your Honor, because it was a phone

8    call with Judge Porter at the time that stopped inquiry on

9    those, and -- because they were then related to the

10   counterclaim which was at that time subject to a motion to

11   dismiss.

12         THE COURT:  Right.  Okay.

13         MR. MCINTYRE:  So the Court's having ruled that

14   counterclaim discovery is appropriate, counterclaim

15   discovery is appropriate.

16         THE COURT:  Okay.  Number 99, which is the next

17   one, asking for Hansen's knowledge now of potentially

18   dangerous effects to a consumer.  Hansen should designate

19   someone to answer this question.  I've already compelled

20   Hansen to respond to Living Essentials' third set of

21   document requests 88 and 90 that also relate to this.  I see

22   no good reason now to limit Living Essentials' ability to

23   depose a 30(b)(6) witness from Hansen on this topic.

24         MR. MCINTYRE:  Okay.  Is the Court imposing any

25   limitation on -- some things are obvious.  If I drink a cup

96

1  of coffee and three single malt scotches, it's probably

2  dangerous to get into my car.  It's so obvious that we --

3  are we producing witnesses to say the obvious or -- or is

4  there some refinement that the Court is going to require

5  Living Essentials to make?

6          THE COURT:  No, I'm not going to refine the topic

7  any further.  I think it's --

8          MR. MCINTYRE:  Okay.

9          THE COURT:  The -- the scenario that you just

10 described I think would be recognized by almost anyone

11 except the most hardened alcoholic that that is a dangerous

12 situation.

13         MR. MCINTYRE:  Of course.

14         THE COURT:  Putting aside the caffeine.  And so,

15 you know, Mr. Cunningham knows what's in the best interests

16 of his client and how to fashion these questions so they

17 have the best and most value to him when he gets a response.

18 I'm not going to --

19         MR. MCINTYRE:  Okay.

20         THE COURT:  I mean, we can go through scenarios

21 all day long, you know.  Does one Monster drink and one beer

22 have an effect?  Does one Monster drink and two beers, is it

23 dangerous, one -- you know, it can -- the possible

24 combinations are endless.  So at some point in time, if --

25 you know, if Living Essentials wants to go through that sort

97

1  of progression, you know, ad nauseam, then -- which I doubt

2  that Mr. Cunningham would do, then an appropriate objection

3  could be made that it's just getting ridiculous, but I'm not

4  going to impose a -- you know, parameters on the questioning

5  and that topic.

6          Okay.  Number -- topics 42 through 46, as I

7  understand the response, Hansen concedes that Living

8  Essentials is entitled to 30(b)(6) testimony provided that

9  it's not attorney-client or work product, and I would tend

10  to agree.

11          MR. MCINTYRE:  That's -- yeah, that was our

12  position, your Honor.  Obviously, we have worked very

13  carefully and closely with the client on these discovery

14  issues and what documents its capable of retrieving, what

15  documents it's incapable of retrieving.  Much of that has

16  already been shared in full with my partner, Mr. Kammer,

17  with Mr. Cunningham.  So --

18          THE COURT:  Okay.

19          MR. MCINTYRE:  -- as long as we don't invade the

20  privilege, that's fine.

21          THE COURT:  Now, I'm not sure if I said 42 through

22  46.

23          MR. MCINTYRE:  Yeah, 46 is lawsuits which I think

24  your Honor has already ruled out.

25          THE COURT:  Well, because I -- if I said 42

98

1  through 46, I misspoke.  I'm really -- the response that I

2  meant to give dealt only with 42 through 44.

3          MR. CUNNINGHAM:  Forty-four, right, your Honor.

4          THE COURT:  Okay.  Now, with respect to 45, let's

5  deal with that because that's included in these -- in

6  disputes.

7          I don't even know what that means.  I don't know

8  what -- I don't know what the question really means, Mr.

9  Cunningham, or the topic, "Hansen's Responses to Living

10 Essentials' Discovery Request."

11         I don't know.  Are you asking -- I don't know what

12 you're asking for.

13         MR. CUNNINGHAM:  I guess what I was getting at,

14 your Honor, was much in tune with the one previously, you

15 know, is this -- asking someone is this discovery request --

16 have all the documents been produced that are responsive,

17 things of that nature.

18         THE COURT:  That may require Mr. McIntyre making

19 himself the person most knowledgeable.

20         MR. CUNNINGHAM:  I'll tell you what, your Honor.

21 I'll withdraw that one.

22         THE COURT:  Okay.

23         MR. MCINTYRE:  Thank you.  On the be careful what

24 you ask for proposition, Tom?

25         THE COURT:  All right.  Now, Number 46, what's --

99

1   what's your position on that, Mr. McIntyre?

2           MR. MCINTYRE:  I think at this point it becomes

3   moot, your Honor, based on, as I recall, the Court's ruling

4   on the we do not have to produce documents that identify

5   lawsuits.  If we don't have to produce documents, I think

6   the Court's same rationale would apply to testimony.

7           THE COURT:  I --

8           MR. MCINTYRE:  Remember the document request

9   number, your Honor, but it -- it's my recollection is that

10  you ruled that we did not have to produce them.

11          MR. CUNNINGHAM:  I don't remember that.

12          THE COURT:  Yeah, I'm not so sure I remember it

13  either, but --

14          MR. MCINTYRE:  That --

15          THE COURT:  My question -- let me -- because I'm

16  on the fence on this one, Mr. Cunningham, is, I mean, I

17  understand at a deposition you can ask questions.  You know,

18  the rules are somewhat liberal.  Even in 30(b)(6) instances

19  you identify a topic and you kind of stick to that topic,

20  but what are you trying to get at here if you care to reveal

21  this in the open that you don't already know?  I mean, you

22  know what lawsuits.  I mean, it's easily ascertainable what

23  lawsuits Hansen's involved in, and by going to the court

24  records, you kind of know what their position is, and -- and

25  this almost asks for Mr. McIntyre to be the person most --

100

1  most knowledgeable because we're talking about legal

2  positions that are taken.

3          MR. CUNNINGHAM:  This is 46, right, your Honor?

4          THE COURT:  Yes, sir.

5          MR. CUNNINGHAM:  What I'm trying to get at is have

6  people brought suit against Hansen because they basically

7  got sick because -- a child got sick because he drank too

8  many energy drinks and had a caffeine toxicity problem or

9  did someone bring suit against Hansen because they drank --

10 they mixed it with an alcoholic energy drink, got too drunk,

11 and drove into another vehicle, you know, or someone was

12 hurt or killed.

13         That's the type of stuff I'm trying to find out.

14 And as far as identification and description of the legal

15 action, all I'm asking for essentially is, yes, someone

16 brought a lawsuit against us.  They brought a lawsuit

17 against us, and it was because they claimed that they had

18 caffeine toxicity from drinking too many Monster Energy

19 Drinks and they weren't warned that that was an issue.

20         I'm not asking for legal positions taken in that

21 case.

22         MR. MCINTYRE:  And how is somebody's unvarnished

23 allegations in a lawsuit relevant or likely -- likely to

24 lead to relevant evidence?

25         MR. CUNNINGHAM:  Because that's a person who

101

1  obviously felt that the product was safe to consume in the

2  manner in which they did because of Hansen's marketing, and

3  they were obviously harmed significantly because of it.

4          MR. MCINTYRE:  Well, there are several predicates

5  there that don't even follow, but --

6          THE COURT:  I mean, I could certainly see how it

7  could lead to relevant evidence because then Mr. Cunningham

8  and his team go out and talk to those parties if they're

9  willing to talk to them, and they start exchanging

10 information and experts and so forth and who knows what they

11 might find.

12         Okay.  I think Hansen should provide someone who

13 is knowledgeable in this area to give -- just to identify,

14 you know, Smith versus Hansen, Jones versus Hansen, a very

15 brief description of what that case is, the allegations are

16 whatever, and -- but let's set some sort of time frame on

17 this.

18         MR. CUNNINGHAM:  Well --

19         THE COURT:  I don't think Hansen's -- Hansen's

20 been in business for, you know, almost two decades now on

21 many products.  So when did the Hansen -- the Monster Energy

22 Drink come on the scene, again?

23         MR. MCINTYRE:  Well, Monster came on the scene in

24 -- as the Court knows, April of 2002, which, with all due

25 respect, I think is entirely too far to go back.

102

1        THE COURT:  Well, I'm not -- I'm not saying I'm

2   going to do that.  I just --

3        MR. MCINTYRE:  I understand.

4        THE COURT:  -- want to --

5        MR. MCINTYRE:  Monster actually -- Monster was

6   first formulated in 2002.  It first went into -- actually

7   appeared in the market sometime in 2003 I believe.

8        THE COURT:  All right.  Mr. Cunningham, I'm

9   looking to you for some guidance here.  I tend to agree

10  going back eight years and asking for every lawsuit filed

11  against Hansen --

12        MR. CUNNINGHAM:  I don't know if it's burdensome

13  or not, your Honor, but how about 2004, which is what you

14  went back with Living Essentials for?

15        THE COURT:  Okay.  Good for the goose, good for

16  the gander.  All right.

17        MR. CUNNINGHAM:  Thank you, your Honor.

18        THE COURT:  Okay.

19        MR. MCINTYRE:  Can I get some definition of

20  harmful effect, your Honor?  I will -- this is no mystery.

21  We engage in -- we have distributor agreements.  From time

22  to time distributors are canceled.  We are in distributor

23  disagreements that lead sometimes to lawsuits.  I mean, what

24  are we talking about specifically?  Are we talking about

25  caffeine?  Are we talking about --

103

1          MR. CUNNINGHAM:  How about physical effects?

2          THE COURT:  Yeah, I was about to say the word

3 "physical."  I think we're talking -- and I think everybody

4 understands that the harmful effects that Living Essentials

5 is looking for are effects that physically harm an

6 individual in one way or another, not that some distributor

7 got canceled, the contract was unfairly terminated or

8 something of that nature.

9          MR. MCINTYRE:  Okay.  I also assume, your Honor,

10 that this only includes any lawsuit in which Hansen, in

11 fact, was a party.

12          THE COURT:  I think so, yes.

13          MR. MCINTYRE:  Okay.  I mean, that's not the call

14 of the question, and I can obviously come up with a scenario

15 where somebody sued a bartender or the establishment --

16          THE COURT:  Okay.

17          MR. MCINTYRE:  -- for applying, you know, a Graham

18 Shop Act case --

19          THE COURT:  I got you.

20          MR. MCINTYRE:  Okay.

21          THE COURT:  I got you.  Yeah.  Yes.  I think it's

22 fair to say that the topic is limited to those cases where

23 Hansen is a named party.

24          MR. MCINTYRE:  Thank you.

25          THE COURT:  Not where somebody claims they were

104

1 mixing, you know, Monster Energy Drinks with vodka in some

2 -- in Joe's Tavern and went out and got in the car and did

3 something.

4         MR. MCINTYRE:  And then sued Joe, right.

5         THE COURT:  Yeah.  Okay.

6         MR. MCINTYRE:  Or, more to the point, the Buena

7 Vista Cafe in San Francisco.

8         THE COURT:  Okay.  All right.  The -- the next

9 topic is 51 through 53 and 70 through 72.  Now, Hansen

10 represents that CEO Sacks testified about these topics, and

11 I have been provided at my request the pages that Hansen in

12 -- believes that Sacks -- in which Sacks responded to these

13 questions, and they include deposition pages 44 through 46

14 and then again at 257 and 258 and then again 309 and 310.

15         I have read those pages, and while I believe that

16 Sacks testified tangentially as to these -- these topics,

17 giving more an idea of, yeah, first we went out with, you

18 know, the 16-ounce drink and then we went to the 24 and the

19 32 and then we decided, you know, resealable, it -- Mr.

20 Sacks did not respond to the topic questions that I have in

21 front of me, and that is what was really the decision making

22 process behind these various decisions then to market a 16-

23 ounce, 24 or 32-ounce drink and resealable or not

24 resealable.

25         And so, Mr. McIntyre, unless I hear why these

105

1  topics should not be reexamined in allowing Living

2  Essentials to get at what the topic question really calls

3  for, I'm inclined to -- and I believe they're reasonable

4  questions -- I'm inclined to allow Hansen -- excuse me --

5  Living Essentials to take the deposition of whatever person

6  is most knowledgeable as to those topics, 51 through 53 and

7  70 through 72.

8          MR. MCINTYRE:  Your Honor, you have the testimony

9  in front of you and you saw what's I think critical here to

10 the questions that were asked.  I'm not sure that a -- this

11 calls for a Mulligan.  I mean, when I take a deposition --

12 and we've all had this experience.  You go back, you read

13 the transcript, and you say I should have asked that

14 followup question and I never asked it.  I mean, clearly,

15 the topic was raised.  Mr. Sacks was asked, and the

16 questions that are now -- it's not as if the question was

17 asked and Mr. Sacks said I can't do it or that we objected

18 and would not permit it or that we got a protective order.

19 It's just that the questions weren't asked, and I think any

20 one of us could go back and read a transcript with 20/20

21 hindsight and say "I should have asked this.  Please, Court,

22 can I go back and do it again?"  And that's really what

23 we're doing here, your Honor.

24          This isn't a matter of I didn't know the prior

25 issue or ask Tom Davis.  This is simply a matter of the

106

1  question wasn't put, and I -- that's fine, but I don't think

2  we have to bring a witness back after somebody has had

3  months to review the transcript and say, "Gee, I should have

4  asked more.  I should have pressed harder.  I just missed

5  these questions in my outline" or whatever.  I mean, that's

6  my principal objection.

7           THE COURT:  Yeah, that's -- that's a valid point,

8  Mr. McIntyre.

9           MR. CUNNINGHAM:  Well, Ed, you didn't produce a

10  witness on these topics.

11           THE COURT:  Well --

12           MR. CUNNINGHAM:  You failed to produce a witness

13  on these topics.

14           THE COURT:  Well, Mr. Cunningham, you did address

15  with Mr. Sacks -- again, as I say, you sort of tangentially

16  talk about it.  It seemed that he had, you know, some

17  knowledge about the topics that we're discussing now, and,

18  you know, Mr. McIntyre is right, at least with the

19  transcripts that I have.  Now, there may be other portions

20  of transcripts out there where you did specifically ask the

21  question as it's propounded here in topic let's say 51, and

22  you got the runaround or you got an answer that, you know, I

23  just don't know.  In that regard, then, you know, perhaps

24  you are entitled to another crack at Sacks or another

25  person, but, you know, Mr. McIntyre makes a pretty good

107

point, you know, the Mulligan point.  Maybe you didn't do

such a great job in the initial questioning to get exactly

what you're looking for in these topics and now you're

looking for a do-over, but I don't have all the transcripts

here.  I only have what's been provided to me.  But this was

provided to me, I would say, Mr. McIntyre, by your office.

        MR. MCINTYRE:  It was.

        THE COURT:  As -- to back up your claim that the

-- the question was asked and answered, and if this is all

there is, then perhaps I should have also asked Mr.

Cunningham to provide me, you know, the other portions where

he claims he asked a question and got a response that was

non-responsive.

        MR. MCINTYRE:  That's true, your Honor, but I'm

looking, for example, at page 45.  The answer was initially

it was released in the 16-ounce size and this is 51, the one

right in front of the Court.  A followup would be, okay, why

did you come to market with the 16-ounce as opposed to two

ounces, four ounces, eight ounces, 32, 64.  It is a

followup.  I can see coming back and looking at a transcript

and say, ooh, that would have been nice to drill down one.

We've all been there, you know, and sometimes to our

chagrin.  I -- the witness was there.  He was asked on these

topics and to bring any witness back and say now out of

hindsight they get to refine the outline and do it again,

108

1    I'm not sure the Court would entertain a motion by me to do

2    the same thing, but, you know --

3         MR. CUNNINGHAM:  Your Honor, here's what I have a

4    problem with.  He tells me he's not producing a witness on

5    the topic.  There will be no witness on the topic.  So I

6    asked a question which may touch on that issue tangentially,

7    and now I come to you and we argue about the objection, and

8    now I'm not allowed to go back when he said he wasn't

9    producing a witness on that topic in the first place.

10        MR. MCINTYRE:  I'm sorry.  Did we say we didn't --

11   I thought we -- well --

12        MR. CUNNINGHAM:  I made objection to Number 51

13   through 53, unless I read it wrong.  Hansen will not

14   designate a competent witness to testify on this topic.

15   Fifty-two, Hansen will not designate.  Fifty-three, Hansen

16   will not designate.  Seventy, Hansen will not designate.

17   Seventy-one, Hansen will not designate.  Seventy-two, Hansen

18   will not designate a witness.

19        MR. MCINTYRE:  But when you pursued them, we did

20   not object.  I mean --

21        MR. CUNNINGHAM:  When I pursued them in a very

22   tangential manner, as your -- as the transcript which you

23   put together, not me --

24        MR. MCINTYRE:  No, I understand.  All right.  We

25   did, yes.  We did in trying to answer the Court's question

109

 1  last night or yesterday afternoon.

 2          UNIDENTIFIED SPEAKER:  (Indiscernible.)

 3          MR. MCINTYRE:  What?  Are we all still here?

 4          THE COURT:  Yeah, I'm -- did we lose somebody?

 5          MR. CUNNINGHAM:  No.

 6          MR. MCINTYRE:  Oh, okay.

 7          MR. CUNNINGHAM:  I'm still here.

 8          MR. MCINTYRE:  Okay.

 9          THE COURT:  I don't have a copy of Hansen's

10  objections, Mr. Cunningham, that you received, you know, on

11  the day of the deposition, and what you just read to me was

12  that Hansen would not provide -- is that coming from those

13  objections?

14          MR. CUNNINGHAM:  It is, your Honor, and it's

15  actually Exhibit C to my brief.

16          THE COURT:  Then I do have them.  Oh, I do.  Hey,

17  my mistake.  Let me get to that.  Okay.  I got it now.

18  Yeah.

19          Well, that puts a slightly different spin on this.

20          MR. MCINTYRE:  You're right, your Honor.

21          THE COURT:  I'm sorry?

22          MR. MCINTYRE:  You're right, your Honor.

23          THE COURT:  I've been a trial attorney for, you

24  know, 20 plus years and, you know, you get into a trial --

25  and, you know, I'm just telling war stories now but you get

110

into a trial and you know there's a particular area based on
some motions in limine or whatever that you're not supposed
to get into, but you also know what the particular judge
that perhaps -- you know, the ruling is somewhat liberal or
fuzzy and you can -- you start dancing up to that line, a
line that you're not sure where it is exactly but at some
point in time when you get far enough beyond it, you know
you're going to get slapped down, and so you start tiptoing
around it and asking a witness questions, and you're sort
of, you know, wincing as you do it, waiting for the
objection to come that it's beyond -- it's already been
ruled upon by the Court as an area that's off limits.  The
Court is sort of giving you the eye at the same time, and
you know you're just treading on thin ice, and if you ask
maybe the next question, you're going to get pounded in
front of the jury, and so you kind of open up some areas but
you're not really able to fully explore them.

Now, admittedly, a deposition is different.  You
don't have a judge there, and you don't have a jury in front
of you.  You just have the other side, and so there are sort
of counterbalancing considerations here with respect to
these topics.  One is Hansen objected to them, said we're
not going to provide somebody to answer those.  This witness
shows up, Mr. Sacks.  Mr. Cunningham starts asking some
questions in this area, perhaps doesn't fully explore them,

111

perhaps with -- and I'm just speculating here, perhaps with
these objections in mind that this may not be the witness
that's going to talk about them, but, you know, Sacks is
providing some responses to areas that are related to these
particular topics.

I think on balance, Mr. McIntyre, despite your
point, which, you know, I think is well taken that, you
know, you don't get a do-over necessarily but this situation
is somewhat different I think given the nature of the
questioning, the timing, how this all went down.  Sacks was
the guy that was responsive, was going to be the 30(b)(6)
witness.  The objections come but are really not received
until the day of.  The bifurcated nature of the deposition
with Davis in the middle, Davis being offered as a 30(b)(6)
and a personal witness on some topics but not others.  I
think out of fairness, which, you know, I would apply to
both sides, I think Mr. Cunningham should have the
opportunity to delve into these specific issues again but
only once again, and he gets another -- he does get the
Mulligan in other words.

MR. MCINTYRE:  Very good, your Honor.  I had not
focused on the objections.

THE COURT:  Okay.

MR. MCINTYRE:  I apologize for that.

THE COURT:  No, no, I -- I've been looking at this

112

1 stuff for a while now too, and I -- I probably read those

2 objections a week or so ago, and I forgot that I had them.

3 So had I been a little more diligent in my preparation, I

4 would have been able to respond with a little more clarity.

5          All right.  Moving on now to topics 59 and 60 and

6 100, 59, 60 and 100.

7          MR. MCINTYRE:  Your Honor, this is Ed McIntyre

8 again.  We've now been on the record for about three hours.

9 Would it be possible, your Honor, to take a very short,

10 maybe no more than five-minute recess, before we continue?

11          THE COURT:  Sure.  If you need to take a bathroom

12 break, I guess now would be the time to do it.  We are

13 coming down the home stretch here.  I do have other calendar

14 matters, another, you know, lengthy hearing that's coming up

15 on the heals of this.  So I don't want to take a lunch

16 break, but if you need --

17          MR. MCINTYRE:  No.  What I was talking about is

18 five minutes for a bathroom break if I may, your Honor.

19          THE COURT:  All right.  I'm going to give you 10

20 minutes.

21          MR. CUNNINGHAM:  An emergency break.  Thank you

22 very much, your Honor.

23          THE COURT:  Okay.  Ten minutes.  We'll get you all

24 back on the line at 11:45.

25          MR. MCINTYRE:  Very good.  Thank you, your Honor.

113

1          THE COURT:  All right.  Thank you.

2          MR. CUNNINGHAM:  Thank you, your Honor.

3      (Proceedings recessed briefly.)

4          THE COURT:  Back on the record, and we were about

5  to discuss topics 59, 60, and 100, starting with 59 and 60.

6  Living Essentials indicates that they're willing to narrow

7  the topic, as indicated in their -- their papers, and Hansen

8  responds that if they are limiting the scope and perhaps the

9  time period, then they're entitled to a 30(b)(6) witness as

10  to 59.  So let's talk about 59 first.

11          What's -- what's Hansen's position with respect to

12  the -- the scope of the question as Living Essentials has

13  indicated they're willing to narrow it down to?  We'll talk

14  about a time period next but the scope, limiting it to

15  energy shots, efficacy and marketing to teens, younger

16  children and mixing it with alcohol?

17          MR. MCINTYRE:  Okay.  That at least narrows the

18  scope, your Honor, to the topic scope, amount of time.

19          THE COURT:  Pardon me?

20          MR. MCINTYRE:  I agree, your Honor, that does

21  narrow the scope of the topics.

22          THE COURT:  And with -- and is that narrowed scope

23  or refined scope acceptable to Hansen or not?

24          MR. MCINTYRE:  Given the Court's other decision, I

25  assume we should be producing a witness on that refined

114

1   scope of 59.

2            THE COURT:  All right.  Now, let's talk about a

3   time period.  I mean, we've -- we talked about April of 2002

4   and the production of documents.  We talked about 2004.  You

5   know, Mr. Cunningham, how far back do you think you need to

6   go?

7            MR. CUNNINGHAM:  I'll hold, your Honor, that these

8   -- these topics were very similar to topics Hansen did with

9   respect to us which we did not limit by time.  With that

10  said, I think if we go to April 2002, that would be fine.

11           THE COURT:  Mr. McIntyre?

12           MR. MCINTYRE:  I think that pushes way far back.

13  I mean, this advertising did not come into this -- the focus

14  of this did not -- particularly children and alcohol did not

15  even come into existence until about 2007, 2008, your Honor.

16           Now, maybe that answers the question is we don't

17  have anybody.  There was no advertising, but I would

18  respectfully request at a minimum 2004, which is the statute

19  of limitations on either of these claims, claims, complaint,

20  or counterclaims.

21           THE COURT:  Okay.  Hang on here for a second.

22           Mr. Cunningham, I'm inclined to simply just go

23  back to 2004 on this and limit you to those topics that you

24  have indicated in your pleadings, and so Hansen should

25  produce a 30(b)(6) witness to answer Number 59 as limited by

115

1   you in your pleadings, back to 2004.

2           MR. CUNNINGHAM:  Thank you, your Honor.

3           THE COURT:  Now, with respect to 60 and 100, which

4   are the next items on the -- on the menu here, Hansen

5   indicates that these sound -- these sound a lot like, you

6   know, motions for production -- or requests for production

7   of documents, and, you know, while that may be true, my

8   response somewhat tongue in cheek is, okay, so what.  I

9   don't think they're asking for a production of these

10  documents but a discussion of these documents and

11  communications.

12          So my -- my question to Mr. Cunningham is do you

13  have any communications or documents that have been provided

14  to you in discovery that would allow you to prepare for a

15  deposition of a witness with respect to topics 60 and 100 or

16  are you simply going to wing it if the Court orders that

17  these topics are -- are appropriate on the day of the

18  deposition when that person most knowledgeable comes in with

19  these documents or communications?

20          MR. CUNNINGHAM:  Well, your Honor, in regards to

21  part of the scope of the previous topic with regards to

22  efficacy of energy drinks, I was told that there were no

23  documents for these particular advertising groups.

24          But, that said, the category now includes the

25  counterclaim information that they may have discussed with

116

1 these people as well.  I just want to ask them if they

2 worked on these topics and, if they did, what kind of

3 documents were exchanged with Hansen, so I can get copies of

4 those documents, so I can identify what exactly it was, see

5 if it's relevant, and then get it produced.

6            MR. MCINTYRE:  I guess I'm not understanding, your

7 Honor.  If -- let's assume that there are documents.  We'll

8 start with that.  Fifty-nine certainly covers the topic and

9 it's "Okay, Mr. Witness, Ms. Witness, here is an E-mail,

10 here is a letter.  It says in the second paragraph X.  Would

11 you explain what the heck you mean?"

12            I wouldn't know how to produce a witness to

13 testify about what's asked for in -- in 60, to testify

14 without having them, the documents, exchanged.  And if you

15 have the documents exchanged, then presumably you want to

16 examine the witness not about the facts of the exchange but,

17 rather, about the substance of the documents.  I think I

18 know what Tom wants.  It's just I'm not sure that 60 gets

19 there, and I think it's subsumed now into 59.

20            THE COURT:  I don't think 59 covers 60.  I mean,

21 59 simply asks, you know, do you have a relationship with,

22 you know, X, Y, and Z, you know, marketing or advertising

23 firms and what kind of services do they render, without

24 talking about --

25            MR. MCINTYRE:  The communications.

117

1          THE COURT:  -- the communications.  I mean, you

2  say, okay, yeah, I got a relationship with Mendelson Zion

3  and they do Internet marketing for us.  Okay.  I think that

4  would answer Number 59.  The next question is what do you

5  and Mendelson actually talk about.  What do you communicate

6  back and forth?  What does Hansen tell Mendelson?  What

7  documents does Hansen give?  So I don't think 59 answers

8  the --

9          MR. MCINTYRE:  I guess I wasn't reading -- I'm

10  sorry, your Honor.  I didn't mean to cut you off.  I wasn't

11  reading 59 so narrowly that given the Court's loss on 59

12  then if 60 is produced, a witness who can testify about

13  communications as limited to, again, the limitation that

14  Living Essentials put on it, I can understand.

15          THE COURT:  Yes.  And that's where I'm going.  So

16  the -- the same response as to 50.

17          MR. MCINTYRE:  To 59?

18          THE COURT:  I'm sorry, 59, as limited by the scope

19  that we talked about and going back to '04.  Okay.  So now

20  100 asks for identification of sources of market research

21  reviewed, considered and/or relied upon by Hansen.

22          Mr. Cunningham?

23          MR. CUNNINGHAM:  Yes, your Honor.  I just want to

24  find out what exactly -- you know what, your Honor, this may

25  have been handled by an issue which you already ruled on in

118

1  regards to I think that if they're looking at these -- at

2  certain reports -- certain reports regarding energy shots

3  and they had those four years ago, I think that that's

4  relevant to a laches claim.  I mean, if they've got a report

5  on energy shots from one of these agencies, you know, their

6  CEO testified before Judge Gonzalez that he had been

7  monitoring the energy drink market for a period of time

8  before they decided to get into it, watching it mature, and

9  that was one of the reasons she ruled in the preliminary

10  injunction that there was no irreparable harm, she didn't

11  believe his testimony, and I think that these -- if they've

12  done marketing reports or had marketing reports done on

13  energy shots that talk specifically about us because we've

14  been 80 percent of the market for so long, then I think it's

15  relevant.

16           MR. MCINTYRE:  But that's not what 100 asks for.

17  It's all sources of market research referring to energy

18  drinks, which is a huge category if you would define it,

19  Tom.  I mean, if you're talking about Living Essentials and

20  its 5-hour shot, that may be something quite different, but

21  this is, as I say here, just horribly over-broad.

22           THE COURT:  Well, I think we're just talking about

23  three -- three drinks, right?

24           MR. MCINTYRE:  Yeah.

25           THE COURT:  The -- where did my notes go?  Why

119

1  don't you recite them again.  There's three drinks.  There's

2  the Extra Strength, the 5-hour, and then the third one I --

3          MR. CUNNINGHAM:  Decaf.

4          THE COURT:  The Decaf, right.

5          MR. MCINTYRE:  You're limiting this to those, Tom?

6          MR. CUNNINGHAM:  I would limit it to that and,

7  your Honor, if I could, to any market research report about

8  mixing energy drinks with alcohol.

9          THE COURT:  Okay.  Are we also talking, Mr.

10  Cunningham, to the limiting or narrowing of the topic as

11  you've discussed with respect to 59 and 60?

12          MR. CUNNINGHAM:  Yes, your Honor.

13          THE COURT:  All right.  And I -- I think that's a

14  fair topic to depose someone on, Mr. McIntyre.

15          MR. MCINTYRE:  Okay.  And is that same time

16  limitation, your Honor, 2004?

17          THE COURT:  Yes.

18          All right.  Moving on to Number 64, 65, and 66.

19  Living Essentials indicates that they need this information

20  about Hansen's other cases to determine if Hansen is taking

21  contrary positions in the -- the instant case.  That's

22  certainly with respect to 65 and 66, and Hansen responds

23  with respect to 65 -- and we'll talk about 64 as well, but

24  65 and 66, that it's an invasion of the attorney-client

25  relationship and work product.

120

1          I think that these -- 65 and 66 certainly relate

2     back to earlier questions or topics that we talked about

3     where factual allegations only were discussed and we

4     determined that that would be okay, and I think in the -- in

5     trying to be consistent, it seems to me that having a

6     witness talk about the factual allegations which I think Mr.

7     Cunningham could obtain for himself by simply going to the

8     Court's docket --

9          MR. MCINTYRE:  And read the pleadings.

10          THE COURT:  -- and read the pleadings, right, and

11     read the pleadings.

12          Nevertheless, you know, that's -- that's fine, and

13     I'm not necessarily trying to give Mr. Cunningham -- or

14     trying to be, you know, duplicative here and redundant

15     unnecessarily so, but a certain amount of duplication is in

16     my view acceptable until it gets to be, you know, overly

17     burdensome.  You know, the old standard asked and answered

18     objection I think is well taken, but many courts and judges

19     -- and I'm one of them -- would say, I'm going to give, you

20     know, the proponent a little leeway to ask the -- you know,

21     the same or similar question in a different way, and so

22     while I think Living Essentials can go to the docket just as

23     easily as anybody else out on the street and get the

24     pleadings and see what the allegations are, I don't see that

25     there's any real harm for a person most knowledgeable to

121

1  talk about factual allegations with respect to 65 and 66.

2         MR. MCINTYRE:  So that we may have some scope of

3  this, your Honor, the product -- first off, the N2G case has

4  been dismissed itself, staying now with Vital.  The facts in

5  those cases, the products in those cases are entirely

6  different than what we're dealing with here, and I'm not

7  even -- other than to simply say he can now take, you know,

8  substantive depositions as if he were representing either

9  Vital or back when the case still existed, N2G, I'm not sure

10 what the scope is that your Honor thinks he ought to be able

11 to do other than, okay, you allege this.  I'll tell you now

12 the positions are not inconsistent.  We allege the same

13 things against all of them.  Excuse me.

14        What are we supposed to prepare a witness to

15 testify about other than the substance of that case, and

16 that -- I mean, that would be entirely too much I

17 respectfully submit, your Honor, to make us now allow a

18 deposition in this case as if it were being taken in that

19 case, and I'm not sure that's what the Court's saying.

20        THE COURT:  No, I'm not saying that.  And so Mr.

21 Cunningham understands, I think the question would be with

22 respect to 65, what are the factual allegations that you've

23 made in Hansen versus Vital, and not telling you how to do

24 your job, Mr. McIntyre, but I might have my witness have a

25 copy of the complaint and say these are the factual

122

1 allegations and sort of read down from it so that there's no

2 variation.

3          Now, after having done that, Mr. Cunningham

4 couldn't go back and say, "Well, why did you make those

5 allegations?"  The topic simply calls for what are the

6 factual allegations?  These are them.  That's the end of

7 discussion as far as I see it.

8          MR. MCINTYRE:  Okay.

9          THE COURT:  I don't know if Mr. Cunningham gets

10 any further along in asking your 30(b)(6) witness what those

11 allegations are with respect to those two cases than he

12 could obtain by going to the court records themselves and

13 getting the pleadings and reading them for himself, but I'm

14 not going to make that strategic or tactical call for him,

15 and I don't see this as being unduly burdensome for your

16 designated witness to say these are the factual allegations.

17          MR. MCINTYRE:  With that limitation, your Honor, I

18 agree.  It's probably a waste of time, but I can understand.

19 The allegations are the allegations.

20          THE COURT:  Okay.

21          MR. CUNNINGHAM:  Your Honor, what I wanted to get

22 at -- and I think by the way I wrote it, factual

23 allegations, I didn't write identification of factual

24 allegations.  I wrote factual allegations.  And, that said,

25 I guess what I was thinking when I put this together was

123

1  they made a bunch of representations, factual

2  representations to the Court on preliminary injunction and

3  declarations from their employees, and, you know, some of

4  those may need explaining.

5         THE COURT:  Well, Mr. Cunningham, let me say this.

6  If you want to go beyond -- if you want to go into those

7  areas you just described, I'm going to say no.  This isn't a

8  litigation about Hansen and Vital, and it's not a litigation

9  about Hansen and N2G.  It's a litigation concerning Living

10  Essentials, and to the extent that, as you suspect or

11  believe or don't even know and want to find out, that

12  Hansen's taking contrary positions, I say go to the Court

13  record and get whatever is a public document and then go

14  from there, because now you're getting into areas that I

15  think, you know, really are getting to be time consuming

16  unnecessarily, to have someone go into all those factual

17  allegations in those other two cases in the areas that you

18  want to pursue.

19         So, I mean, I could do this one of two ways.  I

20  could say no or limit you in the scope as I see it with

21  respect to 65 and 66.  And, as I said, I don't think you get

22  very far, but --

23         MR. CUNNINGHAM:  Yeah.  I guess what I'm getting

24  at, your Honor, is Mr. McIntyre is right.  The three cases

25  are very similar, and the declarations that were submitted

124

1  by the Hansen employees in each case were very similar, but

2  they weren't identical.  There were some slightly different

3  statements that were made, and that's what we wanted to

4  explore.  And these are very general declarations, talking

5  about, again, that energy drinks without sugar can't give

6  energy.

7           THE COURT:  Well, you have --

8           MR. CUNNINGHAM:  The same argument in regards to

9  the three cases.

10          THE COURT:  You apparently have, Mr. Cunningham,

11 those -- those documents from those cases.  Otherwise, you

12 couldn't make the representations that you're now making.

13          MR. CUNNINGHAM:  Yeah.

14          THE COURT:  But asking this witness then to say --

15 because that isn't what the topic indicates -- asking this

16 witness why did the declarant in Vital say X and the

17 declarant in N2G say Y, I mean, that's getting well beyond

18 the scope of the topic and, two, I think it's getting into

19 areas that are not particularly relevant -- well, let me say

20 this.

21          I think it's unnecessarily burdensome to have a

22 witness talk about those aspects of those two other cases

23 because then you go down a rabbit hole back and forth at

24 each -- the deposition then becomes a mini trial as to why

25 did the declarant say X in Vital.  Well, he said X in Vital

125

1  as opposed to Y in N2G because -- and then it's a back and

2  forth, and it's -- it becomes a mini trial into itself, and

3  that's not what this deposition is meant to do.  So you can

4  either take 65 and 66 as I've limited it or the answer is

5  no.

6           MR. CUNNINGHAM:  All right, your Honor.

7           THE COURT:  So which is it?

8           MR. CUNNINGHAM:  I'll withdraw 64 through 66.

9           THE COURT:  Sixty-five through 66?

10          MR. CUNNINGHAM:  Yes.

11          THE COURT:  Okay.  I haven't talked about 64.  The

12  false advertising claims concerning energy drinks made by

13  Hansen against any third party.  I'm not sure -- I mean,

14  that's very broad.  There may be a lot of claims.  You know,

15  it could be something as simple as Hansen sending a letter

16  to some, you know, up start beverage company and that's it.

17  It's just a -- just a claim.

18          What exactly are you asking for?

19          MR. CUNNINGHAM:  You're right, your Honor.  That's

20  too broad.  I will withdraw that one as well.

21          THE COURT:  Okay.

22          MR. MCINTYRE:  Your Honor, I made a representation

23  to the Court earlier, but I didn't have the documents in

24  front of me.  It was when we were discussing producing a

25  witness to testify about lawsuits.

126

1          THE COURT:  Yes.

2          MR. MCINTYRE:  If the Court may recall, it was

3  request for production 90, documents that identify lawsuits

4  against Hansen that concern any adverse events, health

5  issues, energy drink -- because of the consumption of an

6  energy drink.  I obviously syncopated it.  After argument,

7  the Court's ruling -- and I now have your order in front of

8  me -- was that our objections are sustained.  I may regret

9  bringing this up.  You may end up reconsidering the document

10  request, but if we -- if the Court thought that we ought not

11  to have to produce documents on this, I respectfully submit

12  that we probably should not be -- we shouldn't have to

13  actually produce a witness to testify about them.

14          THE COURT:  Well, my recollection isn't entirely

15  clear on that point, Mr. McIntyre.  I seem to recall that

16  the -- the objections that Hansen had which were sustained

17  were because -- not because I didn't think it ought to be

18  produced or not produced but more to the point, that the

19  documents had already been produced and, therefore, you

20  know, maybe the more appropriate response would have been

21  the objection is moot or the issue is moot because the

22  documents have been produced as opposed to I agree with

23  Hansen's position.

24          So I don't think I've taken an inconsistent

25  position, but you have the transcript of that hearing.

127

1          MR. MCINTYRE:  Not in front of me, your Honor.
2  What I'm looking at is simply the request and the Court's
3  minute order, but you're right, we do have elsewhere the
4  transcript.
5          THE COURT:  Yeah.  And I haven't read it.  I
6  haven't read it.
7          MR. MCINTYRE:  Of course.
8          THE COURT:  I've got a copy of it, but I haven't
9  read it.  I don't necessarily like reading myself in print,
10  but I haven't read it to see if what I just said is, you
11  know, the gospel, but --
12          MR. MCINTYRE:  I will check the transcript, your
13  Honor.
14          THE COURT:  And I will do the same to see if I'm
15  correct.  And, you know, I strive to be consistent because
16  inconsistency only creates, you know, uncertainty.  And so
17  if I made an inconsistent ruling, after we're completed here
18  today, I will -- I will correct it in the written order that
19  goes out.
20          MR. MCINTYRE:  Okay.  Fine, your Honor.  For the
21  Court's reference then, it was request for production number
22  90, and obviously I'm referring to the Court's order dated
23  -- document 201 dated February 23, 2010, dealing with
24  request 90, and I guess we will all retire to see what the
25  transcript says.  I just wanted to bring that to the Court's

128

1  attention because I made the representation earlier that we

2  had addressed it.  We had, and I understand what the Court's

3  direction is.

4          THE COURT:  Okay.  And I'll get back to you on

5  that in the written order if it's -- if the previous hearing

6  we had and the ruling on the document production is

7  inconsistent with my ruling here with respect to the

8  lawsuits -- and I think we may be talking about Number 46,

9  topic -- let me make sure.  Is that topic 46?

10          MR. MCINTYRE:  Yes.  It is topic 46, the --

11          THE COURT:  Okay.

12          MR. MCINTYRE:  -- identification and description

13  of legal actions where we were accused of causing harmful

14  effects, and you limited that obviously to physical effects.

15          THE COURT:  Right.  So I will -- I will take a

16  look at that and see if there is any inconsistency.

17          MR. MCINTYRE:  Thank you very much, your Honor.

18          THE COURT:  All right.

19          MR. MCINTYRE:  Appreciate it.

20          THE COURT:  Okay.  Next is Number 62.  Sixty-two

21  asks for communications from customers or users, and, as I

22  understand it, Hansen has no objection to providing a

23  witness providing the inquiry is limited to a specific

24  period of time.  That seems reasonable to me.  I say back to

25  2004.

129

1          Are we okay with that?

2          MR. MCINTYRE:  Yeah.  I believe we've already

3 produced or said we've already produced documents on that

4 topic.

5          THE COURT:  And then, finally, Number 73, product

6 formulations, Hansen argues that it's producing the

7 documents regarding these formulations and that, of course,

8 that's the best evidence, the written word as opposed to the

9 spoken.

10          My response to that is, yeah, I agree with you,

11 Mr. McIntyre, but I think this is an area that's reasonably

12 within the 30(b)(6) realm for a deposition.  It -- you know,

13 for whatever it's worth, you know, Mr. Cunningham is going

14 to get -- you know, he has the formulations or will get

15 them, and I'd much rather rely on that as opposed to the

16 oral representation at a deposition if we are talking about,

17 you know, the specifics of the formulation which I presume

18 can get very -- very detailed and complex, but I think

19 that's what -- I think it's an appropriate topic, for

20 whatever it's worth.

21          Mr. McIntyre, I'll give you a word on that.

22          MR. MCINTYRE:  Okay.  It raises a whole issue, and

23 I -- I think the easiest thing, your Honor, would be to have

24 Mr. Kammer address it because he has -- I told you I was out

25 of pocket.  He has over the last week been back and forth

130

1 with the client on this and some of the other things that

2 the Court has told us to produce.

3          THE COURT:  All right.

4          MR. MCINTYRE:  If I may, your Honor.

5          THE COURT:  Yes.

6          MR. MCINTYRE:  I don't mean to double team, but --

7          THE COURT:  Absolutely.

8          MR. MCINTYRE:  I can't speak on this issue.  He

9 still can speak much better to it.

10          THE COURT:  Okay.

11          MR. KAMMER:  Afternoon, your Honor.

12          THE COURT:  Good afternoon.  Could you speak up a

13 little bit, Mr. Kammer.

14          MR. KAMMER:  Well, I moved around the table, so

15 I'm by the speaker.

16          THE COURT:  All right.

17          MR. KAMMER:  I apologize.  I was not here at the

18 last hearing, and my immediate involvement began after you

19 issued the order of last Wednesday, and I've been working

20 with the client to determine the answers to a few questions

21 that you wanted a report on today and also to -- to

22 determine whether or not it was going to be necessary or

23 possible to ask for clarification.

24          Let me explain which I -- I know Tom Cunningham

25 knows because we've had this conversation, but this is a

131

1 company that primarily operates by E-mail, and there is none

2 prior to 2005.  I won't go into the details because Tom

3 already knows it.

4            There is no central document repository, and one

5 of your Honor's immediate questions was when the client

6 could complete production of the things that you ordered

7 last Wednesday -- or on Tuesday, served on Wednesday.  It's

8 probably a matter of weeks, probably more recently three

9 weeks.  You've now given us four hours of your time, and I

10 can explain in bitter detail why it might take that long,

11 but one of the particular reasons I think the reason Mr.

12 McIntyre asked me to step forward is that in working with

13 the terms of your order, in working with the client, it

14 appeared to me that the appropriate thing for Hansen to do

15 in this case would be to seek modification or clarification

16 of some of the issues you raised.

17            For instance, as I appreciated -- and I'm only the

18 beneficiary of information handed down to me -- some of your

19 directives had to do with the distributors of Hansen's

20 products.  Hansen has radically changed the nature of its

21 distributor relationships within the last two years, but if

22 we went back to the point in time you had indicated in your

23 order of 2002, we're probably talking about perhaps 10,000

24 distributors.  The radical change is that they allied with

25 Anheuser Busch and then later with Coca Cola and used their

132

1 distributor network instead so that the present number of

2 distributors is only about 300.  I don't think Tom really is

3 interested in 10,000 distributors.  I mean, some people were

4 as small as a particular county from the early days, and

5 that would be in the nature of a distribution clarification

6 that we'd ask for, if not the timing of it.

7          The other thing that you wanted a particular

8 answer for was had we searched for the 11 regional sales

9 directors.  It turns out there's only 10 of them at this

10 time, and without going into too much detail, the manner in

11 which we search for records utilizes software that everyone

12 refers to as the vault, and half of those directives were in

13 the vault and the other half are not, but we're now

14 mounting, is the phrase, all of their files and E-mails into

15 the vault and will begin searching again, which leads to the

16 reason why it's going to take two or three weeks.

17          Frankly, the production of electronically stored

18 information is often a matter of a half a year or more, but

19 I think we can complete it by then, but when we search those

20 records in order to comply with the Court's request and when

21 we search for records that are covered by the new document

22 request, we will inevitably create duplicates of records

23 we've already obtained.  We then have to take all of those

24 data files and run them through software that will de-

25 duplicate those and then review those for privilege and

133

1  producibility.  That is underway right now, but it cannot be

2  completed within the next week or so.

3          Now, the reason I raised the modification or

4  clarification issue is that, as the Court knows, the statute

5  that gives you the power to hear all pretrial matters

6  doesn't have an appellate deadline but Federal Rule 72(a)

7  does.  And it's 14 days from service of your Honor, which

8  would be next Wednesday.

9          It is not at all clear whether if we were to make

10 objection to your Honor, which is the way Rule 72 says, it

11 goes to the District Judge and whether that would oust you

12 of power to reconsider, your Honor.  And based on my

13 experience in court, it seems to me, particularly listening

14 to this discussion today, where at least three or four of

15 your rulings have been tied to the rulings you made last

16 week, that both parties would be best served by a

17 consolidation of all of these orders in one document, which

18 would stop that 14-day period, but allow in the meantime

19 either party to seek clarification for you without starting

20 that clock running.

21         The bottom line is 72(a) says that a failure to

22 make these objections within 14 days, again, to the District

23 Judge means you've lost the opportunity to do it.  There's

24 some liberality of that.  But, in any event, the

25 distributions channel would be something we would seek

134

1 modification on.  For all practical purposes, I've heard you

2 today limit much of the production beginning in 2004, and

3 because there is no E-mail prior to January 1st of 2005,

4 going back and looking for anything back to 2002 is almost a

5 fruitless endeavor, and I think I would be inclined to ask

6 you to do that again or to revisit it on that -- in that

7 regard.

8          Now, we had two other questions that I understood

9 you wanted immediate answers to.  One was whether we could

10 obtain the names of people over the age of 13 that had

11 registered on the Internet, and I haven't read the exact

12 terms of your order, but we changed website systems, changed

13 to a new URL basically in the summer of 2009.  At that

14 point, that eliminated -- there's no carryover of anyone

15 that registered prior to that date, and everybody who wanted

16 to register had to register, and we can, in fact, search for

17 everybody 13 or older by initials after that date, but we

18 don't have the ability -- in terms of reasonable

19 accessibility, we don't have the ability to find the data

20 prior to that.

21          And then on the Nielsen data, that's another thing

22 that we might want to address in the nature of

23 clarification.  We have given up hard copies, and we do, in

24 fact, have access to native format copies, but I don't know

25 if anybody had ever raised it before.  I rather suspect and

135

1    began to try and verify yesterday whether or not our license

2    from Nielsen would prohibit us to give it to a third party

3    or whether they're claiming copyright restrictions to it,

4    and a subset which your Honor would recognize is I hope that

5    whatever the license says, it says we can do it under court

6    order, but those are the issues that I've been wrestling

7    with in the process, but I was much more concerned about the

8    -- the procedural niceties of trying to consolidate all of

9    these rulings in one document and then letting the parties

10   ask you for clarification within a time period that works

11   within the meaning of the Rules.

12           Oh, and I'm being prompted by Mr. McIntyre.  I'm

13   willing to make a written request for clarification by

14   tomorrow.

15           THE COURT:  Well, that's what I would ask you to

16   do because I've intently been listening, but if there's

17   going to be a request for clarification and -- and, while I

18   have taken, you know, some notes, I want to make sure I know

19   what it is that you're requesting clarification on.

20           MR. KAMMER:  I don't blame you, and I'm sorry for

21   being so elaborate.  I started drafting that last night, and

22   I'm reasonably confident it may not be the best thing I ever

23   do, but I'll file it tomorrow.

24           THE COURT:  All right.  And then, secondly, with

25   respect to a 14-day period in which, you know, if you do

136

take exception with any of the rulings, which, frankly, I'm
shocked and appalled that you would.  I would think that you
would be -- you know, both sides would be -- would recognize
the wisdom and the fairness of my rulings and be perfectly
happy with them.

MR. KAMMER:  I recognize your wisdom and fairness,
but I still need to examine them in detail.

THE COURT:  I got it.  I'm -- I don't think I'm
willing, necessarily, Mr. Kammer, to -- the ruling in the
order that went out on February 23rd, a little over, you
know, a week ago, you know, I'm not willing to sort of
withdraw that ruling, incorporate it into a new order that
will come out upon the conclusion of today's session and
then say the 14-day clock, you know, then starts again.

MR. KAMMER:  I was going to say, your Honor,
that's perfectly understandable.  I've had no great success
with reconsideration in my life.

THE COURT:  So if you want to seek -- or if either
side wants to seek clarification of the order that came out
on February 23rd, which was really a recitation of what we
had and what I had ordered on the -- I think the 17th of
February when that hearing actually occurred, I mean,
there's been time to do that.  There's been a couple of
weeks now to do that, and I'm hearing it for the first time
right now.

137

1          So I would -- I would -- it would behoove you, Mr.

2     Kammer, to get in your request for clarification as soon as

3     you can.  Whether that request for clarification does

4     anything to stop or toll the -- the effect of that order and

5     give you the opportunity to appeal, if you will, if that's

6     the right word, to Judge Gonzalez or not, I don't know.  But

7     it would behoove you to get that request for clarification

8     in quickly.

9          I will get the order out with respect to today's

10    proceeding very quickly as well.  Perhaps even this evening

11    or perhaps tomorrow you'll have a written order, but when we

12    conclude here today, you will -- you'll know what my order

13    is because we've been going over point by point.

14          So I think that's about all I have to say to that.

15    I mean, we've had a long hearing last time, a long hearing

16    this time.  I'm not inclined to consolidate these orders

17    into one and just have my law clerk produce, you know, a

18    second order that incorporates everything.  You've got the

19    first one.  You can ask for clarification on those issues

20    that you want.  You'll get the second one, today's, very

21    soon.  If you need clarification on that, I guess the clock

22    starts ticking on your 14 days.  You either get the

23    clarification that you're seeking or you're stuck with the

24    ruling as originally given, and then you can do with that

25    what you will.

138

1          MR. KAMMER:  Yes, your Honor.

2          THE COURT:  Okay.  Now, having said that, I'm

3   still not so sure that we've actually resolved Number 73,

4   and that's producing a person most knowledgeable with

5   respect to discussing the formulations, bearing in mind what

6   I said five or 10 minutes ago, and that is I tend to agree

7   with Hansen that the written formulations which will be

8   provided or are being provided are really what -- you know,

9   that's the -- that's the definitive, you know, bottom line

10  on what the formulations are, but I don't see it again as

11  being an objectionable, unreasonable topic to ask the person

12  most knowledgeable.

13         MR. MCINTYRE:  Okay, your Honor.  This is Ed

14  McIntyre again.  I moved back over.

15         THE COURT:  Okay.

16         MR. MCINTYRE:  While we are together, we -- I

17  think Tom and I both heard loud and clear, your Honor, the

18  suggestion that we get to you promptly whatever proposed

19  reasonable schedule we think the -- the -- particularly the

20  counterclaim requires, and I think both of us understand,

21  and we will get together on the phone, get that dealt with

22  and get something before the Court so you have something to

23  look at.

24         THE COURT:  All right.  And then we haven't really

25  fully addressed this.  It was brought up by Mr. Kammer a

139

1  moment ago, and that is the time it will take to produce

2  these documents responsive to the earlier order,

3  understanding that there may be a request to modify or seek

4  modification.  But let's assume, worst case scenario, that

5  my decision is not to modify the order.  Let's assume worst

6  case scenario that you don't take this up to Judge Gonzalez

7  to seek an appeal or review and so the order's in place.

8  What are we talking about?  Two to three weeks, is that what

9  I heard?

10         MR. KAMMER:  I think -- I think three weeks works,

11  your Honor, assuming we don't have computer problems.  I do

12  think that in the -- and perhaps we can negotiate this with

13  Tom.  I don't know what the distribution channel's documents

14  are that he really needs, but there is a radical difference

15  between the facile search that we could make for the 300

16  distributor network that currently exists, and it's several

17  orders of magnitude going through perhaps 10,000 dealers

18  that have existed back to 2002.  I mean, that's -- I'm

19  almost losing the math on that.  That's a factor of 300.

20         THE COURT:  Uh-huh.

21         MR. KAMMER:  And that's -- that's one of the

22  reasons I was going to suggest to the client that we ask for

23  clarification on that issue.  I don't have those facts

24  nailed down for sure, but the -- the alliance with Anheuser

25  Busch followed by the alliance with Coke has radically

140

1  reduced the number of distributors.

2       THE COURT:  Uh-huh.  Well, what I would ask you to

3  do then on this request for clarification is basically file

4  a joint -- a joint statement because I don't know if Mr.

5  Cunningham, after you two have conferred and have conferred

6  already, would necessarily object to a modification, and if

7  there's agreement by the parties on the modification, then

8  obviously I would hold that and consider that far more

9  strongly than one side requesting and the other side

10 objecting, because we have gone down this road and at the

11 time there apparently was no -- no objection to the -- well,

12 there was an objection or at least an understanding of what

13 the ruling was.

14       So why don't you file a joint statement with

15 respect to, you know, issues like the distributorship,

16 10,000 down to 300, Mr. Cunningham.  And I'm not asking, Mr.

17 Cunningham, for an answer from you right now with respect to

18 any modification.  I think that would be unfair.  But if you

19 two can get together, recognizing that time is of the

20 essence if there is going to be a review or an appeal to the

21 District Judge, that, Mr. Cunningham, you can cooperate with

22 Mr. Kammer and Mr. McIntyre and get with them, see what

23 those specific areas are of clarification or modification,

24 and if there's some agreement as to the request, great.  If

25 there isn't, you know, so state that in the joint statement

141

1  and get it in to me.

2          But what I will so with respect to the

3  representations now made, asking for three weeks, I'm going

4  to give you three and a half, out to March 26th.

5          MR. CUNNINGHAM:  Thank you, your Honor.

6          THE COURT:  All right.

7          MR. MCINTYRE:  Thank you, your Honor.

8          THE COURT:  And we'll deal with the request for

9  extensions of time when we get those.  The sooner the

10 better, obviously.  I will deal with the request for

11 modifications when I get those.  The sooner the better, and

12 the sooner the better for you.

13         MR. KAMMER:  Yes, your Honor.

14         MR. CUNNINGHAM:  Your Honor, a couple of things.

15 First, I know that hopefully the schedule will take care of

16 it, but that production date is past the close of discovery

17 and expert reports.  So if we're taking the position that

18 that date's going to be moved, that's fine with me.  But,

19 otherwise, it really hampers my ability to do any expert

20 reports without Hansen's formulas or --

21         THE COURT:  Yeah, the expert -- I'm sorry.  The

22 expert reports were due -- or initial disclosures on the

23 23rd, is that right?

24         MR. CUNNINGHAM:  Yeah.

25         THE COURT:  Yeah.  No, that's a good point.  I

142

1 don't -- I really don't know how to resolve that issue.

2        MR. CUNNINGHAM:  I think we're all in agreement

3 that there's going to be a schedule change.

4        THE COURT:  Yeah.

5        MR. CUNNINGHAM:  It just -- it puts me in an

6 awkward position.

7        THE COURT:  It does.  I mean, I could order that

8 all this stuff be produced before the 23rd.  You know, like

9 on the 19th let's say.  That gets -- that's less than three

10 weeks from now.  You know, Mr. Kammer's represented that it

11 may take a couple, three weeks.

12        MR. CUNNINGHAM:  I'm not sure that's going to give

13 me much time to get to the 23rd.

14        THE COURT:  I think either way you're damned if --

15 I'm damned if I do, damned if I don't so to speak.

16        MR. CUNNINGHAM:  Yeah.

17        THE COURT:  And --

18        MR. CUNNINGHAM:  As long as we have an

19 understanding that that date's going to be moved and --

20        THE COURT:  Well, see, I don't have that

21 understanding just yet.  I have a feeling that it probably

22 will be, but I haven't seen what you're proposing.  I

23 haven't consulted with Judge Gonzalez on this and gotten her

24 input.  I believe that the dates will slide, but I -- I'm

25 very reluctant and I think it would be inappropriate for me

143

1  to say, yes, they will.

2         MR. MCINTYRE:  Your Honor, this is Ed McIntyre.

3  If -- if Tom and Mark and Bill and I meet and confer today,

4  we ought to be able to get a proposed -- because Tom already

5  presented one to Judge Gonzalez.  Some events have even

6  overcome some of the dates he proposed, but there is one

7  that is extent.  I think if we talk today, we ought to be

8  able probably to submit to the Court by tomorrow a proposed

9  new schedule that we'll all have at the same time.  I mean,

10  nobody is going to object to moving these dates and, in

11  fact, reading both Judge Gonzalez' two orders and your

12  Honor's statement is so long as it's reasonable, it's

13  probably going to occur.  That would be my proposal.

14         And, Tom, if you're available today, we'll do it

15  today.

16         MR. CUNNINGHAM:  Unfortunately, I'm not.

17         MR. MCINTYRE:  I'm sorry.  Okay.

18         MR. CUNNINGHAM:  First thing tomorrow, I think I

19  could.

20         MR. MCINTYRE:  That would be fine, sure.

21         MR. CUNNINGHAM:  Yes.

22         THE COURT:  Well, then that's what I'll ask you to

23  do, get your heads together, get something in as quickly as

24  you can.  As soon as we get it, we will consult with Judge

25  Gonzalez and get her -- her guidance, and hopefully these

144

1  dates will slip and slide and you'll have the additional

2  time that you need to produce these documents, review them

3  before expert reports are -- and disclosures are required to

4  be out.

5      I think that's about the best I can do for you

6  right now.  I'm -- I hesitate to give a -- an earlier date

7  for Mr. Kammer and Hansen to produce these documents that

8  may be unattainable and we're just -- you know, I'm just

9  inviting another request to extend the production of those

10  documents, and that may happen ultimately, but that may

11  happen because of various software glitches or things that

12  are just simply beyond the control now.  But assuming

13  everything goes well, it seems like, you know, three and a

14  half weeks would be sufficient time.

15     And so let me leave that date of March 26th for

16  the production.  Let's hope and pray that you can get your

17  requests for extensions of time in and Judge Gonzalez agrees

18  that those extensions are appropriate and then we'll make

19  the appropriate modifications to the dates and get that back

20  out to you quickly.

21     MR. MCINTYRE:  Thank you, your Honor.

22     Tom, do you want to tell us a time, and I'll be in

23  here as early as need be tomorrow?

24     MR. CUNNINGHAM:  Yeah.  Let me -- I'll E-mail you

25  a time.  Let me look at --

145

1          MR. MCINTYRE:  We don't need to waste the Court's

2   time doing this stuff.

3          MR. CUNNINGHAM:  Yeah.

4          MR. MCINTYRE:  Very good.

5          THE COURT:  Okay.

6          MR. CUNNINGHAM:  The last thing for me is native

7   files.

8          MR. MCINTYRE:  Yes, Tom.  I'm sorry.  I didn't

9   mean to cut you off.  Assuming there is no Nielsen copyright

10  issue, we have them in native.  I will produce them in

11  native.

12         MR. CUNNINGHAM:  Okay.  I'm hoping that that

13  wasn't an issue.

14         MR. MCINTYRE:  I don't imagine there's a copyright

15  issue, but I appreciate Bill's caution.

16         MR. CUNNINGHAM:  Yeah, I'm hoping Bill is wrong,

17  because I produced Nielsens to you.

18         MR. KAMMER:  We're hoping we're wrong too, but, I

19  mean, personally when you subscribe to a service for tens of

20  thousands of dollars or whatever it is, you probably have

21  acknowledged intellectual property rights in the service.

22  And I don't want to get the client in trouble.

23         MR. CUNNINGHAM:  Right.

24         MR. KAMMER:  And if you and I have done it

25  already, shame on us.

146

1          MR. MCINTYRE:  And given the Court order that we

2     are to produce it, that's probably sufficient.

3          MR. CUNNINGHAM:  And that said, I also asked for

4     native files on the consumer complaints and suggestions,

5     Excel files that were produced.

6          MR. MCINTYRE:  Anything we have in native format I

7     think you are entitled to in native format.

8          MR. CUNNINGHAM:  Okay.

9          MR. MCINTYRE:  So it's -- you know, Nielsen I know

10    you asked for.  If there were other things you asked for in

11    native and we have it in native, you get it in native

12    format.

13          MR. CUNNINGHAM:  I'm wondering can I get this

14    stuff prior to the 26th?

15          MR. MCINTYRE:  Obviously -- so that your Honor may

16    know, Tom and I have engaged in what we have called rolling

17    production.  To the extent that stuff is available, neither

18    of us has held back to the last minute its production.

19          Of course, Tom, since obviously we can get, for

20    example, Nielsen stuff sooner than maybe some other things.

21          THE COURT:  Yeah, I would encourage the rolling

22    production of documents that have been ordered to be

23    disclosed.  I think that's -- it just gives the other side a

24    greater opportunity to review it.  In some respects it's

25    less efficient because you're going out with multiple

147

1 productions, but in the long-run, I think that's helpful for

2 both sides.

3          MR. MCINTYRE:  I think so, your Honor, and I think

4 fairness dictates as to the circumstances here.

5          THE COURT:  All right.  Gentlemen, is there

6 anything further?

7          MR. MCINTYRE:  Not from Hansen's standpoint, your

8 Honor, at the moment.  Thank you.

9          MR. CUNNINGHAM:  No, your Honor.

10          THE COURT:  Okay.  Thank you very much for your

11 time today.

12          MR. MCINTYRE:  We thank the Court for its time.

13          THE COURT:  Okay.

14          MR. CUNNINGHAM:  Thank you, your Honor.

15          THE COURT:  All right.  Until we meet again.

16      (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

148

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty                    3/18/10
    Transcriber                         Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8   /s/L.L. Francisco
    L.L. Francisco, President
9   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25